PAUL E. MANASIAN (SB No. 130855)
GREGORY A. ROUGEAU (SB No. 194437)
THOMAS T. HWANG (SB No. 218678)
MANASIAN & ROUGEAU, LLP
400 Montgomery Street, Suite 1000
San Francisco, California 94104
Telephone: (415) 291-8425
Facsimile: (415) 291-8426
Email: manasian@mrlawsf.com
Email: rougeau@mrlawsf.com
Email: hwang@mrlawsf.com

Attorneys for Debtor in Possession,
QMECT, INC.

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| QMECT, INC., a California corporation, dba Electrochem, | ) Case No. 04-41044-LT11 |
| | ) |
| | ) Adv. Pro. No. _____ |
| Debtor. | ) |
| | ) |
| Employer's Tax I.D. No. 94-2923737 | ) |
| | ) **COMPLAINT FOR: (1) EQUITABLE** |
| | ) **SUBORDINATION (11 U.S.C. §510(c));** |
| QMECT, INC., dba ELECTROCHEM, a California corporation, | ) **and (2) OBJECTION TO CLAIMS** |
| | ) **(11 U.S.C. §502)** |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| BURLINGAME CAPITAL PARTNERS II, L.P., a Delaware limited partnership; and ELECTROCHEM FUNDING, LLC, a California limited liability company, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

Debtor, QMECT, Inc. dba Electrochem, by and through its attorneys, for its Complaint

herein, allege as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction over this proceeding pursuant to 11 U.S.C. §510 and

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 1 of 15

COMPLAINT FOR EQUITABLE SUBORDINATION AND OBJECTION TO CLAIMS

§502, 28 U.S.C. §§157(a) and (b) and 1334, and various other applicable provisions of the Bankruptcy Code, Bankruptcy Rules and laws of the United States of America.

2. Venue is proper before this Court pursuant to 28 U.S.C. §1409 by virtue of the Chapter 11 case pending before the United States Bankruptcy Court for the Northern District of California (In re QMECT, INC., Bankruptcy Case No. 04-41044-LT11).

3. This Complaint initiates an Adversary Proceeding as contemplated by Rule 7001(8) of the Federal Rules of Bankruptcy Procedure. Resolution of the claims asserted in this action will significantly affect the administration of the estate and would involve the allowance or disallowance of claims against the estate, counterclaims by the estate, and proceedings affecting the liquidation of assets of the estate and the adjustment of the debtor-creditor relationship and the equity security holder relationship. This action is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).

## PARTIES

4. The Debtor QMECT, Inc. dba Electrochem ("Electrochem" or the "Debtor") is a corporation duly organized and existing under the laws of the State of California, and doing business in Alameda County. The Debtor commenced the above-captioned Chapter 11 case by filing its Voluntary Petition herein on February 27, 2004.

5. The Debtor is informed and believes and thereon alleges that Defendant Burlingame Capital Partners II, LP ("Burlingame") is a limited partnership organized and existing under the laws of the State of Delaware and which is doing business in various counties, including San Mateo and Alameda County. Burlingame filed a Proof of Claim with the Court on April 30, 2004 asserting a claim for $2,000,000 in principal and $1,047,836.25 in interest and attorneys fees. The Burlingame Proof of Claim also asserts unliquidated claims stated against the Debtor by Burlingame in the First Amended Cross-Complaint filed by Burlingame and related entities in the action presently pending in San Mateo Superior Court as Qmect, et al. vs. Judson, et al. and Related Cross-Claims, Case No. CIV 426631 (the "State Court Action").

6. The Debtor is informed and believes that Defendant Electrochem Funding LLC ("Electrochem Funding") is a California limited liability company and is doing business in

Case: 04-04190    Doc COMPLAINT FOR DECLARATORY RELIEF Entered 06/29/04 21:46:08 Page 2 of 15

various counties, including San Mateo and Alameda County. Electrochem Funding filed a Proof of Claim with the Court on April 30, 2004 asserting a claim for $2,520,054.18 in principal and $32,194.82 in interest. The Electrochem Proof of Claim also asserts unliquidated claims against the Debtor for liabilities allegedly arising from the cause of action set forth in the First Amended Cross-Complaint filed by Burlingame and related entities in the State Court Action. The Debtor is informed and believes that all of the membership interests of Electrochem Funding are owned by Burlingame or persons and entities affiliated with Burlingame.

### The Debtor's Business

7. The Debtor's business was founded by Fred Koelling in 1983. The Debtor is in the business of providing component electroplating and anodizing services in the electronics and computer industries. Fred and Linda Koelling (the "Koellings") are officers of the Debtor and the only members of the Debtor's board of directors.

8. Prior to the construction of its present facility, the Debtor operated from a rented facility in Hayward, California. In 1995, in order to expand process offerings, improve capacity and production efficiencies, and to improve on its ability to meet new environmental regulations, a partnership affiliated with the Debtor, the Koelling-McNeill partnership. purchased a 38,000 square foot premises in Union City, California (for ease of reference, Koelling-McNeill and the Debtor are referred to collectively herein as the Debtor). Construction of a new electroplating facility within the Union City premises began in 1996.

### Comerica's Lending Relationship With Debtor

9. In or around January 1997, Comerica Bank-California ("Comerica") extended three lines of credit to the Debtor, in the aggregate sum of $1,800,000. The Comerica loans (the "Senior Loans") consisted of (a) a building loan; (b) an accounts receivables line of credit; and (c) an equipment line of credit. The building loan was secured by a first priority interest in the Debtor's real property. The lines of credit were secured by the Debtor's personal property. The Koellings executed unlimited personal guaranties on these loans, and also provided Comerica with security interests in their real and personal property.

/ / /

Page 3

Case: 04-04190    Doc# ...  COMPLAINT TO DETERMINE ... CLAIMS ... Page 3 of 15

10. Due to unforseen cost overruns and various regulatory issues associated with the construction of the Debtor's new Union City facility, the Debtor required an additional $1,600,000 in funding in order to complete its new facility and thereafter realize the economies of scale associated with increased production in the facility.

11. In consideration for making a loan of up to $1,600,000 to the Debtor (the "Flat Note Loan"), Comerica charged Debtor a "fee" of $500,000, thus raising Debtor's liability under the Flat Note Loan to $2,100,000 immediately upon its execution, notwithstanding that the Debtor received only $1,600,000 in loan proceeds. The Flat Note Loan was approved on December 14, 1998. Funding of the Flat Note Loan began on December 24, 1998, and was made in several installments through January 2000, when the Company's new facility was completed. As of January 31, 2000, the total amount owed to Comerica under the Flat Note Loan alone was approximately $1,985,000, inclusive of Comerica's $500,000 "fee" for making the loan.

12. Notwithstanding that the Debtor was not in monetary default under its various loans with Comerica, Comerica informed the Debtor that it was "uncomfortable" with having made the Flat Note Loan. Soon after making the additional loan to Debtor, Comerica threatened to foreclose upon the Debtor's assets unless Debtor obtained some source of alternative funding to pay off the Flat Note Loan indebtedness, due to Debtor's alleged default under non-monetary loan covenants.

13. On or about April 19, 1999, in furtherance of Comerica's insistence that Debtor locate takeout funding sufficient to pay Comerica's Flat Note Loan, Comerica recommended that the Debtor retain Robert and Janice Judson (the "Judsons") and their consulting company, Sierra Financial Group, Inc. ("Sierra") as a financial advisor to the Debtor. Comerica stated that it would "support any strategy" that involved the Judsons and Sierra, and continued to threaten to foreclose on Debtors' assets unless the Debtor so retained the Judsons and Sierra.

14. At the same time that Comerica was funding the Flat Note Loan and was pressuring Debtor to retain the Judsons and Sierra, the Debtor's ability to satisfy the covenants contained in the Flat Note Loan was jeopardized not only by the overruns associated with the construction of the Union City facility, but by a significant downturn in the demand for

Case: 04-04190    Doc COMPLAINT FOR AVOIDABLE SUBORDINATION AND OBJECTION TO CLAIMS  Page 4 of 15

electroplating and anodizing services in Northern California. Nonetheless, the Debtor did not default on payments to Comerica under the Flat Note Loan.

**The Debtor's Retention of the Judsons as Financial Advisors**

15.     On November 18, 1999, Debtor entered into an engagement agreement ("Engagement Agreement") with Sierra, the Judsons' consulting company. A true and correct copy of the Engagement Agreement is attached hereto as Exhibit A.

16.     Pursuant to the terms of the Engagement Agreement, the Judsons, as the principals of Sierra, were engaged to provide "management consulting services" to Debtor, to include evaluation of "management structure, profit responsibility and performance, capital adequacy and acquisition, the Company's planning process, and the Company's banking relationship and other issues that impact the financial performance and strength of the Company." They were also "exclusively" engaged to "assist the Company in refinancing and restructuring its existing debt with Comerica Bank" and, if necessary, to "secure the financing from other sources acceptable to the Company." In consideration for Sierra's agreement to provide advisory services, Debtor paid Sierra a consulting fee of $10,000, plus out-of-pocket expenses.

17.     The Engagement Agreement was amended on or about March 8, 2004 to provide that Sierra would be paid compensation upon the closing of any new debt or equity investment. Attached hereto as Exhibit B is a true and correct copy of the amendment to the Engagement Agreement.

18.     In connection with Sierra's consulting work for the Debtor, the Judsons met on numerous occasions with the Debtor's principals, including Fred Koelling, and were given access to confidential and proprietary information regarding the Debtor. In particular, the Judsons learned that although the Debtor was Northern California's leading electroplating and anodizing company, it was experiencing financial distress due not only to the cost overruns and debt associated with completion of the new Union City facility, but due to the downturn in demand for electroplating and anodizing services from local technology firms.

19.     Despite the Judsons' representations that they had expertise in negotiating loans

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 5 of 15

with banks, including Comerica, and that they would assist the Company in such negotiations, if necessary, Sierra failed to undertake any such negotiations with Comerica. Not only did Sierra not assist the Debtor in negotiations with Comerica, Sierra failed to secure any additional equity or subordinated funding for the Debtor. Despite ostensibly having worked toward finding alternative financing for over a year, the Judsons and Sierra accomplished nothing for the Debtor.

20. While Sierra was acting as the Debtor's financial advisor and management consultant, Comerica continued to pressure Debtor to find funding to pay off the Flat Note Loan, even though every payment which was due on all debt to Comerica had been made by Debtor.

21. The Debtor is informed and believes that the Judsons had a pre-existing relationship with Comerica or certain key management personnel at Comerica and that pursuant to such understanding or relationship, Comerica made a practice of referring bank customers to the Judsons, in return for which the Judsons, among other things, tacitly or explicitly agreed not to take positions adverse to Comerica. The exact nature of the relationship will be ascertained in discovery.

### The Burlingame Transaction

22. Over one year after Sierra's engagement as an advisor by the Debtor, the Judsons told the Debtor and Comerica that they were unable to find any funding sources interested in investing new capital in the Debtor. However, the Judsons would instead seek to established their own investment company for such a purpose. Comerica agreed to forebear on its threatened foreclosure under the Flat Note Loan, so long as the Debtor permitted the Judsons, through their new investment company, to provide the Debtor with financing.

23. The Judsons thereafter formed Burlingame, for the purpose of investing in and/or loaning funds to the Debtor and other similarly-situated borrowers. The Debtor is informed and believes that the general partner (or partners) of Burlingame are entities owned or controlled by the Judsons.

24. In July 2001, the Judsons indicated to the Debtor that the Judson's newly-formed lending entity, Burlingame, had obtained funding commitments. At the same time Sierra and the Judsons were engaged to be the Debtor's management consultant and financial advisor, they

COMPLAINT FOR EQUITABLE SUBORDINATION AND OBJECTION TO CLAIMS
Case: 04-04190     Doc# 1     Filed: 06/28/04     Entered: 06/28/04 21:46:06     Page 6 of 15

advised the Debtor to accept a loan from Burlingame which the Judsons managed and in which the Debtor is informed and believes the Judsons have an economic interest. Upon being advised that Burlingame had offered to make such a loan to Debtor, Comerica informed Debtor that unless the Debtor accepted the terms of Burlingame's proposed funding, Comerica was unwilling to provide any further extensions and would commence collection of the Senior Loan and the Flat Note Loan.

25. In September 2001, the Judsons and Sierra commissioned a due diligence report from an independent auditor to evaluate Debtor's financial condition. That due diligence report confirmed that the Debtor was experiencing financial distress, due to among other things, a "[s]ignificant deterioration recently in overall revenues."

26. On or about November 26, 2001, Debtor entered into a loan transaction with Burlingame Capital Partners ("Burlingame Transaction"), pursuant to an Amended Loan and Security Agreement, wherein Burlingame agreed to make certain loans to Debtor in the principal amount of $2,000,000 (the "Burlingame Debt"). The purpose of the Burlingame Debt was primarily to pay the Flat Note Loan held by Comerica.

27. The Burlingame Transaction included, among other things, limited personal guaranties of Debtor's indebtedness by the Koellings, a second deed of trust and a security agreement encumbering all of the Debtor's real and personal property, and a warrant to purchase stock in the Debtor. A true and correct copy of the Amended Loan and Security Agreement is attached hereto as Exhibit C.

28. The nominal rate of interest on the Burlingame Debt was 22% per annum. In recognition that the Debtor could not possibly service interest at the contract rate – let alone any portion of principal on the Burlingame Debt – the Amended Loan and Security Agreement provided that interest would be paid at the rate of 12% per annum, with the unpaid accruing interest itself bearing interest at the rate of 6%, which resulted in an effective interest rate of approximately 27%.

29. The Amended Loan and Security Agreement also contained covenants which required Debtor to maintain, among other things, certain required ratios for current assets to

COMPLAINT FOR EQUITABLE SUBORDINATION AND OBJECTION TO CLAIMS
Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 7 of 15

current liabilities, total liabilities to tangible net worth, and cash flow coverage. Given the Debtor's financial condition, the Debtor was in covenant default of its obligations under the Amended Loan and Security Agreement immediately upon entering into the Burlingame Transaction.

**Conflicts of Interest with Regard to the Burlingame Transaction**

30. The Debtor is informed and believes that in proposing and effecting the Burlingame Transaction, the Judsons, Sierra and Burlingame engaged in transactions which were and are tainted with conflicts of interest and self-dealing, and which injured the Debtor.

31. On the one hand, the Judsons and Sierra had undertaken a fiduciary duty to Debtor to act on the Debtor's behalf arrange for favorable financing or advise the Debtor if no such financing could be obtained. On the other hand, Robert Judson himself, as the managing member of the general partner of Burlingame, negotiated the Burlingame Transaction on behalf of Burlingame to the benefit of Burlingame and to the detriment of the Debtor.

32. As the Debtor's financial advisor, and in light of the due diligence report which Burlingame had commissioned, the Judsons, acting as Sierra knew that the Debtor would be in covenant default of its obligations under the Amended Loan and Security Agreement almost immediately upon entering into the Burlingame Transaction. The Debtor is informed and believes that given the financial distress experienced by the Debtor prior to entering into the Burlingame Transaction, the Judsons, Sierra, and Burlingame had knowledge that the Debtor would also likely default on the payment obligations under the Amended Loan and Security Agreement. The Debtor is informed and believes that the Judsons and Sierra were never concerned about the financial health of Debtor and that Burlingame was never interested in maintaining an arms' length creditor-debtor relationship with the Debtor. Instead, the Judsons and Burlingame were motivated to close the Burlingame Transaction not only because Burlingame had already "presold" the Burlingame investment fund to various investors, but because they also intended to foreclose on the Debtor's assets, create an entity to run the company, and thereby realize substantially greater returns than simply having its high-interest loan paid back or restructured by the Debtor.

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 8 of 15

33. The Debtor is further informed and believes that the Judsons and Sierra had a financial conflict of interest in closing the Burlingame Transaction, as Sierra would receive a $60,000 "success fee" for finding the Debtor financing under the Engagement Agreement, notwithstanding that the financing "found" by Sierra was an entity established by Sierra's own principals and the terms of the financing were so onerous as to be ill-advised for the Debtor. In addition, the Debtor is informed and believes that although Sierra collected a $60,000 fee, it did not have a loan broker's license as required by California for its role in the Burlingame Transaction.

34. By failing to secure alternative financing for the Debtor at the outset of Sierra's engagement, by failing to advise Debtor to renegotiate with Comerica or to undertake such negotiations on Debtor's behalf, and by failing to advise the Debtor of the substantial likelihood that the Debtor could not perform its obligations under the Burlingame Transaction, the Judsons and their entities, Sierra and Burlingame, acted in bad faith. The Judsons knew, or should have known, that the Burlingame Transaction was not in the best interest of the Debtor or its creditors, but did not so advise the Company, because it was in the best interests of Burlingame and Sierra to consummate the Burlingame Transaction, regardless of its catastrophic impact on the Debtor.

35. Not surprisingly, soon after consummation of the Burlingame Transaction, the Debtor was unable to meet the debt service obligations on the Burlingame Debt. The Debtor defaulted on the monthly payments due to Burlingame within months after the Burlingame Transaction closed. In response, Burlingame threatened to seize the Debtor's business by foreclosing upon a pledge of the Debtor's stock.

36. In September 2002, the Debtor retained Alternative Capital Strategies, LLC ("ACS"), a New York limited liability company in the business of providing management consultation services, to assist the Debtor in informally reorganizing its financial affairs.

37. Following default on the Burlingame Debt, the Debtor attempted, without success, to resolve the parties' disputes concerning the loans made to Debtor by Burlingame. On or about October 23, 2002, the Debtor and the Koellings filed a lawsuit against the Judsons, Sierra and the Burlingame entities in the San Mateo County Superior Court commencing the State Court action.

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 9 of 15

In the State Court Action, the Debtor and the Koellings alleged, <u>inter alia</u>, that the Judsons and Sierra had breached fiduciary duties to the Debtor.

**Interference with Debtor's Ability to Restructure Its Comerica Debt**

38. During the pendency of the State Court Action, ACS located a lender, Structured Financial Group ("SFG"), which indicated that it could fund a "take out" loan which it would use to purchase the Senior Loans from Comerica at a discount. In order to accomplish the proposed transaction, SFG formed a New York limited liability company known as QMECT Funding LLC ("QMECT Funding"). The purpose of QMECT Funding formation was to purchase the Senior Loans and thereafter maintain a working relationship with Debtor which would allow Debtor to reorganize its financial affairs and ultimately pay all of its creditors. On or about June 9, 2003, QMECT Funding also became an equity security holder of the Debtor.

39. On June 13, 2003, SFG, the Debtor and Burlingame entered into an Agreement (the "June 2003 Agreement"). A true and correct copy of the June 2003 Agreement is attached hereto as <u>Exhibit D</u>.

40. The June 2003 Agreement provided, <u>inter alia</u>:

    a)    that Burlingame would have a ninety-day period during which it would have the exclusive right to negotiate with Comerica regarding a possible purchase of the Senior Loans;

    b)    that following the ninety-day period, any party was free to purchase the Senior Loans from Comerica; and

    c)    that each party would act in good faith to achieve the purposes of the June 2003 Agreement.

41. Following execution of the June 2003 Agreement, Burlingame entered into negotiations with Comerica to purchase the Senior Loans. As contemplated by the June 2003 Agreement, during the 90 days following the execution of the June 2003 Agreement, neither the Debtor, SFG nor SFG's affiliate, QMECT Funding entered into any negotiations with Comerica regarding purchase of the Senior Loans, nor did they in any way interfere with Burlingame's negotiations with Comerica regarding purchase of the Senior Loans. The Debtor is informed and

Case: 04-04190   Doc# 1   Filed: 06/28/04   Entered: 06/28/04 21:46:06   Page 10 of 15

believes that Comerica did not sell its Senior Loans to Burlingame simply because Comerica considered the prices offered by Burlingame to be inadequate.

42. Following the expiration of the 90-day period during which Burlingame had the exclusive right to purchase the Senior Loans from Comerica, QMECT Funding and the Debtor entered into extensive negotiations with Comerica for QMECT Funding's acquisition of the Senior Loans. In December 2002 and January 2003, QMECT Funding and Comerica agreed upon a purchase price of $1,750,000 for the Senior Loans. Definitive documentation regarding the sale was heavily negotiated and ultimately agreed upon by Comerica and QMECT Funding and an initial deposit of $25,000 was paid to Comerica.

43. In late January 2004, however, Comerica abruptly terminated its negotiations with QMECT Funding and refused to close the sale of the Senior Loans to QMECT Funding, notwithstanding that the sale documentation and purchase price had been agreed upon.

44. The reason Comerica terminated the sale of the Senior Loans to QMECT Funding was that – unbeknownst to the Debtor and QMECT Funding – Burlingame had repeatedly threatened to sue Comerica if Comerica conveyed its rights under its Senior Loans to Qmect Funding. The purported grounds for the threatened litigation against Comerica were set forth in correspondence by Burlingame's counsel to Comerica's counsel including the letter dated January 14, 2004, a true and correct copy of which is attached hereto as Exhibit E.

45. The purported grounds for the litigation threatened against Comerica by Burlingame were wholly without merit. Burlingame claimed that because QMECT Funding became a minority shareholder of the Debtor the sale of the Senior Loans by Comerica to QMECT Funding would violate the terms of a Subordination Agreement, between Comerica and Burlingame, and would violate various provisions of the loan documents between the Debtor and Burlingame. In fact, the sale of the Senior Loans by Comerica to Electrochem Funding would not have violated any of the terms of the Subordination Agreement or the Burlingame Loan Documents, and the threat of litigation against Comerica by Burlingame was made without any legal basis and for the improper purpose of interfering with the prospective sale of the Senior Loans by Comerica to QMECT Funding.

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 11 of 15

46. Had Burlingame not wrongfully threatened meritless litigation against Comerica, Comerica would have sold the Senior Loans to QMECT Funding. Had QMECT Funding purchased the Senior Loans, it would have worked with the Debtor to restructure its indebtedness. The benefit fo the discounted purchase of the Senior Loans by QMECT Funding would have been used by the Debtor and QMECT Funding to the benefit of the Debtor's estate and its general unsecured creditors. Moreover, during the restructuring, QMECT Funding would have invoked the "standstill" provisions of the Subordination Agreement between Comerica and Burlingame to insure that Burlingame did not commence foreclosure on the Debtor's assets to the detriment of the Debtor's general unsecured creditors.

47. In early February 2004, Burlingame purchased the Senior Loans from Comerica for $1,825,000. Almost immediately following its purchase of the Senior Loans from Comerica, Burlingame commenced foreclosure of the Burlingame Debt. Burlingame's purpose in commencing foreclosure was to seize the Debtor's business, effectively wiping out any possibility that the Debtor's other creditors would be paid, and to then operate the business of the Debtor after foreclosure solely for the benefit of Burlingame. Burlingame's effort to foreclose immediately following its purchase of the Senior Loans was contrary to the purpose of the June 2003 Agreement, which implicitly contemplated that the Debtor's operations would continue for the benefit of the creditors and the shareholders of Debtor, not just Burlingame.

48. At some time after Burlingame purchased the Senior Loans from Comerica, Burlingame assigned the Senior Loans to Burlingame's subsidiary, Electrochem Funding LLC. Electrochem Funding LLC has filed a proof of claim asserting that the aggregate principal amount of the Senior Loans is $2,520,054.18, plus accrued interest of $12,186.35, as of the date this Chapter 11 case was commenced. Through the assertion of that claim in the full face amount of the Senior Loans, Burlingame (through its subsidiary Electrochem Funding, LLC) now seeks to realize upon the benefit of the discounted purchase of the Senior Loans which it was able to obtain by wrongfully interfering with the sale of the Senior Loans to QMECT Funding LLC, which sale would have provided a benefit to the estate equal to or greater than the discount of more than $800,000 which Electrochem Funding wrongfully obtained.

## FIRST CAUSE OF ACTION

### (Equitable Subordination)

49. Debtor incorporate Paragraphs 1 through 48 above as if fully set forth herein.

50. The conduct of Burlingame and Electrochem Funding, and their principals the Judsons, as alleged above was wrongful in that the Burlingame Transaction was ill-advised and tainted by conflicts of interest due to the Judsons' conflicting roles as the Debtor's financial advisor and as principals of Burlingame. The Burlingame conduct was also wrongful in that it interfered with the efforts of QMECT Funding to purchase the Senior Loans through baseless threats of litigation against Comerica.

51. The wrongful conduct of Burlingame and Electrochem Funding harmed the Debtor and its general unsecured creditors in that the Debtor was saddled with extremely expensive debt it could not service and then was unable to restructure its debts due to the wrongful interference by Burlingame with the discounted purchase of the Senor Loans by an entity which would have used to discount to the benefit of all creditors.

52. As a result of the wrongful conduct of Burlingame, the claims of Burlingame and its subsidiary, Electrochem Funding LLC, should be equitably subordinated in whole or part to the claims of general unsecured creditors and the liens securing such claims should be transferred in whole or in part to the estate pursuant to 11 U.S.C. §510(c).

## SECOND CAUSE OF ACTION

### (Objection to Claims Offset)

53. Debtor incorporate Paragraphs 1 through 48 above as if fully set forth herein.

54. The conduct of Burlingame alleged herein gives rise to claims by the Debtor under applicable California law in that such conduct constituted a breach of fiduciary duty to the Debtor and tortious interference with the Debtor's efforts to obtain takeout financing for the Senior Loans. The conduct of Burlingame also constituted an "unfair business practice" under California law.

55. As a result of the damage caused to the Debtor by the conduct of Burlingame, the Judsons and Sierra, the Debtor has claims against Burlingame and Electrochem Funding which

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 13 of 15

offset in whole or in part the claims asserted in the proofs of claim filed by Burlingame and Electrochem Funding. The amount of such offsets shall be proved at trial.

## THIRD CAUSE OF ACTION

### (Objection to Claims / Amount)

56. As stated above, Burlingame has filed a proof of claim alleging that Burlingame is owed $2,000,000 in principal and $1,047,836.25 in accrued but unpaid interest, plus attorneys fees in an unstated amount.

57. As stated above, Electrochem Funding has filed a proof of claim stating that it is owed "in the aggregate" $2,520,054.18 in principal, plus accrued interest of $32,194.82, plus attorneys fees in an unstated amount. Although Electrochem Funding's claim is evidenced by multiple promissory notes, the proof of claim does not identify which amounts are owing under which promissory notes, notwithstanding that the promissory notes are not secured by the same collateral..

58. The Debtor's books and records are inadequate to determine whether the amounts claimed by Burlingame and Electrochem in their proofs of claim are accurate and the Debtor therefore objects to such claims to the extent that Burlingame, and Electrochem Funding are unable to demonstrate that such amounts are owing by the Debtor.

**WHEREFORE**, Debtor QMECT, Inc., prays for judgment as follows:

1. On the First Cause of Action, for a judgment subordinating all or part of the claims of Burlingame Capital Partners II, L.P. and Electrochem Funding, LLC to the claims of the Debtor's general unsecured creditors and transferring all or part of the liens securing such claims to the Debtor's estate;

2. On the Second Cause of Action, a judgment disallowing the claims of Burlingame Capital Partners II, L.P. in an amount equal to the damages suffered by Debtor as a result of Burlingame Capital Partners II, L.P.'s wrongful conduct;

3. On the Third Cause of Action, a judgment allowing the claims of Burlingame Capital Partners II, L.P. and Electrochem Funding, LLC only in the amounts that the holders of such claims are able to prove at trial; and

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 14 of 15

4. Granting such other relief as the Court deems just and proper.

Respectfully submitted,

MANASIAN & ROUGEAU, LLP

By: _____
Paul Manasian
Attorneys for Debtor-in-Possession QMECT, INC.

\\Gradl\m&r\Electrochem\Pleadings\Equitable Sub Complaint.wpd

Case: 04-04190    Doc# 1    Filed: 06/28/04    Entered: 06/28/04 21:46:06    Page 15 of 15

COMPLAINT FOR EQUITABLE SUBORDINATION AND OBJECTION TO CLAIMS