**Entered on Docket**
**August 24, 2005**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



**Signed: August 24, 2005**

_____
**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | No. 04-41044 T |
| | Chapter 11 |
| QMECT, INC., etc., | |
| Debtor-in-Possession. | |
| _____/ | |
| In re | No. 04-46443 T |
| | Chapter 11 |
| FRED AND LINDA KOELLING, | |
| Debtors-in-Possession. | |
| _____/ | |
| QMECT, INC., etc., | A.P. No. 04-4190 AT |
| | A.P. No. 04-4365 AT |
| Plaintiff, | A.P. No. 04-4366 AT |
| vs. | (Consolidated) |
| BURLINGAME CAPITAL PARTNERS II, L.P., etc. et al., | |
| Defendants. | |
| _____/ | |
| AND RELATED ADVERSARY PROCEEDINGS | |
| _____/ | |

## MEMORANDUM OF DECISION

The above-captioned adversary proceedings have been consolidated for trial. The lead case--A.P. No. 04-4190 AT (the "Equitable Subordination Action")--was filed originally in this court. In the Equitable Subordination Action, Qmect, Inc. ("Qmect"), one of the above-captioned debtors-in-possession, objects to the secured claims of Burlingame Capital Partners II ("Burlingame") and its affiliate, Electrochem Funding LLC ("Burlingame Funding"), and seeks to equitably subordinate their claims to the claims of some or all of the other creditors.[1]

The other two adversary proceedings--A.P. 04-4365 AT (the "Guaranty Action") and A.P. 04-4366 AT (the "Breach of Fiduciary Duty Action")--were filed originally in state court, either by or against Qmect and/or Fred and Linda Koelling (the "Koellings"). The Koellings are Qmect's principal shareholders and guaranteed the loans upon which Burlingame's and Burlingame Funding's claims are based. The Guaranty Action and the Breach of Fiduciary Duty Action were removed to this court after Qmect and the Koellings filed their chapter 11 bankruptcy petitions. Prior to the removal of the Guaranty Action, the Koellings filed a cross-complaint against the Burlingame, among others, asserting claims

---

[1]Burlingame Funding was formed after Qmect's chapter 11 case was filed and the conduct complained of occurred. However, Burlingame transferred some of the claims asserted against Qmect to Burlingame Funding after it was formed. Therefore, Burlingame Funding is a necessary party to the equitable subordination claim as well as to the claim objecting to its proof of claim.

2

for breach of contract, fraud, intentional interference with prospective economic advantage and declaratory relief (the "Koelling Cross-Complaint"). The Koellings' claims against defendants other than Burlingame and Burlingame Funding have been remanded to state court. On May 11, 2005, Burlingame filed a motion for summary judgment or adjudication of the claims asserted in the Koelling Cross-Complaint. The motion has been fully briefed and argued and was taken under submission. The Court's conclusions are set forth below.

## SUMMARY OF FACTS

Qmect, a California corporation, is engaged in the electroplating business in Northern California. It operates its business primarily at a facility in Union City, California (the "Real Property"), which it built in the late 1990s. The business was previously operated through a general partnership known as Koelling-McNeill (the "Partnership"), of which Fred Koelling was a general partner. The Partnership operated its business at a rented facility in Hayward, California.

In 1995, the Partnership decided to build its own facility. For that purpose, it purchased the Real Property and in 1996 began construction. At some point in the process, Qmect was formed, and the Partnership sold its assets to Qmect. In 1997, Qmect obtained loans from Comerica Bank-California ("Comerica") to assist in the construction for a total of $1.8 million (the "Comerica Loans"). The Comerica Loans are comprised of three separate loan facilities: (a) a loan secured by a first priority deed of trust

3

on the Real Property, (b) a line of credit secured by Qmect's accounts receivable, and (c) a line of credit secured by Qmect's equipment. The Koellings guaranteed the Comerica Loans and secured their guaranty obligation with liens on their real and personal property. (This guaranty is referred to hereinafter as the "Comerica Guaranty.")

Qmect was unable to complete construction of the facility for the amount of the Comerica Loans. Consequently, in 1998, Qmect obtained an additional loan from Comerica in the face amount of $2,100,000 (the "Flat Note Loan"). The facility was completed in January 2000.

Shortly after making the Flat Note Loan, Comerica began urging Qmect to find an alternate source of funding to pay it off. Comerica suggested that Qmect engage someone to assist it in this effort and recommended Robert and Janice Judson (the "Judsons"), among others. In December 1999, Qmect and Sierra Financial Group, Inc. ("Sierra"), an entity owned by the Judsons, signed an engagement letter (the "Original Engagement Letter").[2]

The Original Engagement Letter provided that Sierra would provide management consulting services to Qmect and would assist Qmect in refinancing and restructuring its existing debt with Comerica and in obtaining sufficient new financing from Comerica, if needed. The Original Engagement Letter provided that, in case

---

[2]The Original Engagement Letter indicates that it was executed in April 1999. However, the parties agree that this date is in error.

4

such efforts with Comerica were unsuccessful, Sierra was also engaged on an exclusive basis to seek financing from other sources acceptable to Qmect. As compensation for the consulting service through December 31, 1999, Qmect agreed to pay Sierra $10,000. Thereafter, it was agreed that Qmect and Sierra would negotiate a monthly fee for further consulting services.

The Original Engagement Letter provided that, if Sierra were successful in negotiating a restructuring of Comerica's debt or in obtaining new financing, it would be entitled to a fee based on the amount of the new or restructured financing. Sierra was not successful in negotiating a restructuring of Comerica's debt or obtaining new financing by the end of 1999 or during the first few months of 2000. No evidence has been presented that it made any effort to do so.

In March 2000, Sierra and Qmect executed an amended engagement letter (the "Amended Engagement Letter"), continuing Sierra's exclusive representation of Qmect in its efforts to restructure its debt. The Amended Engagement Letter failed to provide for any further separate compensation for Sierra's consulting services. However, the Amended Engagement Letter increased the percentage compensation that Sierra would receive if it were successful in negotiating a restructuring of Qmect's existing loans or in finding a new loan. The Amended Engagement Letter provided that, except as amended or modified, the terms of the Original Engagement Letter would remain in effect.

5

The evidence is unclear as to whether Sierra ever attempted to negotiate a restructuring of the Comerica Loans during 2000. Robert Judson declared that he contacted Comerica during this period with regard to this subject and that Comerica made it clear that it was not interested in restructuring the debt. Fred Koelling declared that Robert Judson never informed him that he had spoken to Comerica about this subject. To the contrary, Fred Koelling declared that Robert Judson warned him repeatedly that any such communications would be detrimental to Qmect's relationship with Comerica. In deposition, a Comerica bank officer testified that Robert Judson had discussed restructuring the Comerica Loans with him, but he could not remember when.

In the Spring of 2000, Robert Judson wrote to a number of potential lenders to solicit their interest in providing financing to Qmect. Two of the potential lenders expressed some interest in doing so. There is a factual dispute concerning why Qmect did not attempt to obtain financing from either of these two parties. Robert Judson declared that the Koellings rejected both offers because the parties sought more equity in Qmect than Fred Koelling was willing to give up. Fred Koelling declared that no formal offers were ever made and that, at a meeting with Comerica, Robert Judson recommended that Qmect not attempt to obtain new financing from these sources.

Qmect has provided evidence, in the form of a letter to a potential investor in a fund to be organized by the Judsons that, as early as May 2000, the Judsons contemplated forming their own

6

fund to provide subordinated financing to Qmect. In or about December 2000, the Judsons formed Burlingame for that purpose.

On or about June 4, 2001, Burlingame sent Qmect a proposal letter (the "Burlingame Loan Proposal Letter"), agreeing to solicit investors for the purpose of making a $2,000,000 loan to enable Qmect to pay off the Flat Note Loan. As a condition to its doing so, Burlingame required Qmect to sign a copy of the Burlingame Loan Proposal Letter, agreeing to the key terms of the loan (the "Term Sheet"). The Burlingame Loan Proposal Letter contained the following provision (the "Release"):

> Regardless of whether the Financing is approved or closes, Borrower agrees, to indemnify and hold Lender, its general Partner, its affiliates and the directors, officers, employees, and representatives of any of them, harmless from and against all claims, expenses (including, but not limited to, attorneys' fees), damages, and liabilities of any kind which may be incurred by, or asserted against, any such person in connection with or arising out of, this Proposal Letter, the Financing, any other related financing, documentation, disputes or environmental liabilities, or any related investigation, litigation, or proceeding. Under no circumstances shall Lender, its General Partner or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result in connection with this Proposal Letter, or the Financing or any other financing.

Apparently, in 2001, someone engaged in negotiations with Comerica to obtain additional financing for Qmect because on the following day, June 5, 2001, Comerica sent a letter to Qmect,

7

offering to make a $3.5 million loan to Qmect, secured by a junior deed of trust on real property owned by Kids' Connection, Inc. ("Kids' Connection"), an entity owned by Linda Koelling (the "June 5, 2001 Comerica Offer"). The June 5, 2001 Comerica Offer provided, among other things, that neither the June 5, 2001 Comerica Offer nor its contents should be disclosed "except to those individuals who are your officers, employees or advisors who have a need to know...."

Fred Koelling apparently considered Robert Judson Qmect's advisor because he disclosed the contents of the June 5, 2001 Comerica Offer to him. On June 13, 2001, at Fred Koelling's request, Robert Judson sent to Comerica a letter rejecting Comerica's offer on Qmect's behalf. The letter was sent on Burlingame letterhead (the "June 2001 Rejection Letter"). The June 2001 Rejection Letter enclosed a copy of the Burlingame Loan Proposal Letter, signed by Fred Koelling on June 8, 2001.

In the June 2001 Rejection Letter, Robert Judson asserted that placing a junior deed of trust on Kids' Connection's real property would violate Kids' Connections' agreement with its principal lender, City National Bank, which held the first deed of trust on the real property. Judson also expressed the view that it would not be "workable" or "realistic" for Comerica to replace City National Bank as Kids' Connections' principal lender "[g]iven the less than ideal relationship between Kids Connection and Comerica...." He reminded Comerica that, for some time, Burlingame had been interested in making a $2,000,000 subordinated

8

loan to Qmect. He expressed the view that this arrangement would be preferable from both Comerica's and Qmect's point of view.

The $2,000,000 subordinated loan from Burlingame (the "Burlingame Loan") did not close until late 2001. In the mean time, the Koellings provided $1,500,000 in new capital in the form of a loan so that Qmect could meet its operating expenses. According to Fred Koelling, at the last minute, in November 2001, Burlingame insisted on a personal guaranty for the loan (the "Burlingame Guaranty"). The Koellings pledged their stock in Qmect to secure the Burlingame Guaranty. At that time, their stock represented a controlling interest in Qmect.

Before the loan closed, in November 2001, Qmect engaged an entity known as International Profit Associates ("IPA") to provide financial advice. A representative of IPA accompanied Fred Koelling to a meeting with Comerica and Robert Judson where the Burlingame Loan was discussed. At the meeting, the IPA representative counseled Koelling against accepting the Burlingame Loan and suggested filing for bankruptcy. At the conclusion of the meeting, Robert Judson told Koelling he had made a serious mistake in hiring IPA and insisted that IPA be terminated. Fred Koelling followed Judson's advice.

Qmect did not hire an attorney to negotiate the Burlingame Loan. However, it did hire an attorney to review the documents. There does not appear to be a factual dispute as to whether Robert Judson advised Fred Koelling to obtain an attorney to negotiate the Burlingame Loan with Burlingame on Qmect's behalf. Fred

9

Koelling declared that Robert Judson assured him that he did not need an attorney to negotiate the Burlingame Loan. Robert Judson declared that he advised Qmect to hire its own counsel but he does not specify for what purpose. Burlingame has provided a copy of an e-mail dated February 27, 2002 from Robert Judson to Fred Koelling, transmitting various loan documents and stating that, "as always," he is advised to have his own counsel review the documents. It says nothing about having his own counsel to negotiate the loan.

The Burlingame Loan was used in part to pay off the Flat Note Loan. The Burlingame Loan bore interest at the nominal rate of 22% per annum and an effective rate of 27% per annum. The Burlingame Loan closed in November 2001. According to Fred Koelling's declaration, the net proceeds of the Burlingame Loan, after paying off the Flat Note Loan, were largely used to pay interest to Burlingame. In addition, Sierra received a $60,000 fee for "finding" the Burlingame Loan.

Qmect was unable to service the Burlingame Loan, and it went into default almost immediately. Beginning in July 2002, according to Fred Koelling's declaration, Burlingame began proposing that it take over Qmect. The proposal did not include a release of the Burlingame Guaranty. In October 2002, Qmect and the Koellings filed a complaint in state court against the

10

Judsons, Sierra, and Burlingame for breach of fiduciary duty, among other things.[3]

During the fall of 2002 or the spring of 2003, Qmect engaged Alternative Capital Strategies, LLC ("ACS"), to assist it in reorganizing its financial affairs. ACS located a proposed lender, Structured Capital Group ("SCG"), the principal of which is an individual named Basem Zakariya ("Zakariya"). SCG expressed an interest in purchasing the Comerica Loans at a discount and working with Qmect to resolve its financial problems.

On May 28, 2003, SCG sent a letter to Comerica offering to purchase the Comerica Loans for $2,100,000.[4] The Judsons may have learned of the offer that day or the next, because, on May 29, 2003, Burlingame e-mailed to the Koellings a notice of the proposed sale on June 12, 2003 of the pledged Qmect stock. In any event, they learned of the offer by June 4, 2003 because, on that day, they put Comerica on notice in some fashion that they would sue Comerica if Qmect or a Qmect affiliate purchased the Comerica Loans. (See Declaration of Robert R. Moore in Support of Motion for Summary Judgment on Cross-Complaint, Ex. J.) Burlingame asserted that it would violate Burlingame's subordination

---

[3]This action has since been removed to this court, commencing the adversary proceeding referred to as the Breach of Fiduciary Duty Action.

[4]Alternatively, SCG offered to pay Comerica $1,800,000 for the Comerica Loans plus $900,000 to be paid into an escrow pending resolution of a dispute between Comerica and the Koellings concerning the amount due.

11

agreement with Comerica if Comerica sold the Comerica Loans to a third party without giving Burlingame 90 days' prior notice. Burlingame also asserted that it would violate various provisions of its loan agreement with Qmect if the Comerica Loans were sold to a third party, even with advance notice.

On June 9, 2003, Qmect issued additional shares and transferred them to various parties other than the Koellings. SCG received 1000 of the newly issued shares. The result was that the stock pledged to Burlingame no longer represented a controlling interest in Qmect. Zakariya was also made a director of Qmect on June 9, 2003. On the same day, the Koellings assigned to Kids' Connection their rights under the promissory note executed by Qmect, evidencing their $1,500,000 loan to Qmect during the preceding year.

On June 9, 2003, Comerica sent a letter by fax and personal delivery to Qmect and Burlingame, informing them that Comerica had decided to sell the Comerica Loans. It disclosed that Comerica had received a offer to purchase the Comerica Loans, which had expired, from a third party that appeared to be affiliated with Qmect. By this letter, Comerica proposed to give Burlingame and Qmect an opportunity to bid against each other on the purchase of the Comerica Loans.

On June 10, 2003, Qmect sought a temporary restraining order of the proposed stock foreclosure sale. Qmect did not disclose to the court or to Burlingame at that time that it had issued additional stock. The temporary restraining order was denied.

12

Thereafter, on June 12, 2003, Qmect sent Burlingame a letter informing it of the issuance and transfer of the additional stock.

On June 14, 2003, Burlingame, Qmect, the Koellings, and SCG executed an agreement concerning the purchase of the Comerica Loans (the "June 14 Agreement"). The June 14 Agreement provided, that, by 3:00 p.m. on June 17, 2003, Burlingame would make an offer to purchase the Comerica Loans at a price determined to be appropriate by Burlingame in its good faith judgment. If the offer were rejected or a counterproposal made, Burlingame and Qmect would cooperate in determining the appropriate response. If Comerica did not accept an offer from Burlingame by September 15, 2003, either Burlingame or Qmect (or its affiliate) would be entitled to make independent offers to purchase the Comerica Loans. However, prior to September 15, 2003, only Burlingame will be entitled to bid.

The June 14 Agreement provided that, if Burlingame purchased the Comerica Loans, it would release the Koellings from the Comerica Guaranty subject to the following provision:

> All parties agree to cooperate in good faith to achieve the purposes of this agreement. No party shall be deprived of any benefit of this agreement under this provision unless and until a court has ruled that such party has acted in bad faith and should be deprived of such benefit.
> Without limiting the foregoing, with respect to the unconditional guaranty, in the event that Burlingame should have a claim that Koelling acted in bad faith with regard to the joint bidding process, the guaranty shall remain in effect, and Burlingame shall take no action to enforce it, until a court has ruled on the matter. If Burlingame & Company [i.e.,

13

> Qmect] have both bid on the notes and
> Burlingame has purchased the bank documents
> and the court has ruled that Koelling acted in
> bad faith in the joint bidding process, then
> the court may order that Koelling guarantee
> will not be released.

Burlingame made an offer to purchase the Comerica Loans for $1,600,000 on or before June 17, 2003. Comerica rejected the offer. There is no evidence that it made a counteroffer. Burlingame made a second offer to purchase the Comerica Loans on September 9, 2003, this time for $1,400,000. Comerica rejected this offer as well. Fred Koelling was advised of the amounts of the offers in each instance before they were made and did not raise an objection to them.[5]

In the fall of 2003, SCG reached an agreement with Comerica to purchase the Comerica Loans for approximately $1,725,000.[6] Burlingame learned of the proposed sale and, on January 14, 2004, its counsel wrote Comerica two letters. In the first letter (the "Litigation Threat Letter"), Burlingame reiterated its threat to sue Comerica if the Comerica Loans were sold to SCG. In the second letter, Burlingame offered to purchase the Comerica Loans for $50,000 more than offered by SCG. The loan documents drafted

---

[5]The Koellings did not inform the Judsons that SCG had previously made an offer to Comerica to purchase the Comerica Loans for $2.1 million. However, there is no evidence that the Judsons asked either the Koellings or Zakariya the amount of SCG's previous offer.

[6]SCG formed an entity known as Qmect Funding for this purpose. For the sake of simplicity, the Court refers to both entities in the memorandum as SCG.

14

by Comerica required SCG to indemnify Comerica in the event it was sued because of the sale. SCG was unwilling to agree to this provision, and Comerica refused to waive it. Therefore, the sale agreement fell through.

Thereafter, on or about February 4, 2004, Comerica agreed to sell the Comerica Loans to the Burlingame for $1,850,000. It did not give SCG an opportunity to submit a competing bid. Comerica asked Burlingame to agree to indemnify Comerica in the event of suit, but Burlingame refused to do so. Nevertheless, Comerica proceeded with the sale. Shortly after acquiring the Comerica Loans, Burlingame commenced foreclosure proceedings with respect to the Burlingame Loan and filed suit against the Koellings on the Comerica Guaranty. On February 27, 2004, Qmect filed a chapter 11 bankruptcy petition to prevent the foreclosure. Shortly thereafter, Burlingame created Burlingame Funding and assigned the Comerica Loans to it.

## LAW APPLICABLE TO SUMMARY JUDGMENT MOTIONS

The Court should grant summary judgment on a claim if the moving party establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. Proc. 56, made applicable to this adversary proceeding by Fed. R. Bankr. Proc. 7056. A fact is material if it could affect the outcome of the decision. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-588 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A motion to dismiss a complaint is

15

governed by the same standards as a motion for summary judgment when evidence is presented in support of the motion.  See Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).

In determining whether to grant summary judgment or adjudication, the Court is required to view the evidence in the light most favorable to the nonmoving party.  The Court is also required to draw any inferences from the evidence in the manner most favorable to the non-moving party. Matsushita, 475 U.S. at 587.  However, a genuine issue may not be created by a mere "scintilla" of evidence produced by the nonmoving party. Liberty Lobby, 477 U.S. at 251.

Normally, the party moving for summary judgment is required to come forward with sufficient evidence to support a prima face case establishing the right to judgment in its favor.  To successfully oppose the motion, the adverse party is then required to come forward with sufficient evidence to create a genuine issue of material fact.  However, when the adverse party has the burden of proof on the claim, the moving party is not required to present evidence negating the elements of the adverse party's claim.  All the moving party need do is point out to the Court the pleadings or other papers that establish that the adverse party will be unable to present sufficient evidence to sustain some essential element of its claim.  The burden is then on the adverse party to come forward with sufficient evidence to establish a prima facie case on its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

16

(1986); <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 884-85 (1990).

**DISCUSSION**

The Koelling Cross-Complaint asserts five claims for relief against Burlingame: i.e., two claims for breach of contract, a claim for fraud, a claim for intentional interference with prospective economic advantage, and a claim for declaratory relief. Burlingame moves for summary judgment with respect to all five claims. Alternatively, they move to dismiss some or all of the claims or to summarily adjudicate such portions of the claims as to which there is no genuine issue of material fact. The Court will discuss each claim separately.

**A. FIRST BREACH OF CONTRACT CLAIM**

The first claim for relief in the Koelling Cross-Complaint asserts that Burlingame breached the June 14 Agreement by suing the Koellings on the Comerica Guaranty after acquiring the Comerica Loans. As discussed above, the June 14 Agreement provided that, if Burlingame acquired the Comerica Loans, it would release the Koellings from the Comerica Guaranty. However, this release was conditioned on the Koellings having acted in good faith in connection with the joint bidding process. Burlingame contends that they did not. Although the Koellings dispute this contention, the June 14 Agreement contemplates that, in the event of a dispute, a judicial determination of the issue could be

17

sought.[7]  Until then, the Comerica Guaranty would remain in effect but could not be enforced.  Thus, the Court concludes that Burlingame has not breached the June 14 Agreement by filing the Guaranty Action and is entitled to summary judgment to this effect on the first claim for relief.

**B. SECOND BREACH OF CONTRACT CLAIM**

The second breach of contract claim also alleges that Burlingame breached the June 14 Agreement.  This claim for relief cites two additional types of breach.  First, it alleges that Burlingame breached the June 14 Agreement by failing to make a good faith attempt to buy the Comerica Loans within the initial 90 day period.  Second, it alleges that Burlingame breached the June 14 Agreement by causing Comerica to renege on its agreement to sell the Comerica Loans to SCG.

In its motion for summary judgment, in response to the first allegation of breach, Burlingame contends that the June 14 Agreement contains no requirement that it make a good faith effort to purchase the Comerica Loans during the initial 90 days.  In any event, it contends it did make a good faith effort to purchase the Comerica Loans during the initial 90 days.

As discussed above, the June 14 Agreement did require Burlingame to make an offer to purchase the Comerica Loans by June 17, 2003 at a price that it deemed appropriate in its good faith

_____

[7]The substance of this dispute will be addressed in connection with the fifth claim for relief, for declaratory judgment.

18

judgment. There is no dispute that Burlingame made a timely offer to purchase the Comerica Loans for $1.6 million. The Koellings have presented no evidence that this was not a good faith offer. They admit that they never advised Burlingame that SCG had previously made an offer to purchase the Comerica Loans for $2.1 million. Fred Koelling has declared that he assumed that Robert Judson knew the amount of the offer. However, he does not dispute that he knew that Burlingame was planning to make a much lower offer or declare that he recommended that the offer be increased.

The June 14 Agreement provides that, if Comerica rejected the offer, as it did, Burlingame and Qmect would cooperate in determining an appropriate response. The only evidence before the Court is that, prior to September 15, 2003, Burlingame made a second offer for $1.4 million, that Robert Judson discussed the proposed offer with Fred Koelling before making it, and that Fred Koelling raised no objection. Thus, the evidence supports Burlingame's request for summary adjudication, declaring that it did not breach the June 14 Agreement by failing to make a good faith effort to acquire the Comerica Loans within the first 90 days of the agreement.

Burlingame's motion for summary does not address the second allegation of breach: i.e., that Burlingame breached the good faith provision by causing Comerica to renege on the sale agreement with SCG. As a result, Burlingame is not entitled to

19

summary judgment with respect to this remaining allegation of the second breach of contract claim.[8]

## C. FRAUD CLAIM

The third claim for relief in the Koelling Cross-Complaint is for fraud. It alleges that, to induce the Koellings to enter into the June 14 Agreement, Burlingame fraudulently represented to them that it would release them from the Guaranty if Burlingame purchased the Comerica Loans. It alleges that Burlingame never intended to do so and is now falsely contending that the Koellings did not act in good faith in connection with the June 14 Agreement. But for this misrepresentation, it alleges, the Koellings would never have entered into the June 14 Agreement, which required Qmect to dismiss its fraud claim in the Breach of Fiduciary Duty Action and gave Burlingame the exclusive right to attempt to purchase the Comerica Loans for the initial 90 days.

_____

[8]As discussed above, the June 14 Agreement required all parties to act in good faith to achieve the purposes of the agreement. For purposes of this motion for summary judgment, the Court concludes that the Litigation Threat Letter is sufficient evidence to support Qmect's claim that Burlingame breached this provision. Burlingame contends that the litigation privilege precludes the Koellings from basing any of its claims on the Litigation Threat Letter. However, as discussed below in connection with the Koellings' claim for intentional interference with prospective economic advantage, the Court concludes that there is a genuine issue of material fact as to whether Burlingame is entitled to assert the litigation privilege with respect to the Litigation Threat Letter under these circumstances. Moreover, the Court is uncertain at this time whether the litigation privilege is a defense to a breach of contract claim. If necessary, this legal issue may be addressed at the time of trial.

20

As a further basis for the fraud claim, the third claim for relief alleges that the Koellings were deceived into believing that Burlingame would make a good faith effort to acquire the Comerica Loans within the initial 90 day period. It alleges that the Koellings would not have entered into the June 14 Agreement but for this deception. The third claim for relief alleges that, as a result of Burlingame's failure to make a good faith effort to acquire the Comerica Loans within the initial 90 day period, the Koellings incurred tens of thousands of dollars in costs putting together an agreement for the sale of the Comerica Loans to SCG.

In their motion for summary judgment, Burlingame first contend that a claim for fraud will not lie when the fraud involves nothing more than an alleged breach of contract. In support of this contention, they cite <u>Freeman and Mills, Inc. v. Belcher Oil Co.</u>, 11 Cal. 4th 85 (1995). They also contend that the fraud claim is not stated with sufficient particularity. <u>See</u> <u>Lazar v. Superior Court</u>, 12 Cal. 4th 631, 645 (1996)("In California, fraud must be pled specifically; general and conclusory allegations do not suffice."); <u>see also</u> Fed. R. Civ. Proc. 9(b), made applicable to this proceeding by Fed. R. Bankr. Proc. 7009 (requiring circumstances of fraud to be stated with particularity).

Whether the Koellings' claim for fraud is barred by <u>Freeman</u> is not a simple question. In <u>Freeman</u>, the California Supreme Court overruled <u>Seaman's Direct Buying Service, Inc. v. Standard Oil Co.</u>, 36 Cal. 3d 752 (1984), in which it had recognized, at least in the area of insurance, a tort cause of action for bad

21

faith denial of the existence of a contract. The <u>Freeman</u> court noted that <u>Seaman's</u> had spawned an excessive amount of frivolous litigation asserting bad faith denial of contract claims. Moreover, the lower courts had found the holding difficult to apply, and the decision had been roundly criticized by academics and courts in other jurisdictions. <u>Freeman</u>, 11 Cal. 4th at 95-102.

However, the effect of <u>Freeman</u> is not as far reaching as Burlingame contends. More recently, in <u>Lazar</u>, the California Supreme Court attempted to "clarify...whether or under what circumstances a plaintiff may state a cause of action for fraudulent inducement of employment contract." <u>Lazar</u>, 12 Cal. 4th at 634-35. In <u>Lazar</u>, the trial court had sustained a demurrer to the fraud claim. The court of appeals reversed, and the reversal was affirmed by the Supreme Court.

The <u>Lazar</u> court concluded that the allegations of the complaint satisfied the elements of a fraud claim: i.e., misrepresentation, knowledge of falsity, intent to defraud, justifiable reliance, and resulting damages. It noted that an action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. <u>Id.</u> at 638. It distinguished <u>Hunter v. Up-Right, Inc.</u>, 6 Cal. 4th 1174 (1993), in which it denied an employee plaintiff a tort remedy against his former employer for fraudulent inducement to resign instead of being terminated.

22

The *Lazar* court noted that, in *Hunter*, the employee could not prove detrimental reliance since, if he had not resigned, the employer could have terminated him, and the employee would have suffered the same damages. In a case of fraudulent inducement to enter into a contract, the same problem was not presented since, if the contract had never been made, it could not have been breached so as to cause the plaintiff's damages. *Lazar*, 12 Cal. 4th at 642-43. The *Lazar* court noted that "contract remedies alone do not address the full range of policy objectives underlying the action for fraudulent inducement of contract." *Id.* at 646.

Based on *Lazar*, the Court concludes that a plaintiff may state a claim for fraud based on a fraudulent inducement to enter into a contract, provided all elements of the claim are sufficiently pled. The question remains whether the Koellings have done so. Burlingame contends that they have not. However, since the issue arises in the context of a motion for summary judgment, rather than a motion based solely on the pleadings, the issue is not whether the fraud claim has been adequately pled but whether the Koellings have presented sufficient evidence to support such a claim. The Court concludes that they have not.

The only evidence presented by the Koellings in support of their opposition to the motion for summary judgment is the declaration of Fred Koelling. The statements made in the the declaration relevant to the fraud claim are as follows:

> 21. Burlingame represented that they would release the Comerica guarantees if they acquired the Comerica Loan. In exchange for

23

> this promise, and only because of this promise, I agreed to dismiss their fraud claim in the QMECT case against Burlingame and other entities under the control of the Judsons.
>
> 22. In hind sight, if [sic] appears Burlingame falsely stated that they would release the guarantees if they acquired the Comerica loan. I, looking back, believe that Burlingame never intended to release the personal guarantees, and are now falsely arguing that I, along with my wife and Qmect, did not act in good faith under the June Agreement.
>
> 23. I relied upon these false representations. I would not have signed the June 2004 Agreement if Burlingame had not deceived me into believing that they would make a good faith effort to acquire the Comerica Loan during the 90-day period, and would release the personal guarantees after acquiring the Loan.

The Court finds these statements insufficient to sustain a claim for fraud.

The representation referred to in paragraph 21 appears to be the provision in the June 14 Agreement. The Court does not read Lazar to permit a claim for fraudulent inducement to enter into a contract to be based on the contract provisions themselves. Moreover, even if such a claim were permitted, the statements recited above do not provide evidence that Burlingame entered into the June 14 Agreement with no intention of performing it according to its terms. Fred Koelling's statement that, in hindsight, he believes that Burlingame never intended to release the Comerica Guaranty is mere opinion, not evidence.

There is not even a straightforward allegation that Burlingame misrepresented that it would make a good faith effort to acquire

24

the Comerica Loans within the initial 90 day period.  The Koelling Cross-Complaint simply alleges that the Koellings were deceived. It does not allege by whom or in what manner the deception was accomplished. Similarly, Fred Koelling's declaration lacks any specific statement that this representation was made.  The closest it comes is in paragraph 23, when Fred Koelling states that he would not have entered into the June 14 Agreement "if Burlingame had not deceived me into believing that they would make a good faith effort to acquire the Comerica Loan...."  In sum, the Court concludes that Burlingame is entitled to summary judgment on the third claim for relief for fraud.

**D.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM**

The fourth claim for relief in the Koelling Cross-Complaint is for intentional interference with prospective economic advantage.  The elements of a claim for intentional interference with prospective economic advantage are:  (1) an economic relationship between the plaintiff and third party containing the probability of future benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, and (5) damages to the plaintiff proximately caused by the acts of the defendant.  <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 389, 393 (1995); <u>see also</u> <u>Navallier v. Sletten</u>, 262 F.3d 923, 939 (9th Cir. 2001).  Moreover, the intentional conduct

25

causing the disruption must be "wrongful by some legal measure other than the fact of interference itself." <u>Della Penna</u>, 11 Cal. 4th at 393.

The fourth claim for relief alleges that, in February 2004, Burlingame knew that SCG was about to acquire the Comerica Loans and that its doing so would benefit Qmect and the Koellings. It alleges that Burlingame intentionally interfered with SCG's attempt to purchase the Comerica Loans by causing Comerica to renege on its commitment to sell them to SCG and that, as a result, the Koellings have a significantly higher indebtedness on the Comerica Loans that they would have had if SCG had acquired them.

Burlingame asserts that it is entitled to summary judgment on this claim for "any number of reasons." First, Burlingame contends that the Koellings lack standing to assert this claim. They opine that, if anyone has standing to assert this claim, it is SCG, not the Koellings. This contention has no merit. The Court agrees that SCG might have standing to assert a claim against Burlingame for interference with its prospective economic advantage as a result of its purchase of the Comerica Loans. However, the Koellings also have standing to assert a claim based on their prospect of an economic advantage as a result of this purchase.

The Koellings allege that, if SCG had purchased the Comerica Loans, Qmect and they would have owed sufficiently less on the Comerica Loans. Presumably, they believe that, because SCG was

26

purchasing the Comerica Loans at a substantial discount, SCG would have passed the benefit of this discount through to them. They have provided no evidence that SCG agreed to do so. However, there is evidence that SCG had accepted stock in Qmect and a seat on its Board of Directors. Burlingame has referred to SCG as Qmect's affiliate. Clearly, in bankruptcy terminology, SCG was an "insider." The Court concludes that SCG's status as an "insider" is sufficient to make it probable that the Koellings and Qmect would have benefitted economically from SCG's having purchased the Comerica Loans rather than Burlingame.

Next, Burlingame contends that this claim must fail because its conduct is protected by the competition privilege. The Court disagrees that, under these facts, the competition privilege entitles Burlingame to summary judgment on this claim. The competition privilege only applies when a competitor "uses fair and reasonable means" to compete. See PMC, Inc., 45 Cal. App. 4th at 603, quoting from Tri-Growth Centre City, Ltd. V. Silldorf, Burdman, Duignan & Eisenberg, 216 Cal. App. 3d 1139, 1153 (1989); see also A-Mark Coin Company v. General Mills, Inc., 148 Cal. App. 3d 312, 323 (1983), quoting the Restatement of Torts. 2d, § 768. For the competition privilege to apply, the Court must conclude that it was not *wrongful* for Burlingame to send the Litigation Threat Letter to Comerica under these circumstances.

California courts have not provided a definitive meaning of wrongful conduct in this context. Visto Corp. v. Sprogit Technologies, Inc., 360 F. Supp. 2d 1064, 1067 (2005). However,

Case: 04-04190   Doc# 94   Filed: 08/24/05   Entered: 08/24/05 10:49:18   Page 27 of 36

it is generally recognized to include both conduct that violates the common law or is merely unfair according to common social standards. <u>Visto Corp.</u>, 360 at 1067. In determining whether conduct is wrongful, the focus should be on the defendant's objective conduct, not on its motive. <u>Id.</u> The Court concludes that there is a genuine issue of material fact as to whether, under these circumstances, threatening Comerica with litigation if it sold the Comerica Loans to SCG was fair or reasonable. For example, sending the Litigation Threat Letter to Comerica after agreeing that Qmect or SCG could make an independent bid to purchase the Comerica Loans after the initial 90 day period arguably constituted a breach of the June 14 Agreement.

Third, Burlingame contends that the Koellings will be unable to prove that they engaged in any wrongful conduct because its conduct in sending the Litigation Threat Letter is protected by the litigation privilege. As with the competition privilege, the Court concludes that there is a genuine issue of material fact as to whether the litigation privilege applies here. The litigation privilege is codified in Cal. Civ. Code § 47(b). Among other things, it protects a party from being sued for any communication made in a judicial proceeding. "The principal purpose of the privilege is to afford the utmost freedom of access to the courts without fear of being subsequently harassed by derivative tort actions." <u>Rothman v. Jackson</u>, 49 Cal. App. 4th 1134, 1146 (1996). It has been held to apply to a communication made by any participant in a judicial proceeding to achieve the objects of the

28

litigation.    <u>Silberg v. Anderson</u>, 50 Cal. 3d 205, 212 (1990).


Although the litigation privilege was first developed to apply to suits for defamation for statements made in court, courts have applied it more broadly.  It has been recognized as a defense to every other type of tort action, excepting only an action for malicious prosecution.  It has also been applied to communications made preliminary to litigation, including threats of litigation. <u>Rothman</u>, 49 Cal. App. 4th at 1140.

However, the doctrine has some limits.  One of these limits is that the party making a pre-litigation communication must have been seriously contemplating filing a judicial action in good faith and in the near future.  <u>See Edwards v. Cenext Real Estate Corp.</u>, 53 Cal. App. 4th 15, 32-37 (1997).  The good faith test is subjective, turning on the party's state of mind.  <u>Financial Corp. Of America v. Wilburn</u>, 189 Cal. App. 3d 764, 777 (1987).  The party asserting the litigation privilege has the burden of establishing that it seriously contemplated litigation in good faith at the time it made the statement.  <u>Edwards</u>, 53 Cal. App. 4th at 32.  "[E]ven a threat to file a lawsuit would be insufficient to activate the privilege if the threat to file a lawsuit is merely a negotiating tactic and not a serious proposal made in good faith contemplation of going to court."  <u>Id.</u> at 35.[9]

_____

[9]The good faith requirement does not turn on the merits of the action.  The party making the communication may contemplate commencing litigation in good faith even if the litigation would be groundless as long as the party did not believe the

29

Because of the subjective nature of the good faith test, it is particularly inappropriate to grant summary judgment on the basis of this doctrine. Under these facts at least, the Court is unable to determine that Burlingame acted with subjective good faith in sending the Litigation Threat Letter as a matter of law. There is certainly evidence, based on what occurred thereafter, that the purpose of the threat was not to resolve a dispute but rather to gain an advantage in the joint bidding on the Comerica Loans.

Fourth, Burlingame asserts that the fourth claim for relief must fail because the Koellings will be unable to establish that the Litigation Threat Letter caused Comerica to renege on the agreement to sell the Comerica Loans to SCG. They contend that Comerica did not renege on the agreement to sell the Comerica Loans to SCG because Burlingame threatened it with litigation. They assert that Comerica sold the Comerica Loans to Burlingame because it offered $100,000 more than SCG. There is evidence to support a contrary view. It is undisputed that, after receiving the 2004 offer from Burlingame, Comerica did not attempt to solicit a higher bid from SCG. If Comerica's motivation was simply price, its failure to do so makes no sense.

To the contrary, it appears to be undisputed that the reason that Comerica did not conclude the sale of the Comerica Loans to SCG was that SCG refused to sign an agreement to indemnify

_____

litigation to be groundless. <u>Wilburn</u>, 189 Cal. App. 3d at 777.

30

Comerica if it was sued as a result of the sale.  In the motion for summary judgment in the Equitable Subordination and Breach of Fiduciary Duty Actions, Burlingame provided excerpts of a deposition of a Comerica bank officer.  The bank officer testified that Comerica routinely requires indemnification agreements when it sells loans.

However, at the hearing on the motion for summary judgment, the Court asked Burlingame's counsel whether Comerica had required Burlingame to provide it with a similar indemnification agreement. Burlingame's counsel replied that Comerica had tried to obtain a similar indemnification agreement from Burlingame, but that Burlingame had refused.  Nevertheless, Comerica closed the sale with Burlingame.  Based on the foregoing, the Court is unable to conclude summarily that the Koellings will be unable to establish causation.  The final element of the claim for intentional interference is damages.  The Court concludes that the failure of SCG's attempt to purchase the Comerica Loans is sufficient to support a finding with respect to this element.  As noted above, Burlingame contends that this claim must fail because the Koellings have provided no evidence of the specific benefit they would have received had SCG purchased the Comerica Loans. The Koellings respond that their inability to establish any precise benefit is the result of Burlingame's wrongful conduct.  They argue that Burlingame should not be able to avoid liability for its wrongful conduct by virtue of this act of destruction.

31

The Court agrees. Unlike the remedy for equitable subordination, which requires a precise determination of harm to creditors, the remedy for intentional interference with prospective economic advantage is flexible. There is evidence to support an award of compensatory damages. Fred Koelling has declared that he spent tens of thousands of dollars assisting SCG in making its offer to purchase the Comerica Loans. This investment was put to waste as a result of Burlingame's conduct. Moreover, as long as at least nominal compensatory damages are established, provided it finds that Burlingame's conduct was sufficiently egregious, the Court can also award punitive damages. Sole Energy Co. v. Petrominerals Corp., 128 Cal. App. 4th 212, 238 (2005). Thus, the Court concludes that Burlingame is not entitled to summary judgment on this claim.

**E. DECLARATORY RELIEF CLAIM**

The fifth claim for relief of the Koelling Cross-Complaint seeks a declaration of the parties' rights and obligations under the June 14 Agreement: i.e., whether the Koellings are entitled to a release of the Comerica Guaranty. Burlingame contends that they are not. It contends that the Koellings acted in bad faith in connection with the joint bidding process under which circumstance the June 14 Agreement excuses Burlingame from releasing them from the Comerica Guaranty. Although the Koellings, as Cross-Complainants, have the burden of proof on most elements of their claims, the Court concludes that, in this instance, Burlingame has the burden of proving that the Koellings acted in bad faith and

32

thus of coming forward with evidence of bad faith sufficient to support its request for summary judgment.

In the summary judgment motion, Burlingame contends that the Koellings acted in the following ways by "before and after June 14, 2003...

- Failing to inform Burlingame that an offer to purchase the Comerica Loan had been made in May 2004 for $2,100 which was rejected by Comerica Bank;

- Failing to provide information and documents requested by Burlingame to assist in formulating an offer to purchase the Comerica Loan;

- When documents were provided, frequently they were misleading and often fraudulent;

- Refusing to provide Burlingame with information concerning prior efforts to purchase the Comerica Loan;

- Representing to a number of creditors and others in the lending community that QMECT was arranging for new financing and that Burlingame supported the refinancing, which was entirely untrue and potentially compromised Burlingame's efforts to purchase the Comerica Loan;

- Misrepresenting Qmect's finances;

- Misrepresenting QMECT's relationship with Structure Capital; and,

- Misrepresenting their relationship with QMECT Funding...."

Thee contentions are repeated, word for word, in Robert Judson's declaration filed in support of the motion for summary judgment.

33

No other evidence is provided with respect to these alleged instances of bad faith.

In his declaration filed in opposition to the motion, Fred Koelling declares that he always believed that Burlingame was aware of the prior offer from SCG. He denies refusing to supply Burlingame with timely financial information or providing it with fraudulent or misleading documents. He also denies making any false representations to creditors or others in the lending community regarding Qmect's attempt to arrange for new financing or Burlingame's support of it. Finally, he denies misrepresenting to Burlingame Qmect's relationship with SCG or SCG Funding. He notes that he introduced SCG to Burlingame.[10]

Based on the foregoing, the Court concludes that Burlingame's motion for summary judgment with respect to the fifth claim for relief must be denied. The "evidence" of bad faith offered in support of Burlingame's contention that it is excused from releasing the Koellings from their liability under the Comerica

---

[10]Elsewhere, Burlingame cites as an instance of bad faith, excusing Burlingame from releasing the Koellings from the Comerica Guaranty, Fred Koelling's refusal to permit Burlingame to replace him as CEO of Qmect as long as Qmect was in default on its loan obligations as required by the June 14 Agreement. The Koellings note that the June 14 Agreement required Burlingame to consult Fred Koelling before selecting a new CEO. They contend that Burlingame never did this. This issue is irrelevant to the outcome of the motion. Burlingame did not attempt to replace Fred Koelling as CEO until after Qmect filed its chapter 11 petition. A creditor's attempt to enforce a contractual provision, permitting it to replace a debtor-in-possession's CEO, would appear to violate the automatic stay. See 11 U.S.C. § 362(a)(3).

34

Guaranty is ambiguous and conclusory. It is insufficient to support a claim of bad faith even if it were not controverted by the necessarily equally ambiguous and conclusory denials by Fred Koelling.

### CONCLUSION

Burlingame is entitled to summary judgment on the first and third claims for relief and to summary adjudication on the first allegation of breach in the second claim for relief: i.e., that Burlingame did not breach the June 14 Agreement by failing to make a good faith attempt to purchase the Comerica Loans within the first 90 days of the agreement. Burlingame's motion for summary judgment is denied with respect to the second allegation of the second claim for relief and to the fourth and fifth claims for relief. Counsel for Burlingame is directed to submit a proposed form of order in accordance with this decision.

END OF DOCUMENT

35

COURT SERVICE LIST

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery St., Ste. 1000
San Francisco, CA 94104

Tobias S. Keller
Pachulski, Stang, Ziehl, Young,
   Jones & Weintraub P.C.
Three Embarcadero Center, Ste. 1020
San Francisco, CA 94111-4023

Robert R. Moore
Allen Matkins Leck Gamble & Mallory LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111

Philip J. Nicholsen
Law Offices of Philip J. Nicholsen
221 Main St., #740
San Francisco, CA 94105