

**Signed: August 24, 2005**

_____
**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | No. 04-41044 T |
| | Chapter 11 |
| QMECT, INC., etc., | |
|        Debtor-in-Possession. | |
| _____/ | |
| In re | No. 04-46443 T |
| | Chapter 11 |
| FRED AND LINDA KOELLING, | |
|        Debtors-in-Possession. | |
| _____/ | |
| QMECT, INC., etc., | A.P. No. 04-4190 AT |
| | A.P. No. 04-4365 AT |
|        Plaintiff, | A.P. No. 04-4366 AT |
|    vs. | (Consolidated) |
| BURLINGAME CAPITAL PARTNERS II, L.P., etc. et al., | |
|        Defendants. | |
| _____/ | |
| AND RELATED ADVERSARY PROCEEDINGS | |
|      _____/ | |

**MEMORANDUM OF DECISION**

The above-captioned adversary proceedings have been consolidated for trial. The lead case--A.P. No. 04-4190 AT (the "Equitable Subordination Action")--was filed originally in this court. In the Equitable Subordination Action, Qmect, Inc. ("Qmect"), one of the above-captioned debtors-in-possession, objects to the proofs of claim filed by Burlingame Capital Partners II ("Burlingame") and its affiliate, Electrochem Funding LLC ("Burlingame Funding"), and seeks to equitably subordinate their claims to the claims of some or all of Qmect's creditors.[1]

The other two adversary proceedings--A.P. 04-4365 AT (the "Guaranty Action") and A.P. 04-4366 AT (the "Breach of Fiduciary Duty Action")--were filed originally in state court, either by or against Qmect and/or Fred and Linda Koelling (the "Koellings"). The Koellings are Qmect's principal shareholders and guaranteed the loans upon which Burlingame's and Burlingame Funding's claims are based. The Guaranty Action and the Breach of Fiduciary Duty Action were removed to this court after Qmect and the Koellings filed their chapter 11 bankruptcy petitions.

---

[1]Burlingame Funding was formed after Qmect's chapter 11 case was filed and the conduct complained of occurred. However, Burlingame transferred some of the claims asserted against Qmect to Burlingame Funding after it was formed. Therefore, Burlingame Funding is a necessary party to the equitable subordination claim as well as to the claim objecting to its proof of claim.

2

On May 11, 2005, Burlingame filed a motion for summary judgment with respect to all of the claims asserted in the Equitable Subordination and Breach of Fiduciary Duty Actions. The motion has been fully briefed and argued and was taken under submission. The Court's conclusions are set forth below.

**SUMMARY OF FACTS**

Qmect, a California corporation, is engaged in the electroplating business in Northern California. It operates its business primarily at a facility in Union City, California (the "Real Property"), which it built in the late 1990s. The business was previously operated through a general partnership known as Koelling-McNeill (the "Partnership"), of which Fred Koelling was a general partner. The Partnership operated its business at a rented facility in Hayward, California.

In 1995, the Partnership decided to build its own facility. For that purpose, it purchased the Real Property and in 1996 began construction. At some point in the process, Qmect was formed, and the Partnership sold its assets to Qmect. In 1997, Qmect obtained loans from Comerica Bank-California ("Comerica") to assist in the construction for a total of $1.8 million (the "Comerica Loans"). The Comerica Loans are comprised of three separate loan facilities: (a) a loan secured by a first priority deed of trust on the Real Property, (b) a line of credit secured by Qmect's accounts receivable, and (c) a line of credit secured by Qmect's equipment. The Koellings guaranteed the Comerica Loans and secured their guaranty obligation with liens on their real and

3

personal property.  (This guaranty is referred to hereinafter as the "Comerica Guaranty.")

Qmect was unable to complete construction of the facility for the amount of the Comerica Loans.  Consequently, in 1998, Qmect obtained an additional loan from Comerica in the face amount of $2,100,000 (the "Flat Note Loan").  The facility was completed in January 2000.

Shortly after making the Flat Note Loan, Comerica began urging Qmect to find an alternate source of funding to pay it off. Comerica suggested that Qmect engage someone to assist it in this effort and recommended Robert and Janice Judson (the "Judsons"), among others.  In December 1999, Qmect and Sierra Financial Group, Inc. ("Sierra"), an entity owned by the Judsons, signed an engagement letter (the "Original Engagement Letter").[2]

The Original Engagement Letter provided that Sierra would provide management consulting services to Qmect and would assist Qmect in refinancing and restructuring its existing debt with Comerica and in obtaining sufficient new financing from Comerica, if needed.  The Original Engagement Letter provided that, in case such efforts with Comerica were unsuccessful, Sierra was also engaged on an exclusive basis to seek financing from other sources acceptable to Qmect.  As compensation for the consulting service through December 31, 1999, Qmect agreed to pay Sierra $10,000.

---

[2]The Original Engagement Letter indicates that it was executed in April 1999.  However, the parties agree that this date is in error.

4

Thereafter, it was agreed that Qmect and Sierra would negotiate a monthly fee for further consulting services.

The Original Engagement Letter provided that, if Sierra were successful in negotiating a restructuring of Comerica's debt or in obtaining new financing, it would be entitled to a fee based on the amount of the new or restructured financing. Sierra was not successful in negotiating a restructuring of Comerica's debt or obtaining new financing by the end of 1999 or during the first few months of 2000. No evidence has been presented that it made any effort to do so.

In March 2000, Sierra and Qmect executed an amended engagement letter (the "Amended Engagement Letter"), continuing Sierra's exclusive representation of Qmect in its efforts to restructure its debt. The Amended Engagement Letter failed to provide for any further separate compensation for Sierra's consulting services. However, the Amended Engagement Letter increased the percentage compensation that Sierra would receive if it were successful in negotiating a restructuring of Qmect's existing loans or in finding a new loan. The Amended Engagement Letter provided that, except as amended or modified, the terms of the Original Engagement Letter would remain in effect.

The evidence is unclear as to whether Sierra ever attempted to negotiate a restructuring of the Comerica Loans during 2000. Robert Judson declared that he contacted Comerica during this period with regard to this subject and that Comerica made it clear that it was not interested in restructuring the debt. Fred

5

Koelling declared that Robert Judson never informed him that he had spoken to Comerica about this subject. To the contrary, Fred Koelling declared that Robert Judson warned him repeatedly that any such communications would be detrimental to Qmect's relationship with Comerica. In deposition, a Comerica bank officer testified that Robert Judson had discussed restructuring the Comerica Loans with him, but he could not remember when.

In the Spring of 2000, Robert Judson wrote to a number of potential lenders to solicit their interest in providing financing to Qmect. Two of the potential lenders expressed some interest in doing so. There is a factual dispute concerning why Qmect did not attempt to obtain financing from either of these two parties. Robert Judson declared that the Koellings rejected both offers because the parties sought more equity in Qmect than Fred Koelling was willing to give up. Fred Koelling declared that no formal offers were ever made and that, at a meeting with Comerica, Robert Judson recommended that Qmect not attempt to obtain new financing from these sources.

Qmect has provided evidence, in the form of a letter to a potential investor in a fund to be organized by the Judsons that, as early as May 2000, the Judsons contemplated forming their own fund to provide subordinated financing to Qmect. In or about December 2000, the Judsons formed Burlingame for that purpose.

On or about June 4, 2001, Burlingame sent Qmect a proposal letter (the "Burlingame Loan Proposal Letter"), agreeing to

6

solicit investors for the purpose of making a $2,000,000 loan to enable Qmect to pay off the Flat Note Loan. As a condition to its doing so, Burlingame required Qmect to sign a copy of the Burlingame Loan Proposal Letter, agreeing to the key terms of the loan (the "Term Sheet"). The Burlingame Loan Proposal Letter contained the following provision (the "Release"):

> Regardless of whether the Financing is approved or closes, Borrower agrees, to indemnify and hold Lender, its general Partner, its affiliates and the directors, officers, employees, and representatives of any of them, harmless from and against all claims, expenses (including, but not limited to, attorneys' fees), damages, and liabilities of any kind which may be incurred by, or asserted against, any such person in connection with or arising out of, this Proposal Letter, the Financing, any other related financing, documentation, disputes or environmental liabilities, or any related investigation, litigation, or proceeding. Under no circumstances shall Lender, its General Partner or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result in connection with this Proposal Letter, or the Financing or any other financing.

Apparently, in 2001, someone engaged in negotiations with Comerica to obtain additional financing for Qmect because on the following day, June 5, 2001, Comerica sent a letter to Qmect, offering to make a $3.5 million loan to Qmect, secured by a junior deed of trust on real property owned by Kids' Connection, Inc. ("Kids' Connection"), an entity owned by Linda Koelling (the "June 5, 2001 Comerica Offer"). The June 5, 2001 Comerica Offer provided, among other things, that neither the June 5, 2001

7

Comerica Offer nor its contents should be disclosed "except to those individuals who are your officers, employees or advisors who have a need to know...."

Fred Koelling apparently considered Robert Judson Qmect's advisor because he disclosed the contents of the June 5, 2001 Comerica Offer to him. On June 13, 2001, at Fred Koelling's request, Robert Judson sent to Comerica a letter rejecting Comerica's offer on Qmect's behalf. The letter was sent on Burlingame letterhead (the "June 2001 Rejection Letter"). The June 2001 Rejection Letter enclosed a copy of the Burlingame Loan Proposal Letter, signed by Fred Koelling on June 8, 2001.

In the June 2001 Rejection Letter, Robert Judson asserted that placing a junior deed of trust on Kids' Connection's real property would violate Kids' Connections' agreement with its principal lender, City National Bank, which held the first deed of trust on the real property. Judson also expressed the view that it would not be "workable" or "realistic" for Comerica to replace City National Bank as Kids' Connections' principal lender "[g]iven the less than ideal relationship between Kids Connection and Comerica...." He reminded Comerica that, for some time, Burlingame had been interested in making a $2,000,000 subordinated loan to Qmect. He expressed the view that this arrangement would be preferable from both Comerica's and Qmect's point of view.

The $2,000,000 subordinated loan from Burlingame (the "Burlingame Loan") did not close until late 2001. In the mean time, the Koellings provided $1,500,000 in new capital in the form

8

of a loan so that Qmect could meet its operating expenses. According to Fred Koelling, at the last minute, in November 2001, Burlingame insisted on a personal guaranty for the loan (the "Burlingame Guaranty"). The Koellings pledged their stock in Qmect to secure the Burlingame Guaranty. At that time, their stock represented a controlling interest in Qmect.

Before the loan closed, in November 2001, Qmect engaged an entity known as International Profit Associates ("IPA") to provide financial advice. A representative of IPA accompanied Fred Koelling to a meeting with Comerica and Robert Judson where the Burlingame Loan was discussed. At the meeting, the IPA representative counseled Koelling against accepting the Burlingame Loan and suggested filing for bankruptcy. At the conclusion of the meeting, Robert Judson told Koelling he had made a serious mistake in hiring IPA and insisted that IPA be terminated. Fred Koelling followed Judson's advice.

Qmect did not hire an attorney to negotiate the Burlingame Loan. However, it did hire an attorney to review the documents. There does not appear to be a factual dispute as to whether Robert Judson advised Fred Koelling to obtain an attorney to negotiate the Burlingame Loan with Burlingame on Qmect's behalf. Fred Koelling declared that Robert Judson assured him that he did not need an attorney to negotiate the Burlingame Loan. Robert Judson declared that he advised Qmect to hire its own counsel but he does not specify for what purpose. Burlingame has provided a copy of an e-mail dated February 27, 2002 from Robert Judson to Fred

9

Koelling, transmitting various loan documents and stating that, "as always," he is advised to have his own counsel review the documents. It says nothing about having his own counsel to negotiate the loan.

The Burlingame Loan was used in part to pay off the Flat Note Loan. The Burlingame Loan bore interest at the nominal rate of 22% per annum and an effective rate of 27% per annum. The Burlingame Loan closed in November 2001. According to Fred Koelling's declaration, the net proceeds of the Burlingame Loan, after paying off the Flat Note Loan, were largely used to pay interest to Burlingame. In addition, Sierra received a $60,000 fee for "finding" the Burlingame Loan.

Qmect was unable to service the Burlingame Loan, and it went into default almost immediately. Beginning in July 2002, according to Fred Koelling's declaration, Burlingame began proposing that it take over Qmect. The proposal did not include a release of the Burlingame Guaranty. In October 2002, Qmect and the Koellings filed a complaint in state court against the Judsons, Sierra, and Burlingame for breach of fiduciary duty, among other things.[3]

During the fall of 2002 or the spring of 2003, Qmect engaged Alternative Capital Strategies, LLC ("ACS"), to assist it in reorganizing its financial affairs. ACS located a proposed

_____

[3]This action has since been removed to this court, commencing the adversary proceeding referred to as the Breach of Fiduciary Duty Action.

10

lender, Structured Capital Group ("SCG"), the principal of which is an individual named Basem Zakariya ("Zakariya"). SCG expressed an interest in purchasing the Comerica Loans at a discount and working with Qmect to resolve its financial problems.

On May 28, 2003, SCG sent a letter to Comerica offering to purchase the Comerica Loans for $2,100,000.[4] The Judsons may have learned of the offer on that day or the next, because, on May 29, 2003, Burlingame e-mailed to the Koellings a notice of the proposed sale on June 12, 2003 of the pledged Qmect stock. In any event, they learned of the offer by June 4, 2003 because, on that day, they put Comerica on notice in some fashion that they would sue Comerica if Qmect or a Qmect affiliate purchased the Comerica Loans. (See Declaration of Robert R. Moore in Support of Motion for Summary Judgment on Cross-Complaint, Ex. J.) Burlingame asserted that it would violate Burlingame's subordination agreement with Comerica if Comerica sold the Comerica Loans to a third party without giving Burlingame 90 days' prior notice. Burlingame also asserted that it would violate various provisions of its loan agreement with Qmect if the Comerica Loans were sold to a third party, even with advance notice.

On June 9, 2003, Qmect issued additional shares and transferred them to various parties other than the Koellings. SCG received 1000 of the newly issued shares. The result was that the

---

[4]Alternatively, SCG offered to pay Comerica $1,800,000 for the Comerica Loans plus $900,000 to be paid into an escrow pending resolution of a dispute between Comerica and the Koellings concerning the amount due.

11

stock to Burlingame no longer represented a controlling interest in Qmect. Zakariya was also made a director of Qmect on June 9, 2003. On the same day, the Koellings assigned to Kids' Connection their rights under the promissory note executed by Qmect, evidencing their $1,500,000 loan to Qmect during the preceding year.

On June 9, 2003, Comerica sent a letter by fax and personal delivery to Qmect and Burlingame, informing them that Comerica had decided to sell the Comerica Loans. It disclosed that Comerica had received a offer to purchase the Comerica Loans, which had expired, from a third party that appeared to be affiliated with Qmect. By this letter, Comerica proposed to give Burlingame and Qmect an opportunity to bid against each other on the purchase of the Comerica Loans.

On June 10, 2003, Qmect sought a temporary restraining order of the proposed stock foreclosure sale. Qmect did not disclose to the court or to Burlingame at that time that it had issued additional stock. The temporary restraining order was denied. Thereafter, on June 12, 2003, Qmect sent Burlingame a letter informing them of the issuance and transfer of the additional stock.

On June 14, 2003, Burlingame, Qmect, the Koellings, and SCG executed an agreement concerning the purchase of the Comerica Loans (the "June 14 Agreement"). The June 14 Agreement provided, that, by 3:00 p.m. on June 17, 2003, Burlingame would make an offer to purchase the Comerica Loans at a price determined to be

12

appropriate by Burlingame in its good faith judgment. If the offer were rejected or a counterproposal made, Burlingame and Qmect would cooperate in determining the appropriate response. If Comerica did not accept an offer from Burlingame by September 15, 2003, either Burlingame or Qmect (or its affiliate) would be entitled to make independent offers to purchase the Comerica Loans. However, prior to September 15, 2003, only Burlingame will be entitled to bid.

The June 14 Agreement provided that, if Burlingame purchased the Comerica Loans, it would release the Koellings from the Comerica Guaranty subject to the following provision:

> All parties agree to cooperate in good faith to achieve the purposes of this agreement. No party shall be deprived of any benefit of this agreement under this provision unless and until a court has ruled that such party has acted in bad faith and should be deprived of such benefit.
> Without limiting the foregoing, with respect to the unconditional guaranty, in the event that Burlingame should have a claim that Koelling acted in bad faith with regard to the joint bidding process, the guaranty shall remain in effect, and Burlingame shall take no action to enforce it, until a court has ruled on the matter. If Burlingame & Company [i.e., Qmect] have both bid on the notes and Burlingame has purchased the bank documents and the court has ruled that Koelling acted in bad faith in the joint bidding process, then the court may order that Koelling guarantee will not be released.

Burlingame made an offer to purchase the Comerica Loans for $1,600,000 on or before June 17, 2003. Comerica rejected the offer. There is no evidence that it made a counteroffer. Burlingame made a second offer to purchase the Comerica Loans on

13

September 9, 2003, this time for $1,400,000. Comerica rejected this offer as well. Fred Koelling was advised of the amounts of the offers in each instance before they were made and did not raise an objection to them.[5]

In the fall of 2003, SCG reached an agreement with Comerica to purchase the Comerica Loans for approximately $1,725,000.[6] Burlingame learned of the proposed sale and, on January 14, 2004, its counsel wrote Comerica two letters. In the first letter (the "Litigation Threat Letter"), Burlingame reiterated its threat to sue Comerica if the Comerica Loans were sold to SCG.[7] In the second letter, Burlingame offered to purchase the Comerica Loans

---

[5]The Koellings did not inform the Judsons that SCG had previously made an offer to purchase the Comerica Loans for $2.1 million. However, the Judsons clearly knew that an offer had been made. There is no evidence that the Judsons ever asked the Koellings or Zakariya the amount of SCG's previous offer.

[6]SCG formed an entity known as Qmect Funding for this purpose. For the sake of simplicity, the Court refers to both entities in the memorandum as SCG.

[7]In the Litigation Threat Letter, Burlingame contended that the sale of the Comerica Loans to SCG would violate section 5 of its subordination agreement. Section 5 of the subordination agreement prohibited Comerica, upon Qmect's default, among other things, from taking any action with respect to the collateral without giving Burlingame 90 days prior notice. Burlingame also contended that the sale of the Comerica Loans to SBC would violate sections 7.2 (no change of control), 7.4 (no additional debt), 7.5 (no agreement with anyone other than Burlingame to create additional encumbrances), 7.7 (no direct or indirect investments), 7.8 (no transactions with affiliates), and 7.12 (no contract that could restrict or invalidate the security interest in any of Qmect's property) of the Burlingame Loan agreement.

14

for $50,000 more than offered by SCG. The loan documents drafted by Comerica required SCG to indemnify Comerica in the event it was sued because of the sale. SCG was unwilling to agree to this provision, and Comerica refused to waive it. Therefore, the sale agreement fell through.

Thereafter, on or about February 4, 2004, Comerica agreed to sell the Comerica Loans to the Burlingame for $1,850,000. It did not give SCG an opportunity to submit a competing bid. Comerica asked Burlingame to agree to indemnify Comerica in the event of suit, but Burlingame refused to do so. Nevertheless, Comerica proceeded with the sale. Shortly after acquiring the Comerica Loans, Burlingame commenced foreclosure proceedings with respect to the Burlingame Loan and filed suit against the Koellings on the Comerica Guaranty. On February 27, 2004, Qmect filed a chapter 11 bankruptcy petition to prevent the foreclosure. Shortly thereafter, Burlingame created Burlingame Funding and assigned the Comerica Loans to it.

### LAW APPLICABLE TO SUMMARY JUDGMENT MOTIONS

The Court should grant summary judgment on a claim if the moving party establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. Proc. 56, made applicable to this adversary proceeding by Fed. R. Bankr. Proc. 7056. A fact is material if it could affect the outcome of the decision. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-588 (1986); Anderson v. Liberty Lobby,

15

477 U.S. 242, 248 (1986).  A motion to dismiss a complaint is governed by the same standards as a motion for summary judgment when evidence is presented in support of the motion.  See Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).

In determining whether to grant summary judgment or adjudication, the Court is required to view the evidence in the light most favorable to the nonmoving party.  The Court is also required to draw any inferences from the evidence in the manner most favorable to the non-moving party.  Matsushita, 475 U.S. at 587.  However, a genuine issue may not be created by a mere "scintilla" of evidence produced by the nonmoving party.  Liberty Lobby, 477 U.S. at 251.

Normally, the party moving for summary judgment is required to come forward with sufficient evidence to support a prima face case establishing the right to judgment in its favor.  To successfully oppose the motion, the adverse party is then required to come forward with sufficient evidence to create a genuine issue of material fact.  However, when the adverse party has the burden of proof on the claim, the moving party is not required to present evidence negating the elements of the adverse party's claim.  All the moving party need do is point out to the Court the pleadings or other papers that establish that the adverse party will be unable to present sufficient evidence to sustain some essential element of its claim.  The burden is then on the adverse party to come forward with sufficient evidence to establish a prima facie

16

case on its claim.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 884-85 (1990).

### DISCUSSION

Burlingame and Burlingame Funding seek summary judgment or adjudication with respect to all of the claims asserted against them in the Equitable Subordination and Breach of Fiduciary Duty Actions.  The Equitable Subordination Action is asserted by Qmect against Burlingame and Burlingame Funding.  It consists of three claims for relief: (1) a claim for equitable subordination of Burlingame's and Burlingame Funding's secured claims, (2) an objection to Burlingame's proof of claim (the "Burlingame Proof of Claim") based on alleged offsetting claims, and (3) an objection to Burlingame Funding's proof of claim (the "Burlingame Funding Proof of Claim") based on its failure to allocate the claim between the individual loans.  The motion for summary judgment with respect to these claims is discussed in section A below.

The Breach of Fiduciary Duty Action is asserted by Qmect and the Koellings against the Judsons, Sierra, Burlingame, and two other Burlingame's affiliates.[8]  Burlingame Funding is not party to this action.  The Breach of Fiduciary Duty Action consists of six claims:  (1) breach of fiduciary duty, (2) rescission of contract, (3) unfair business practice, (4) breach of contract, (5) declaratory relief, and (6) injunctive relief.  The motion for

---

[8]The claims against the Judsons, Sierra, and the two other Burlingame affiliates have been remanded to state court.

17

summary judgment with respect to these claims is discussed in section B below.

**A. EQUITABLE SUBORDINATION ACTION**

**1. Equitable Subordination Claim**

The first claim for relief in the Equitable Subordination Action seeks to equitably subordinate the secured claims of Burlingame and Burlingame Funding to the claims of all general, unsecured creditors and to transfer their liens to the estate for the benefit of unsecured creditors pursuant to 11 U.S.C. § 510(c).[9] Equitable subordination is an extraordinary remedy, to be used sparingly. <u>Matter of CTS Truss, Inc.</u>, 868 F.2d 146 (5th Cir. 1989). Its purpose is not to punish the wrongdoer but to remedy the harm done to creditors as a result of the inequitable conduct. The remedy may be imposed only to the extent necessary to eliminate the harm. <u>In re Mobile Steel Co.</u>, 563 F.2d 692, 701 (5th Cir. 1977); <u>In re Pacific Express, Inc.</u>, 69 B.R. 112, 116 (Bankr. 9th Cir. 1986). It may not be used to disallow the claim or to impose damages upon the creditor. <u>Mobile Steel</u>, 563 F.2d at 699 & 699, n.10.

It is well established that a party seeking to equitably subordinate a claim must establish three things: (1) that the

---

[9]Section 510(c) provides that "the court may--(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

18

party whose claim is to be subordinated has engaged in inequitable conduct; (2) that the misconduct has injured creditors of the debtor or given an unfair advantage to the party whose claim is to be subordinated, and (3) that subordination of the wrongdoer's claim is not inconsistent with bankruptcy law. In re Lazar, 83 F.3d 306, 309 (9th Cir. 1996); Mobile Steel, 563 F.2d at 699-700. Equitable subordination may be based on conduct that, although lawful, shocks the conscience: e.g., unjust enrichment brought about by "double dealing" or "foul conduct." See In re Harvest Milling Co., 221 F. Supp. 836, 838 (D. Or. 1963). Moreover, the inequitable conduct need not be related to the acquisition or assertion of the claim to be subordinated. Pacific Express, 69 B.R. at 116.

Unless the creditor is an insider or fiduciary of the debtor, the creditor's conduct must have been egregious to warrant subordination of its claim. Id. While the burden of proof and persuasion is by the preponderance of the evidence regardless of whether the creditor is an insider or a noninsider, the transactions of an insider are subject to strict scrutiny while those of a noninsider are not. In re Heartland Chems. Inc., 136 B.R. 503, 517 (Bankr. C.D. Ill. 1992). The fact that the result of a bargain seems unduly harsh in hindsight does not establish that the other party acted inequitably. "Inequitable conduct" in commercial life means breach plus some advantage-taking...." Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1367 (7th Cir. 1990). Qmect's equitable subordination claim

19

is based on Burlingame's conduct during two different time frames: (1) its conduct leading up to and in connection with the Burlingame Loan (December 1999 through November 2001) and (2) its conduct in connection with its purchase of the Comerica Loans (May 2003 through January 2004). The Court will discuss each part of the claim separately.

**(1) The Burlingame Loan**

The first issue presented by this portion of Qmect's claim is whether Burlingame should be treated as an insider or fiduciary of Qmect so as to subject the fairness of the Burlingame Loan to strict scrutiny. Burlingame contends that it was not Qmect's fiduciary: i.e., it was a lender which contracted with Qmect at arms' length. It is well established that, unless a lender exerts control over its borrower, it may not be treated as an insider or fiduciary of its borrower. See <u>Kham & Nate's Shoes</u>, 908 F.2d at 1357-58.

Qmect contends that Burlingame should be treated as a fiduciary for purposes of the equitable subordination claim for two reasons. First, Qmect notes that Sierra acted as its financial advisor and as its exclusive agent in its search for financing. See <u>Persson v. Smart Inventions, Inc.</u>, 125 Cal. App. 4th 1141, 1160 (2005)("a fiduciary relationship is a recognized legal relationship such as...principal and agent"). Because Sierra and Burlingame were both owned by the Judsons, Sierra had a conflict of interest in advising Qmect to enter into the

20

Burlingame Loan. According to Qmect, this is sufficient to subject the fairness of the Burlingame Loan to strict scrutiny.

Second, Qmect notes that, both through Sierra and independently, Burlingame had access to confidential financial information. It asserts that Fred Koelling placed confidence in the Judsons and Sierra as Qmect's financial advisor. Qmect asserts that this created a confidential relationship between Qmect and Burlingame sufficient to impose a fiduciary duty on Burlingame. In support of this contention, Qmect relies on Persson v. Smart Inventions, Inc., 125 Cal. App. 4th 1141 (2005). The Persson court noted that, while a limited number of relationships qualify as fiduciary relationships, confidential relationships are less well defined. However, a party in a confidential relationship with another is also under a fiduciary duty to the other party. Id. at 1160-61.

In response, Burlingame contends that Sierra was only Qmect's financial advisor for one month, during December 1999. Thereafter, Sierra served only as Qmect's exclusive agent to locate and negotiate financing. Moreover, even if Sierra was Qmect's fiduciary, Burlingame was not. It was a separate legal entity and dealt with Qmect at arms' length. With respect to Qmect's second contention, Burlingame contends that access to confidential information is not sufficient to create a fiduciary duty nor is the fact that Qmect may have placed confidence in the Judsons and Sierra. It contends that the line of cases cited by Qmect has no application to commercial dealings. See Rickel v.

21

Schwinn Bicycle Co., 144 Cal. App. 3d 648, 654-55 (1983)(confidential relationship imposing fiduciary duty precluded where there is an expectation of a nonmutual profit).

The Court concludes that there is a genuine issue of fact as to whether Sierra ceased acting as Qmect's financial advisor at the end of 1999. The Amended Engagement Letter does not terminate this role. It simply fails to provide for any additional *separate* compensation for those services, as anticipated by the Original Engagement Letter. However, the formula for payment for Sierra's services was enhanced. There is an issue of fact as to whether this enhancement was intended to cover Sierra's financial advice as well as its efforts to obtain financing for Qmect. There is evidence that the Judsons and/or Sierra provided Qmect with financial advice after the end of 1999. No evidence has been provided to date establishing that the Judsons or Sierra ever advised Qmect or the Koellings that they were no longer acting as Qmect's financial advisor.

However, this dispute is not material, at least in connection with Qmect's equitable subordination claim. Clearly, under Persson, as Qmect's exclusive agent to obtain financing, Sierra was Qmect's fiduciary through the funding of the Burlingame Loan.

See also V. Sands v. Eagle Oil and Refining Co., Inc., 83 Cal. App. 2d 312, 318 (1948). Moreover, the Court also concludes that a genuine issue of material fact exists as to whether, for purposes of equitable subordination, Sierra's fiduciary duty should subject Burlingame's conduct to strict scrutiny. As noted

22

above, the conduct giving rise to equitable subordination need not have occurred in connection with the claim to be subordinated.

However, the Court agrees with Burlingame that Qmect's second theory for imposing a fiduciary duty on Burlingame is not viable and that it is entitled to summary judgment with respect to this portion of the claim. A lender will typically obtain confidential information in the process of doing due diligence before making a loan. If this were sufficient to result in the imposition of a fiduciary duty on a lender, virtually every lender would be deemed the fiduciary of its borrower. As noted above, the law is to the contrary.

Next, Burlingame contends that, even if the Court concludes that there is a genuine issue of material fact as to whether Sierra had a fiduciary duty to Qmect, there is no evidence that Sierra breached that duty. The only evidence produced is that Sierra attempted to renegotiate Qmect's loans with Comerica and also contacted numerous parties whom it thought might be interested in providing financing. However, the terms offered by Comerica and the two third parties who did express an interest were not acceptable to the Koellings. Burlingame asserts that there is no evidence that it knew, in November 2001, when the Burlingame Loan was funded, that Qmect would not be able to service the debt. It asserts that Qmect provided optimistic projections indicating that it would be able to make the payments.

The Court concludes that Qmect has provided sufficient evidence to create a genuine issue of fact as to whether Sierra

23

breached its fiduciary duty to Qmect and whether that breach should be ascribed to Burlingame. There is evidence that Sierra exerted efforts to renegotiate the Comerica Loans and that it also contacted numerous third parties to see if they were interested in providing Qmect with additional financing. However, there is also evidence that Robert Judson advised Qmect not to accept the offer from Comerica or to pursue the two expressions of interest from third parties.

In addition, there is evidence that Sierra may have breached its fiduciary duty to Qmect by pressuring Qmect to terminate its independent financial consultant who had advised Qmect to file a bankruptcy petition rather than accepting the Burlingame Loan which Qmect contends has onerous terms. Filing a chapter 11 bankruptcy might have bought Qmect sufficient time to permit it, represented by someone other than an affiliate of the entity wishing to make the loan itself, to find a loan on more reasonable terms.

Qmect also contends that Sierra acted inequitably in accepting a $60,000 finder's fee in connection with the Burlingame Loan. It asserts that the fee was improper because it constituted a loan broker's fee, noting that Sierra did not have a loan broker's license. Burlingame responds that the law distinguishes between a finder's fee and a broker's fee. It contends that Sierra acted only as a finder and thus did not need a license. In support of this contention, Burlingame cites <u>Independent Cellular Tel. Inc. v. Daniels & Assocs.</u>, 863 F. Supp. 1109, 1115 (N.D. Cal.

24

1994) and <u>Preach v. Monter Rainbow</u>, 12 Cal. App. 4th 1441, 1451-52 (1993).[10]

The cases cited by Burlingame are not precisely on point as they deal with real estate brokers rather than loan brokers. However, by analogy, they support the proposition that, if Sierra acted only as a loan "finder," it did not need a license. Whether Sierra stepped over the line and thus should not have obtained the $60,000 fee is beyond the scope of this motion. As noted above, the claims against Sierra have been remanded to state court. Thus, the Court need not determine whether Sierra acted improperly in accepting the $60,000. However, Qmect also contends that Burlingame breached its fiduciary duty in requiring Qmect to pay Sierra the $60,000 fee. Burlingame appears to concede that the fee could just as easily have been paid to Burlingame which did act as a loan broker and did have a loan broker's license. Qmect contends that Burlingame breached its fiduciary duty by acting as a broker for both sides of the transaction without the written consent of the parties. It cites state law requiring such consent. However, the Court views the Release as giving Burlingame consent to act in this dual fashion.

_____

[10]Burlingame also notes that the absence of a license merely prevents the broker from suing to collect its fee. It does not make accepting a fee illegal or require the fee to be disgorged. <u>See</u> <u>Broffman v. Newman</u>, 213 Cal. App. 3d 252, 261 (1989). While correct, this point is irrelevant. Qmect is not attempting to recover the $60,000 fee. It is arguing that Sierra's acceptance of the $60,000 was part of Burlingame's overall egregious behavior, warranting subordination of its claim.

25

Finally, Burlingame contends that the Release, which Qmect executed in June 2001 and upon which Burlingame relied in agreeing to solicit investors, was sufficiently broad to release Qmect's equitable subordination claim. In support of this proposition, it cites <u>Navellier v. Sletten</u>, 262 F.3d 923, 939 (9th Cir. 2001). Qmect raises several arguments as to why the Release does not bar the equitable subordination claim. First, it notes the Release does not use the term "release." Second, it does not contain an express waiver of the protections of section 1542 of the California Civil Code.[11] Third, it contends that the Release was extinguished because that the Burlingame Loan documents contained an integration clause and did not incorporate the Release.

The Court need not address Qmect's contentions here because it concludes that the Release did not release Qmect's equitable subordination claim. As discussed above, the purpose of an equitable subordination claim is not to impose liability on the defendant or to grant a monetary award to the plaintiff. Its purpose is to remedy harm done to other creditors by adjusting the creditor priorities. Thus, while asserted by Qmect, the claim belongs to its creditors, as they existed at the time of the inequitable conduct. Qmect could not effectively release a claim

---

[11]Burlingame asserts that the Release is indeed a release, citing authority for that proposition. It contends that Cal. Civ. Code § 1542 does not apply because it applies only to a "general release." It asserts that the Release is a specific release. <u>See</u> <u>Brae Transp., Inc. v. Coopers and Lybrand</u>, 790 F.2d 1439 (9th Cir. 1986); <u>Larsen v. Johannas</u>, 7 Cal. App. 3d 491, 506 (1970).

26

that exists for the benefit of a third party.  <u>Navellier</u> is inapposite to the facts presented here as it involves the applicability of a release to a breach of contract claim. <u>Navallier</u>, 262 F.3d at 923.

However, Qmect's first claim for relief must fail, to the extent it is based on Burlingame's conduct in connection with the Burlingame Loan.  Burlingame is correct that there is no evidence to support the contention that Qmect's unsecured creditors, as they existed at the time of the Burlingame Loan, were harmed by the Burlingame Loan.  To the contrary, in the absence of such evidence, the Court must infer that the Burlingame Loan permitted these creditors' claims to be paid.  Thus, even if the Court concluded after trial of the disputed factual issues, that Burlingame's conduct (or conduct that may be ascribed to it) in connection with the Burlingame Loan was sufficiently inequitable to warrant equitable subordination, the Court would be unable to grant an appropriate remedy.  As a result, Burlingame is entitled to a summary adjudication and dismissal of this portion of the equitable subordination claim.

**(2) The Comerica Loans**

The second part of Qmect's first claim for relief concerns Burlingame's conduct in connection with the Comerica Loans beginning in the Spring of 2003 and through January 2004, when Burlingame acquired the Comerica Loans.  Qmect alleges that Burlingame acted egregiously by interfering with SCG's efforts to purchase the Comerica Loans: i.e., by making baseless threats of

27

litigation against Comerica if it sold the Comerica Loans to SCG.[12] It alleges that Burlingame's inequitable conduct harmed general, unsecured creditors by preventing SCG from acquiring the Comerica Loans and working with Qmect to resolve its financial problems.

Burlingame asserts various defenses to this portion of Qmect's first claim for relief. First, it contends that there is no evidence that it acted improperly, let alone egregiously. It argues that its conduct in connection with the purchase of the Comerica Loans was entirely proper and is protected by the competition privilege. See <u>PMC, Inc. v. Saban Entm't, Inc.</u>, 45 Cal. App. 4th 579, 603 (1996); <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 389 (1995); <u>A-Mark Coin Co. v. General Mills, Inc.</u>, 148 Cal. App. 3d 312, 323-24 (1983).

Second, Burlingame contends that there is no evidence that its conduct prevented SCG from purchasing the Comerica Loans. The evidence is undisputed that, at the time Burlingame purchased the Comerica Loans, Comerica's agreement with SCG had fallen apart. Moreover, Burlingame bid $100,000 more for the Comerica Loans that SCG had agreed to pay.

Third, Burlingame notes that the Litigation Threat Letter is the sole basis for Qmect's claim that Burlingame acted improperly

---

[12] Qmect concedes that Burlingame cannot be fairly viewed as a fiduciary or in confidential relationship with it during this time period. Therefore, as discussed above, for the Burlingame Funding's secured claims to be equitably subordinated, the Court must find that Burlingame's conduct was egregious.

28

in connection with its purchase of the Comerica Loans. Burlingame asserts that the litigation privilege prevents its claim from being equitably subordinated on that account. See Cal. Civ. Code § 47(b); Silberg v. Anderson, 50 Cal. 3d 205, 215 (1990); Visto Corp. v. Sprogit Techns., Inc. 360 F. Supp. 2d 1064 (N.D. Cal. 2005); Rubin v. Green, 4 Cal. 4th 1187, 1194 (1993).

Finally, Burlingame contends that there is no evidence that the general, unsecured creditors would have been better off if SCG had bought the Comerica Loans. According to Burlingame, Qmect's assertion that SCG would have worked with Qmect to resolve its financial difficulties, to the benefit of unsecured creditors, is mere speculation.

In response, Qmect notes that the litigation privilege is an affirmative defense which must be pled in the defendant's answer to be asserted. Qmect contends that Burlingame has waived the defense by failing to plead it. See Carroll v. Acme-Cleveland Corp., 955 F.2d 1107, 1115 (7th Cir. 1992); Ingraham v. United States, 808 F.2d 1075, 1079 (5th Cir. 1987). It contends that the privilege does not apply to a claim for equitable subordination, noting that Burlingame has cited no authority for this proposition.

In any event, Qmect points out, as applied to communications made before a lawsuit has been filed, the litigation privilege is not absolute. To be entitled to assert the privilege, the party making the threat must have had a good faith contemplation of litigation. See Edwards v. Centex Real Estate Corp., 53 Cal. App.

29

4th 15, 33-34 (1997); <u>Laffer v. Levinson</u>, 34 Cal. App. 4th 117, 124-25 (1995). Qmect contends that there is substantial evidence that Burlingame was not serious about suing Comerica and was merely threatening litigation in bad faith as a tactic to gain an advantage in purchasing the Comerica Loans.

Qmect disputes Burlingame's contention that the evidence is clear that the Litigation Threat Letter did not cause the failure of the sale of the Comerica Loans to SCG. It asserts that the evidence is clear that the sale to SCG failed because SCG would not agree to indemnify Comerica from any litigation as a result of the sale. It contends that there is substantial evidence that Comerica would not have insisted on this provision had Burlingame not threatened it with suit. Qmect concedes that the evidence is somewhat speculative as to what SCG would have done if it had purchased the Comerica Loans. However, it contends that it is reasonable for the Court to infer that SCG would have worked with Qmect and not commenced foreclosure proceedings, thereby forcing it into bankruptcy.

The Court concludes that there is substantial evidence that Burlingame acted egregiously in connection with its competition with SCG to purchase the Comerica Loans. As discussed above, there is evidence that, in late May or early June of 2003, Burlingame learned that SCG was attempting to purchase to Comerica Loans. At that time Burlingame threatened Comerica with litigation if it sold the Comerica Loans to SCG. As a result,

30

Comerica made a decision to sell the Comerica Loans and offered Burlingame and SCG an equal opportunity to bid for the loans.

Rather than competing on an equal basis, Burlingame chose to enter into an agreement with Qmect and SCG giving Burlingame the exclusive right to bid for the Comerica Loans for a period of 90 days. Thereafter, either party would be entitled to bid. However, when SCG attempted to purchase the Comerica after the 90 days had elapsed, again, Burlingame threatened Comerica with litigation. Burlingame offers various rationales for its conduct. Nevertheless, the Court finds sufficient evidence to create a genuine issue of material fact as to whether Burlingame's conduct was sufficiently egregious to warrant equitable subordination.

The competition privilege does not alter the Court's conclusion. This privilege only applies when a competitor "uses fair and reasonable means" to compete. See PMC, Inc., 45 Cal. App. 4th at 603, quoting from Tri-Growth Centre City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg, 216 Cal. App. 3d 1139, 1153 (1989). There is a genuine issue of material fact as to whether, under these circumstances, threatening Comerica with litigation if it sold the Comerica Loans to SCG was fair or reasonable.

The Court is unable to conclude that the litigation privilege is an affirmative defense that Burlingame has waived by failing to plead in its answer. The authorities cited by Qmect only state that an affirmative defense is waived if not timely pled. They do not identify the litigation privilege as an affirmative defense.

31

Moreover, even if the litigation privilege is an affirmative defense, Qmect does not cite any prejudice based on Burlingame's having failed to plead it earlier. Absent such prejudice, the Court would be inclined to permit Burlingame to amend its answer to assert the defense.

Whether the litigation privilege applies to an equitable subordination claim is more problematic. The authorities hold that the privilege applies to all tort actions other than an action for malicious prosecution. However, a claim for equitable subordination is not a tort claim; it is an equitable remedy. At the same time, the purpose for the litigation privilege would appear to apply equally to an equitable subordination action. For purposes of this motion, the Court will assume, without ruling, the privilege does apply. However, as discussed above, whether it applies here is subject to a material factual dispute.

There is also substantial evidence that the Litigation Threat Letter caused the sale of the Comerica Loans to SCG to fail. Burlingame commenced foreclosure proceedings against Qmect's assets immediately after acquiring the Comerica Loans, thereby precipitating the chapter 11 filing. The filing prevented Qmect from paying pre-petition unsecured claims. It is reasonable to infer that the claims of Qmect's unsecured creditors that existed when Burlingame's conduct occurred were the same claims to which Qmect seeks to subordinate the secured claims of Burlingame and Burlingame Funding. As a result, unlike the first half of Qmect's first claim for relief, the Court would be able to fashion an

32

appropriate remedy if Qmect is able to prove the other elements of its claim.

Nevertheless, the second portion of the first claim for relief must fail as well. Burlingame is correct that Qmect has failed to present any evidence that SCG would have worked with Qmect to resolve its financial problems, so that the unsecured creditors would have been better off if SCG had purchased the Comerica Loans. The only evidence to this effect is that SCG had been issued some stock and that its principal had taken a position on Qmect's Board of Directors. The Court does not believe that this is sufficient to create a genuine issue of fact on this essential element of Qmect's equitable subordination claim.

## 2. Objection to the Burlingame Proof of Claim

In the second claim for relief in the Equitable Subordination Action, Qmect objects to the Burlingame Proof of Claim. The Burlingame Proof of Claim is based on the Burlingame Loan which is junior in priority to the Comerica Loans. It asserts a claim in the principal amount of $2,000,000 plus $1,047,836.25 in accrued interest. It also seeks attorneys' fees in an unspecified amount.

Qmect objects to the Burlingame Proof of Claim on the ground that it is entitled to offset against some of all of the claim its damages based on Burlingame's tortious conduct. Neither Burlingame nor Qmect specify the tortious conduct to which this refers. However, the claim for intentional interference with prospective economic advantage, asserted by the Koellings in the Guaranty Action, is clearly a tort claim asserted by Qmect as

33

well.  Both Qmect and the Koellings had a prospective economic advantage from SCG purchasing the Comerica Loans.

As discussed in the Court's Memorandum of Decision with regard to Burlingame's motion for summary judgment in the Guaranty Action, there are genuine issues of material fact with regard to all of the elements of the intentional interference claim. Therefore, Burlingame's motion for summary judgment with regard to Qmect's second claim for relief in the Equitable Subordination Action will be denied.

### 3. Objection to the Burlingame Funding Proof of Claim

In the third claim for relief in the Equitable Subordination Action, Qmect objects to the Burlingame Funding Proof of Claim. The Burlingame Funding Proof of Claim is based on the Comerica Loans which were purchased at a discount by Burlingame and subsequently transferred to Burlingame Funding.  The Burlingame Funding Proof of Claim asserts a secured claim in the principal amount of $2,520,054.18 plus accrued pre-petition interest of $12,186.35 (the "Burlingame Funding Proof of Claim").  As noted above, the Comerica Loans consisted of three separate loan facilities, each with its own collateral.

The Burlingame Funding Proof of Claim does not allocate the amounts of the claim among the three loan facilities.  In the third claim for relief, Qmect objects to this failure and contends that it deprives the Burlingame Funding Proof of Claim to the presumption of  validity normally accorded to a properly executed and filed proof of claim.  See Fed. R. Bankr. Proc. 3001(f).

34

Qmect contends that its own books and records are not sufficiently accurate to permit it to verify the correct amount due under each of the loan facilities. Therefore, it contends, the Burlingame Funding Proof of Claim should be disallowed unless Burlingame Funding can present sufficient evidence to establish the amount of its claims.

Burlingame Funding addresses this claim for relief summarily. It contends that the objection fails for vagueness because it does not cite the subsection of 11 U.S.C. § 502 upon which its objection is based. Burlingame Funding's motion for summary judgment on this claim is denied. Qmect is not seeking disallowance of Burlingame Funding's claim based on one of the criteria set forth in 11 U.S.C. § 502. It is simply contending that the Burlingame Funding Proof of Claim is insufficiently detailed to relieve Burlingame Funding of the burden of proving its claim. The Court agrees with Qmect that Burlingame Funding's failure to allocate the amount claimed with respect to each of the separate loan facilities deprives it of this evidentiary benefit. Burlingame's motion for summary judgment with respect to this claim will also be denied.

**B.  BREACH OF FIDUCIARY DUTY ACTION**

**1.  Breach of Fiduciary Duty Claim**

In the first claim for relief in the Breach of Fiduciary Duty Action, Qmect alleges that, by agreeing to act as Qmect's financial consultant, the Judsons and Sierra acted as fiduciaries with respect to Qmect and breached their fiduciary duty by acting

35

in the Judsons' interests rather than Qmect's. However, Qmect's claims for breach of fiduciary duty against the Judsons and Sierra have been remanded to state court. The only charging allegations against Burlingame in this claim for relief are that Burlingame knew about this conduct, participated in it, and benefitted from it. On this basis, Qmect contends that Burlingame is liable for any damages incurred by Qmect as a result of the Judsons' or Sierra's breach of their fiduciary duty. Thus, the first claim relief asserts a claim for breach of fiduciary duty against a nonfiduciary. Qmect has provided the Court with no authority that such a claim can be asserted. In the absence of such authority, the Court concludes that Burlingame is entitled to summary judgment with respect to this claim.

## 2. Rescission of Contract Claim

The second claim for relief in the Breach of Fiduciary Duty Action seeks to rescind an agreement referred to as the "Sierra Agreement" on the ground that it is illegal.[13] The claim alleges that the Sierra Agreement purports to constitute Sierra and the Judsons as loan brokers and that neither Sierra or the Judsons have a loan broker's license. The second claim for relief also alleges that the Judsons and Sierra acted in conflicting roles, as

---

[13]The Court cannot find a definition for this term in the complaint but assumes that the agreement referred to is the Original and Amended Engagement Letter pursuant to which Sierra agreed to attempt to renegotiate Qmect's debts to Comerica or to obtain new financing to permit Qmect to pay off the Flat Note Loan.

36

both consultant and broker to Qmect, in violation of Cal. Bus. & Prof. Code § 10176 (prohibiting acting as a broker for more than one side of a deal without obtaining both parties' informed consent). As a result, the claim alleges, the Sierra Agreement should be rescinded and all consideration received pursuant to the agreement disgorged.

As noted above, the claims against Sierra and the Judsons have been remanded. Burlingame was not a party to the Original or Amended Engagement Letter and did not receive any compensation pursuant to it. Therefore, the Court concludes that these allegations do not state any claim against Burlingame. The only allegation that does concern Burlingame is contained in the final sentence of the second claim for relief. It alleges that the Burlingame Loan is a product of the illegal agreement with Sierra and the Judsons and thus that it too is void or voidable.

It is unclear whether, by this allegation, the second claim for relief intends to seek rescission of the Burlingame Loan as well as of the Sierra Agreement. If it does, the Court concludes that the second claim for relief also fails to state a viable claim for relief and that Burlingame is entitled to summary judgment in its favor with respect to this claim as it applies to Burlingame and the Burlingame Loan. Qmect has provided the Court with no authority for the proposition that a loan may be rescinded

37

because the loan broker was unlicensed or represented both the borrower and the lender without obtaining their informed consent.[14]

### 3. Unfair Business Practice Claim (Cal. Bus. & Prof. Code § 17200 *et seq.*)

The third claim for relief in the Breach of Fiduciary Duty Action alleges that, in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*, the defendants agreed and conspired to engage in unfair business practices and acts of unfair competition or encouraged the other defendants to do so and accepted the benefits of that conduct. It alleges that the purpose of these unfair acts was to take over Qmect's business, property, and prospects. The third claim for relief seeks disgorgement of any benefits received by the defendants from their acts of unfair competition and injunctive relief to prevent them from continuing to engage in such acts of unfair competition.

In its motion for summary judgment, Burlingame contends that this claim may not be maintained because the allegations supporting such a claim must be supported by other illegal conduct. It contends that Qmect is unable to produce evidence of any such conduct by Burlingame.[15]

_____

[14]In any event, as noted above, the Court concludes that the Release evidences Qmect's informed consent to the dual representation.

[15]In support of this contention, Burlingame cited Independent Cellular Tel, Inc. v. Daniels & Assocs., 863 F. Supp. 1109 (N.D. Cal. 1994). The Court did not find this decision helpful.

38

A claim for unfair business practices or competition pursuant to Bus. & Prof. Code § 17200 *et seq.* must establish that the practice or act "is either unlawful (i.e., is forbidden by law), unfair (i.e. harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." Albillo v. Intermodal Container Services, Inc., 114 Cal. App. 4th 190, 206 (2004). As discussed above, the Court concludes that the evidence is sufficient to create a genuine issue of material fact as to whether Burlingame's having sent the Litigation Threat Letter to Comerica constituted an unfair business practice or unfair competition under these circumstances: i.e., in light of the June 14 Agreement.

As discussed above, the Court concluded that Burlingame was entitled to summary judgment on Qmect's equitable subordination claim as it applied to the Litigation Threat Letter based on Qmect's failure to provide any evidence of resulting damages. A claim under Bus. & Prof. Code § 17200 does not entitle the plaintiff to recover its damages. Madrid v. Perot Systems Corp., 130 Cal. App. 4th 440, 452 (2005). Therefore, Qmect's failure to produce evidence of damages does not entitle Burlingame to summary judgment on this claim.

Nevertheless, for similar reasons, the Court concludes that Burlingame is entitled to summary judgment on this claim. Remedies for breach of Bus. & Prof. Code § 17200 are limited to restitution and injunctive relief. Id. at 453-55. Qmect's claim for injunctive relief makes no sense, as applied to the sole

39

viable instance of unfair competition: i.e., Burlingame's use of the Litigation Threat Letter to obtain an advantage in its bid for the Comerica Loans. There is no likelihood that Burlingame would have an opportunity to repeat this conduct.

Neither does restitution appear to be a viable remedy under these circumstances. "Restitution" has been defined narrowly in this context: i.e., as the "return of property or funds in which the plaintiff has an ownership interest (or is claiming through someone with an ownership interest)." It includes both "money that was once in the plaintiff's possession" and "money in which the plaintiff had a vested interest." It does not permit the court to order other monies disgorged so as to prevent a defendant from being unjustly enrichment. Id.

Qmect has failed to produce any evidence that it has an ownership interest in any monies or property obtained by Burlingame as a result of sending the Litigation Threat Letter to Comerica. True, Qmect has an ownership interest in its assets which are encumbered by the Comerica Loans. However, the Litigation Threat Letter did not create this encumbrance; it merely enabled Burlingame to obtain Comerica's right to enforce it.[16]

_____

[16]Presumably, Comerica would not be pleased with a court order directing Burlingame to transfer the Comerica Loans back to Comerica and requiring Comerica to pay back to Burlingame the purchase price for the Comerica Loans. In any event, such an ordere would be improper since Comerica is not a party to this action.

40

### 4. Breach of Contract Claim

The fourth claim for relief in the Breach of Fiduciary Duty Action is asserted only against the Judsons and Sierra. As noted above, those claims have been remanded to state court. As a result, this claim is not within the scope of Burlingame's motion for summary judgment.

### 5. Declaratory Relief Claim

In the fifth claim for relief in the Breach of Fiduciary Duty Action, Qmect seeks a declaration that, due to the Judsons and Sierra's improper conduct, both the Engagement Letter and the Burlingame Loan are invalid. It seeks a declaration that all fees obtained by the Judsons and Sierra pursuant to the Original and Amended Engagement Letters should be disgorged. As noted above, these claims have been remanded to state court. However, the fifth claim for relief also seeks a declaration that the Burlingame Loan was illegal and is unenforceable and that Burlingame has no rights pursuant to the Burlingame Loan other than, at best, the right of a nonvoting equity holder. For the reasons stated above, in connection with the rescission claim, Burlingame is entitled to summary judgment on this claim.

### 6. Injunctive Relief Claim

In the sixth claim for relief in the Breach of Fiduciary Duty Action, Qmect and the Koellings seek to enjoin Burlingame and Burlingame Funding from foreclosing on Qmect's real and personal property and on the Koellings' stock in Qmect. The claim alleges that it would cause Qmect and the Koellings irreparable injury if

41

defendants were permitted to foreclose. Burlingame and Burlingame Funding are entitled to summary judgment on this claim as well. At present, they are prevented by the automatic stay from foreclosing its security interests or proceeding against the Koellings with respect to their guaranties. However, if the Court concludes that the automatic stay should be vacated, Qmect has alleged no legal or factual basis for enjoining them from exercising their legal rights with respect to their collateral.

## CONCLUSION

With respect to the Equitable Subordination Action, the Court concludes that Burlingame is entitled to summary judgment on the first claim for relief. Its motion for summary judgment with respect to the second and third claims for relief will be denied. With respect to the Breach of Fiduciary Duty Action, the Court concludes

that Burlingame is entitled to summary judgment on all of the claims asserted against Burlingame. Counsel for Burlingame is directed to submit a proposed form of order in accordance with this decision.

END OF DOCUMENT

42

COURT SERVICE LIST

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery St., Ste. 1000
San Francisco, CA 94104

Tobias S. Keller
Pachulski, Stang, Ziehl, Young,
   Jones & Weintraub P.C.
Three Embarcadero Center, Ste. 1020
San Francisco, CA 94111-4023

Robert R. Moore
Allen Matkins Leck Gamble & Mallory LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111

Philip J. Nicholsen
Law Offices of Philip J. Nicholsen
221 Main St., #740
San Francisco, CA 94105

43