

**Signed: February 08, 2006**

**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                    No. 04-41044 T
                                         Chapter 11
QMECT, INC., etc.,

          Debtor-in-Possession.
_____/

In re                                    No. 04-46443 T
                                         Chapter 11
FRED AND LINDA KOELLING,

          Debtors-in-Possession.
_____/

QMECT, INC., etc.,                       A.P. No. 04-4190 AT
                                         A.P. No. 04-4365 AT
          Plaintiff,                     A.P. No. 04-4366 AT

     vs.                                 (Consolidated)

BURLINGAME CAPITAL PARTNERS II,
L.P., etc. et al.,

          Defendants.
_____/

AND RELATED ADVERSARY PROCEEDINGS
_____/

**DECISION AFTER TRIAL IN CONSOLIDATED PROCEEDINGS**

The above-captioned adversary proceedings were tried to the Court on October 24, 25, 26, 27 and 28, and December 7, 2005 and on January 9, 10, 11, and 12, 2006. Closing argument was presented on January 24, 2006. The Court's findings of fact and conclusions of law are set forth below.

**GENERAL FINDINGS OF FACTS**[1]

1.  Qmect, Inc. ("Qmect"), a California corporation, is engaged in the electroplating business in Northern California. Fred and Linda Koelling (the "Koellings") are the principal shareholders of Qmect. Fred Koelling is Qmect's president; Linda Koelling is its secretary; and the Koellings are Qmect's directors.

2.  Qmect operates its business primarily at a facility in Union City, California (the "Qmect Real Property"), which it built in the late 1990s. The business was previously operated through a general partnership known as Koelling-McNeill (the "Partnership"), of which Fred Koelling was a general partner. The Partnership operated its business at a rented facility in Hayward, California.

3.  In 1995, the Partnership decided to build its own facility. For that purpose, it purchased the Qmect Real Property

---

[1]Findings of fact should be construed as conclusions of law, and conclusions of law should be construed as findings of fact where appropriate. <u>See</u> Fed. R. Bankr. Proc. 7052.

2

and in 1996 began construction.  At some point in the process, Qmect was formed, and the Partnership sold its assets to Qmect.

4.   In 1997, Qmect obtained loans from Comerica Bank-California ("Comerica") to assist in the construction of the new facility for a total of $1.8 million (the "Original Comerica Loans").  The Original Comerica Loans were comprised of four separate loan facilities: (a) two loans secured by a first priority deed of trust on the Real Property (the "Comerica Deed of Trust"), (b) a line of credit secured by Qmect's accounts receivable, and (c) a loan secured by Qmect's equipment.

5.   The Koellings executed personal guaranties of Qmect's obligations to Comerica (the "Comerica Guaranties").  The Comerica Guaranties were secured by the Koellings' personal real and personal property assets.

6.   Qmect was unable to complete construction of the facility for the amount of the Original Comerica Loans.  Consequently, in 1998, Qmect obtained an additional loan from Comerica in the face amount of $2,100,000 (the "Flat Note Loan").   The facility was completed in January 2000.  Shortly thereafter, Comerica began urging the Koellings to find a source of funds to pay off the Flat Note Loan.

7.   In December 1999, Qmect retained Sierra Financial Group ("Sierra") to provide consulting services for this purpose. Robert and Janice Judson (the "Judsons") were the principals of Sierra.

3

8.   In or about December 2000, the Judsons formed Burlingame Capital Partners II, L.P. ("Burlingame") as a fund to make "mezzanine" loans.  In the Spring of 2001, Burlingame offered to loan Qmect $2,000,000 to enable Qmect to pay off the Flat Note Loan (the "Burlingame Loan").

9.   The Burlingame Loan did not close until November 2001 (although $100,000 of the loan was funded in September 2001). During the Summer of 2001, the Koellings caused $1,500,000 to be advanced to Qmect to enable it to meet its operating expenses (the "$1.5 Million Loan").

10.   The $1.5 Million Loan was secured by real property (the "Kids Connection Real Property") owned by Kids Connection, Inc. ("Kids Connection"), a corporation owned by Linda Koelling.  The funds were wired directly from Kids Connection's bank account to Qmect's bank account.  However, on advice of the Koellings' accountant, the $1.5 Million Loan was documented as a loan by Kids Connection to the Koellings followed by a loan by the Koellings to Qmect.  In connection with the Burlingame Loan, the Koellings signed an agreement, providing that repayment of the $1.5 Million Loan would be subordinated to the Burlingame Loan (the "Burlingame Subordination Agreement").

11.   In November 2001, shortly before the Burlingame Loan was due to close, Burlingame insisted that the Koellings execute a personal guaranty of the Burlingame Loan (the "Burlingame Guaranty").   The Burlingame Guaranty included the following provision (the "Carve Out"):

4

> 9. Notwithstanding anything to the contrary
> contained in the instrument, no recourse may
> be had against, no judgment satisfied out of,
> any of the Excluded Assets (as defined below)
> for or arising out of any obligations,
> liabilities or indemnities of Guarantor. As
> used herein, the term "Excluded Assets" shall
> mean and refer to any and all of Guarantor's
> ownership in Kids Connection, Inc.
> Notwithstanding the foregoing, any asset which
> would otherwise be included in the definition
> of Excluded Assets, shall not be considered a
> part of Excluded Assets if Guarantor invests
> additional cash or other assets in Kids
> Connection, Inc. or Guarantor purchases
> additional shares of stock or any other form
> of ownership in Kids Connection, Inc. without
> Lender's prior written consent.

12. The Burlingame Guaranty was secured by Fred Koelling's stock in Qmect (the "Qmect Stock Collateral"). At that time, the Qmect Stock Collateral represented a controlling interest in Qmect.

13. The Burlingame Loan was used in part to pay off the Flat Note Loan. The net proceeds of the Burlingame Loan, after paying off the Flat Note Loan, were largely used to pay interest to Burlingame and a $60,000 finder's fee to Sierra.

14. Qmect was unable to service the Burlingame Loan, and it went into default in July 2002.

15. In October 2002, Qmect and the Koellings filed an action in state court against the Judsons, Sierra, and Burlingame for fraud and negligent misrepresentation, among other things (the "Breach of Fiduciary Duty Action"). However, the complaint in that action (the "Breach of Fiduciary Duty Complaint") was not served on the defendants at that time.

5

16.    In September 2002, Linda Koelling entered into an agreement with Kids Connection, increasing her annual salary from $80,000 to $225,000 and securing the obligation by a deed of trust on the Kids Connection Real Property (the "September 2002 Salary Increase").

17.    During the fall of 2002, Qmect engaged Alternative Capital Strategies, LLC ("ACS") to assist it in reorganizing its financial affairs.

18.    In November 2002, Robert Judson wrote a letter to the investors in Burlingame, expressing his concern that Qmect or a party friendly to Qmect might purchase the Original Comerica Loans (the "November 2002 Investor Letter").  He stated that such a purchase could be detrimental to Burlingame.  He did not express the view that such a purchase would violate any agreement between Burlingame and either Comerica or Qmect.

19.    In the November 2002 Investor Letter, Robert Judson also stated that Burlingame had been in negotiations with Comerica with regard to Burlingame's purchase of the Original Comerica Loans at a discount of approximately $100,000 of their face amount.  Burlingame did not inform Qmect or the Koellings about its negotiations with Comerica.

20.    In the November 2002 Investor Letter, Robert Judson also stated that he did not wish to foreclose on the Qmect Stock Collateral because Qmect had a number of unpaid liabilities, including unpaid payroll taxes.

6

21.  In early 2003, ACS located a proposed lender, Structured Capital Group ("SCG").  The principal of SCG is an individual named Basem Zakariya ("Zakariya").  SCG made a proposal to Comerica and Burlingame for a restructuring of Qmect's secured debt.  Neither secured creditor was interested in the proposal.

22.  On May 28, 2003, SCG sent a letter to Comerica, offering to purchase the Original Comerica Loans.  The letter offered two alternative prices:  (1) $2.7 million, of which $1.8 million would be paid to Comerica at closing, the remaining $900,000 of which would be placed in an escrow or with a court pending resolution of a dispute between Comerica and Qmect concerning this portion of the debt or (2) $2.1 million at closing in full satisfaction of the purchase price and in settlement of all claims.

23.  In or before May 2003, the Breach of Fiduciary Duty Complaint was served on the Defendants.  On May 29, 2003, Burlingame e-mailed to the Koellings a notice of the proposed foreclosure sale of the Qmect Stock Collateral which was scheduled to take place on June 12, 2003.

24.  On or before June 4, 2003, Burlingame learned that SCG was attempting to purchase the Original Comerica Loans.  On June 4, 2003, Burlingame's counsel sent a letter to Comerica's counsel, threatening to sue Comerica if Qmect or a Qmect affiliate purchased the Original Comerica Loans (the "First Litigation Threat Letter").

25.  In the First Litigation Threat Letter, Burlingame's counsel claimed that Comerica's sale of the Original Comerica

7

Loans to a third party without giving Burlingame 90 days' prior notice would violate Burlingame's subordination agreement with Comerica (the "Comerica Subordination Agreement"). Burlingame's counsel also asserted that the sale of the Original Comerica Loans to an affiliate of Qmect would violate various provisions of the Burlingame Loan agreement (the "Burlingame Loan Agreement"). Qmect was not provided with a copy of the First Litigation Threat Letter.

26. On June 9, 2003, Comerica sent a letter to Qmect and Burlingame, by fax and personal delivery, informing them that Comerica had decided to sell the Original Comerica Loans. The letter disclosed that Comerica had received an offer to purchase the Original Comerica Loans from an entity that appeared to be affiliated with Qmect. The letter stated that the offer had now expired. In the letter, Comerica proposed to give the parties an opportunity to bid against each other for the purchase of the Original Comerica Loans.

27. On June 9, 2003, Qmect issued additional shares and transferred them to Robert McNeill ("McNeill"), Business Debt Solutions ("BDS"), and Qmect Funding, LLC ("Qmect Funding").[2] The result of this transaction was that the Qmect Stock Collateral no longer represented a controlling interest in Qmect. On the same day, Qmect's Board of Directors adopted a corporate resolution

_____

[2] McNeill was an existing shareholder. BDS was an entity which had previously provided consulting services to Qmect. Qmect Funding was an entity formed by Zakariya in anticipation of acquiring the Original Comerica Loans.

8

purporting to make Zakariya a director. On the same day, the Koellings assigned to Kids Connection their right to repayment by Qmect of the $1.5 Million Loan.

28. On June 10, 2003, Qmect sought a temporary restraining order in state court of the proposed stock foreclosure sale. Qmect did not disclose to the state court or to Burlingame at that time that it had issued additional stock in Qmect. The temporary restraining order was denied.

29. On June 12, 2003, the day of the foreclosure sale, Fred Koelling informed Robert Judson about the issuance and transfer of the additional stock. As a result, Burlingame chose not to proceed with the foreclosure sale. Instead, the parties discussed a strategy for cooperative bidding for the Original Comerica Loans.

30. On or about June 14, 2003, Burlingame, Qmect, the Koellings, and SCG entered into a written agreement concerning bidding for the Original Comerica Loans (the "June 14 Agreement"). The June 14 Agreement contained the following provisions:

(A) Before 9:00 a.m on June 16, 2003, Qmect and the Koellings would dismiss with prejudice the third and fourth claim in the Breach of Fiduciary Duty Complaint: i.e., the fraud and negligent misrepresentation claims.

(B) Before 3:00 p.m. on June 17, 2003, Burlingame would make an offer to purchase the Original Comerica Loans at a price determined to be appropriate by Burlingame. Burlingame agreed to provide a copy of the offer to SCG at the time the offer was

9

submitted to Comerica. If the offer were rejected or a counterproposal were made by Comerica, Burlingame and SCG would cooperate in determining the appropriate response.

(C) If Comerica did not accept Burlingame's offer (or any subsequent offer submitted by Burlingame) by September 15, 2003, then Burlingame and SCG would each be entitled to submit independent offers to purchase the Original Comerica Loans. Until then, neither Qmect nor SCG, nor any of their affiliates would submit an offer to purchase the Original Comerica Loans.

(D) If Comerica accepted Burlingame's offer to purchase the Original Comerica Loans by September 15, 2003, then SCG would have 90 days from the date of purchase to purchase a 50 percent interest in the Original Comerica Loans. The purchase price for this 50 percent interest would be 50 percent of the price paid by Burlingame plus 50 percent of the interest accruing on the Original Comerica Loans from the date of purchase to the date of payment for the 50 percent interest. Alternatively, SCG had the right, instead of purchasing the 50% interest in the Original Comerica Loans, to payment of $250,000. These rights would not apply if Burlingame purchased the Original Comerica Loans after September 15, 2003.

(E) If Burlingame or any party affiliated with Burlingame purchased the Original Comerica Loans, Burlingame would release the Koellings from the Comerica Guaranties. This provision was subject to the following handwritten provision, referred to as Rider 1 (the "Good Faith Provision"):

10

> All parties agree to cooperate in good faith
> to achieve the purposes of this agreement. No
> party shall be deprived of any benefit of this
> agreement under this provision unless and
> until a court has ruled that such party has
> acted in bad faith and should be deprived of
> such benefit.
>
> Without limiting the foregoing, with respect
> to the unconditional guaranty, in the event
> that Burlingame should make a claim that
> Koelling acted in bad faith with regard to the
> joint bidding process, the guaranty shall
> remain in effect, and Burlingame shall take no
> action to enforce it, until a court has ruled
> on the matter. If Burlingame & Company [i.e.,
> SCG] have both bid on the notes and Burlingame
> has purchased the bank documents and the court
> has ruled that Koelling acted in bad faith in
> the joint bidding process, then the court may
> order that Koelling guaranty will not [be]
> released.

(F) Finally, the June 14 Agreement provided that nothing in the agreement would affect the rights, remedies or obligations of Burlingame, Qmect or the Koellings under the Burlingame Loan Agreement.

31. Burlingame made an offer to purchase the Comerica Loans for $1,600,000 on or before June 17, 2003. Comerica rejected the offer without making a counteroffer. Shortly thereafter, Ken Tamizato ("Tamizato"), the loan officer from Comerica in charge of the Original Comerica Loans, called Fred Koelling and inquired why Burlingame was the only party bidding. Fred Koelling did not disclose the existence of the June 14 Agreement to Tamizato. Tamizato told Fred that he would have to "turn the heat up": e.g., by calling the loans so that the loans would accrue interest at a

11

default rate. Fred Koelling conveyed the substance of this conversation to Robert Judson.

32. On June 20, 2003, counsel for Burlingame wrote another letter to counsel for Comerica (the "Second Litigation Threat Letter"). In the Second Litigation Threat Letter, counsel asserted again that sale of the Original Comerica Loans to Qmect or a Qmect affiliate would violate the Comerica Subordination Agreement as well as the Burlingame Loan Agreement. He also asserted that, by threatening to begin charging default interest on the Original Comerica Loans under these circumstances, Comerica would be exposing itself to a lawsuit by Qmect. Qmect was not provided with a copy of the Second Litigation Threat Letter.

33. After Comerica rejected Burlingame's initial offer to purchase the Original Comerica Loans, on or about July 15, 2003, Burlingame and Qmect entered into a term sheet (the "July 15 Term Sheet"). The July 15 Term sheet provided for two alternative courses of action, designated as Plan A and B.

(A) Plan A provided that, subject to Comerica's approval, Qmect and the Koellings would execute a deed in lieu of foreclosure to Burlingame, transferring Qmect's assets to Burlingame, in partial satisfaction of its debt. The amount of the debt would be agreed upon between the parties. The assets would be transferred into a new company, into which Burlingame would inject $500,000 of equity. Qmect's debt to Comerica would become the debt of the new company.

12

(B) Plan B provided that, if Comerica did not approve of Plan A, the capitalization of Qmect would be restored so that the shares held by Burlingame to secure the Burlingame Guaranty would represent 95 percent of all outstanding stock. Burlingame would be entitled to replace any individuals on the Board of Directors who were no longer shareholders. It was anticipated that the new Board might elect to file a chapter 11 petition on behalf of the new company. Under this scenario, Burlingame would have no obligation to make any loans or capital contributions to Qmect.

(C) Under either Plan A or B, Fred Koelling would continue to serve as President of Qmect, but not as CEO, for one year, at a specified salary, an agreement which could be renewed annually. His duties would be primarily in sales and research and development. He would continue to be a member of the Board of Directors. Burlingame agreed not to enforce the Burlingame Guaranty during this one year period and to release the Koellings from the Burlingame Guaranty at the end of the year provided Fred Koelling complied with his obligations under the employment agreement.

34. On September 5, 2003, Burlingame made a second offer to purchase the Original Comerica Loans. This time, the offer was for only $1,400,000, $200,000 less than the original offer. SCG was given notice of Burlingame's intention to make this offer shortly before it was communicated to Comerica and did not object to the amount. Comerica rejected the offer and did not make a counteroffer.

13

35.   The 90 day period during which, pursuant to the June 14 Agreement, Burlingame had the exclusive right to bid on the Original Comerica Loans until September 15, 2003.  Neither Qmect nor SCG, nor any of their affiliates, made any attempt to bid on the Original Comerica Loans during that period.

36.   Comerica would not agree to Plan A set forth in the July 15 Term Sheet.  Fred Koelling asked Robert Judson why they could not then proceed in accordance with Plan B.  On September 16, 2003, Robert Judson wrote a letter to Fred Koelling, expressing various reasons why Plan B did not appear viable.

37.   On October 13, 2003, Qmect Funding, the entity formed by Zakariya in anticipation of purchasing the Original Comerica Loans, wrote a letter to Tamizato, offering to purchase the Original Comerica Loans for $1.7 million.  Comerica agreed to sell the Original Comerica Loans to Qmect Funding for this amount (the "Qmect Funding Sale Agreement") and loan documents were drafted. Neither SCG nor the Koellings advised the Judsons of the Qmect Funding Sale Agreement.

38.   On October 29, 2003, Robert Judson wrote to Fred Koelling, requesting updated financial information, ostensibly to assist Burlingame in continuing its attempt to purchase the Original Comerica Loans.  Fred Koelling did not provide the requested information until January 14, 2004.

39. In early January 2004, the Judsons learned about the impending sale of the Original Comerica Loans to Qmect Funding. On January 14, 2004, Robert Judson e-mailed Fred Koelling, asking

14

him to confirm or deny whether this transaction was in progress. In the e-mail, he asserted that the purchase of the Original Comerica Loans by Qmect Funding would violate the Burlingame Loan Agreement.

40. On January 14, 2004, Burlingame's counsel wrote to counsel for Comerica, making the same assertions made in the e-mail to Fred Koelling and threatening legal action (the "Third Litigation Threat Letter"). On January 22, 2004, Burlingame issued deposition subpoenas directed to Tamizato and Comerica in the Breach of Fiduciary Duty Action.

41. On January 16, 2004, Burlingame's counsel wrote to counsel for Zakariya, asserting that his efforts to purchase of the Original Comerica Loans violated the Burlingame Loan Agreement.

42. Notwithstanding these threats, negotiations between Comerica and Qmect Funding concerning the purchase of the Original Comerica Loans proceeded. However, Comerica insisted that Zakariya personally agree to indemnify Comerica from any suit by Burlingame regarding the transaction. Zakariya refused to do so. On January 23, 2004, Zakariya signed the draft Qmect Funding Sale Agreement and sent it to Comerica, with the indemnification provision deleted. He also sent Comerica a $25,000 deposit.

43. On January 26, 2004, counsel for Burlingame wrote to counsel for Comerica, offering to purchase the Original Comerica Loans for $50,000 more than the $1.7 million offered by SCG. Comerica asked Burlingame to indemnify it from any suit by Qmect

15

or Qmect Funding. Burlingame refused. Nevertheless, on or about February 2, 2004, Burlingame and Comerica executed an agreement providing for the sale of the Original Comerica Loans to Burlingame for $1,825,000 (the "Burlingame Loan Sale Agreement"). The Burlingame Loan Sale Agreement did not include an indemnification agreement.

44.    Shortly after acquiring the Comerica Loans, Burlingame commenced foreclosure proceedings with respect to Qmect's personal property assets and filed suit against the Koellings in state court on the Burlingame Guaranty (the "Guaranty Action").

45.    On February 27, 2004, Qmect filed a chapter 11 petition to stop the foreclosure sale.

46.    Shortly thereafter, Burlingame transferred the Original Comerica Loans to a newly formed entity ("Burlingame Funding").

47.    On November 16, 2004, the Koellings filed a chapter 11 petition.

48.    Burlingame and Burlingame Funding filed timely proofs of claim (the "Proofs of Claim") in both chapter 11 cases.

49.    After the chapter 11 cases were filed, the two lawsuits between the parties filed in state court were removed to the bankruptcy court. The Guaranty action was designated A.P. No. 04-4365 AT (the "Guaranty Action") and the Breach of Fidcuiary Duty Action was designated A.P. 04-4366 AT. Some of the claims in those actions were subsequently remanded to state court.

Case: 04-04190    Doc# 192    Filed: 02/08/06    Entered: 02/09/06 10:30:56    Page 16 of 67

50.  During the chapter 11 case, Qmect commenced A.P. No 04-4190 AT (the "Equitable Subordination Action").  The three adversary proceedings were consolidated for trial.

51.  On or about August 24, 2005, the Court granted summary judgment with respect to some of the claims asserted in the consolidated adversary proceedings.  Shortly before the trial commenced, the Court permitted Burlingame and Qmect to amend their pleadings to dismiss certain claims, to add other claims, and to add new parties to existing claims.

**CONCLUSIONS OF LAW (INCLUDING CLAIM SPECIFIC FINDINGS OF FACT)**

As noted above, this decision addresses claims asserted in three adversary proceedings which were tried to the Court on a consolidated basis.  The Court's findings and conclusions with respect to the claims asserted in the Equitable Subordination Action, A.P. No. 04-4190 AT, are set forth in Section A below. The Court's findings and conclusion with respect to the claims asserted in the Guaranty Action, A.P. No. 04-4365 AT, are set forth in Section B below.  The Court's findings of fact and the conclusions of law with respect to the Breach of Fiduciary Duty Action, A.P. No. 04-4366 AT, are set forth in Section C below.

**A.  EQUITABLE SUBORDINATION ACTION**

As tried to the Court, the Equitable Subordination Complaint included four claims for relief: (1) Intentional Interference With Prospective Economic Advantage, (2) Breach of Contract, (3) Breach of Covenant of Good Faith and Fair Dealing, and (4) Objection to Claims.  The first three claims were asserted only as offsets to

17

the Proofs of Claim and not as a basis for affirmative relief. The Court's findings of fact and its conclusions of law with respect to these claims for relief are set forth in sections A-1, A-2, A-3, and A-4, respectively. Qmect has the burden of proof with respect to the first three claims. The burden of proof with respect the fourth claim for relief will be discussed in section A-4.

**1. Intentional Interference With Prospective Economic Advantage**

In this claim for relief, Qmect alleged that Burlingame intentionally interfered with its prospective economic advantage by sending the Litigation Threat Letters. It alleged that this was intended to and did disrupt Qmect Funding's attempt to purchase the Original Comerica Loans to its detriment.[3] The elements of a claim for intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and a third party containing the probability of future benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant. <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 389, 393 (1995).

_____

[3]This claim is also asserted against Burlingame Funding. However, no evidence was presented supporting such a claim in that Burlingame Funding was not formed until after the conduct in question occurred.

18

The acts that caused the disruption must be wrongful as a legal matter for some reason other than that they interfered with the prospective economic relationship.  _Id._, at 393.

At trial, Qmect presented persuasive evidence that it had an economic relationship with Qmect Funding and that Burlingame knew of this economic relationship.  It also presented persuasive evidence that Burlingame sent the Second and Third Litigation Threat Letters with the intention of disrupting that prospective economic relationship.  As discussed in the next claim for relief, the Court was also persuaded that these acts actually disrupted that relationship.  Furthermore, the Court was persuaded that these acts were otherwise wrongful in that they constituted a breach of the June 14 Agreement.

However, as discussed more fully in connection with the next claim for relief, for breach of contract, the Court finds and concludes that this claim must fail for two reasons.  First, Qmect failed to persuade the Court that there was a probability of future benefit to Qmect if Qmect Funding acquired the Original Comerica Loans.  Second, for the same reason, Qmect failed to persuade the Court that it was damaged by Burlingame's disruption of the prospective economic relationship.  Given this conclusion, the Court need not address the defenses to this claim raised by Burlingame: e.g., that the claim is barred by the competition privilege or the litigation privilege.

**2.  Breach of Contract**

19

In this claim for relief, Qmect alleged that Burlingame breached the June 14 Agreement by causing Comerica to renege on the Qmect Funding Loan Sale Agreement. It alleged that Comerica's failure to sell the Comerica Loans to be Qmect Funding caused Qmect to suffer damages in an amount to proven at trial. Qmect alleged that it performed all of its obligations under the June 14 Agreement.

Based on the evidence presented at trial, the Court finds and concludes that Qmect performed all of its obligations under the June 14 Agreement. The Court finds and concludes that Burlingame breached the Good Faith Provision of the June 14 Agreement by sending the Second and Third Litigation Threat Letters to Comerica.

In the June 14 Agreement, Burlingame agreed that, if it failed to purchase the Original Comerica Loans by September 15, 2003, Burlingame and SCG would each be entitled to make independent bids for the Original Comerica Loans. The Good Faith Provision provided that Burlingame, SCG, and Qmect would all cooperate in good faith to achieve the purposes of the June 14 Agreement. Burlingame breached the Good Faith Provision by interfering with SCG's rights to make an independent bid for the Original Comerica Loans after the 90 days had expired.[4]

---

[4]The Court does not consider significant the fact that Zakariya intended to purchase the Original Comerica Loans through Qmect Funding rather than SCG.

20

Burlingame contended that the June 14 Agreement did not give SCG the right to bid for the Original Comerica Loans even after the expiration of the 90 day period. It contended that the purchase of the Original Comerica Loans by Qmect Funding violated its rights under the Burlingame Loan Agreement, among other things, and that it preserved its right to object to SCG bidding in paragraph 5 of the June 14 Agreement.[5] Jan Judson testified that this understanding of the June 14 Agreement was discussed among the parties at the time the agreement was executed of the June 14 Agreement. The Court did not believe Jan Judson's testimony. The plain language in paragraph 2 states otherwise. Had the parties agreed to such an important provision, the Court believes that it would have been spelled out more clearly in the June 14 Agreement.

The Court also finds and concludes that the Second and Third Litigation Threat Letters caused Comerica to renege on the Qmect Funding Loan Sale Agreement. The Court was persuaded that Zakariya could have obtained the financing required to purchase the Original Comerica Loans and would have completed the purchase had Comerica not insisted on being indemnified. The Court was also persuaded that Comerica would have sold the Original Comerica Loans to Qmect Funding without requiring the indemnification but for the Second and Third Litigation Threat Letters. The critical

_____

[5]As noted above, paragraph 5 of the June 14 Agreement provided that nothing in the agreement would affect the rights, remedies or obligations of Burlingame, Qmect or the Koellings under the Burlingame Loan Agreement.

Case: 04-04190   Doc# 192   Filed: 02/08/06   Entered: 02/09/06 10:30:56   Page 21 of 67

evidence supporting this conclusion is the fact that Comerica sold the Original Comerica Loans to Burlingame even though Burlingame refused to indemnify Comerica.

The Court was not persuaded that Comerica sold the Original Comerica Loans to Burlingame because Burlingame offered more money. Had price been the issue, Comerica would have gone back to Qmect Funding for a higher bid. Although Burlingame's offer to close the transaction in seven days may have been attractive to Comerica, particularly at the time the offer was made, the Court is persuaded that the sale to Qmect Funding could have closed sooner than the sale to Burlingame had Burlingame not interfered with the sale to Qmect Funding.

However, to prevail on its breach of contract claim, Qmect must establish that it was damaged by Burlingame's breach. Thus, Qmect was required to persuade the Court that, more probably than not, it would have been better off if Qmect Funding had purchased the Original Comerica Loans than it is now as a result of Burlingame having purchased them. For this purpose, Qmect called Zakariya as a witness.

Zakariya testified that, if Qmect Funding had acquired the Original Comerica Loans, he intended to propose to Burlingame that Qmect Funding reduce the amount of its secured claim to the amount it had paid for the Original Comerica Loans. In return, Burlingame would be required to convert $1 million of its secured claim to equity. Qmect Funding would also receive equity for the amount it reduced its secured claim. Qmect's secured debt would

Case: 04-04190   Doc# 192   Filed: 02/08/06   Entered: 02/09/06 10:30:56   Page 22 of 67

thereby reduced by almost $2 million. The problem with this proposal was that, to become a reality, it would have required Burlingame's consent. Jan Judson testified that Burlingame never would have agreed to such a proposal. The Court believed her.

The result of this proposal would have been that Fred Koelling, Qmect Funding, and Burlingame would have shared the equity in Qmect. It was not clear whether Qmect Funding would have acquired a controlling interest by virtue of the transaction. However, it might have since, according to Zakariya, it already held a 35 percent equity interest. However, clearly, Burlingame would have been a minority shareholder. The Court was persuaded that Burlingame would not have been willing to accept such a role in Qmect under the circumstances.

Qmect Funding could have pressured Burlingame to agree by threatening to foreclose on Qmect's assets. Since the Original Comerica Loans were senior to Burlingame's secured claim, Burlingame's security interest would have been extinguished as a result of such a foreclosure. However, Burlingame could have purchased the Original Comerica Loans at the foreclosure sale, albeit at the face amount. The Court is persuaded that Burlingame would have preferred doing so to accepting the role of a minority shareholder in a Qmect owned jointly with the Koellings and Zakariya.

Qmect presented no other evidence concerning what would have happened absent an agreement between Qmect Funding and Burlingame. Qmect had no agreement with Zakariya that Qmect Funding would

23

convert any portion of the face amount of the Original Comerica Loans to equity. Qmect Funding's acquisition of the Original Comerica Loans would not have prevented Burlingame from foreclosing. Thus, Qmect still would have been required to file a bankruptcy petition to stay such a foreclosure. Given the absence of persuasive evidence of damages, the Court is compelled to find in favor of Burlingame on this claim.[6]

### 3. Breach of Covenant of Good Faith and Fair Dealing

In this claim for relief, Qmect alleged that Burlingame breached the implied covenant of good faith and fair dealing with respect to the June 14 Agreement by interfering with Qmect Funding's attempt to purchase the Original Comerica Loans. This claim duplicates the claim for breach of contract discussed in the preceding section. For the same reason, failure to prove damages, the Court finds in favor of Burlingame.

### 4. Objections to Proofs of Claim

In this claim, Qmect objected to proofs of claim filed by Burlingame and Burlingame Funding, asserting claims in partially quantified amounts.[7] A properly executed and filed proof of claim

---

[6]Burlingame asserts various defenses to this claim. Given the Court's conclusion that Qmect has failed to prove that it incurred any quantifiable damages as a result of Burlingame's breach of the June 14 Agreement, the Court not need address them.

[7]They also filed proofs of claim asserting unquantified amounts for damages, fees, and costs, and related items based on the claims asserted in the Guaranty Action and the Burlingame Cross-Complaint. Qmect did not object to these proofs of claim. Thus, to the extent that Burlingame and Burlingame Funding have

24

is prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. Proc. 3001(f). Thus, unless an objection is filed that is of sufficient substance to put the validity and/or amount of the claim in controversy, the claim is deemed allowed. If a sufficient objection is filed, the claimant has the burden of proving its claim. The Court's findings and conclusions with respect to these contested proofs of claim are set forth below.

**a. <u>Burlingame's Proof of Claim</u>**

Burlingame filed a proof of claim in the Qmect bankruptcy case, asserting a secured claim in the principal amount of $2,000,000, for pre-petition interest of $1,047,836.25, and for an unquantified amount of late fees and costs of collection, including attorneys' fees. Qmect objected to Burlingame's proof of claim only on the ground that it was entitled to assert offsets to those claims. Qmect had the burden of proof with respect to these offset claims. As discussed elsewhere, the Court finds and concludes that it failed to meet that burden.

At trial, Burlingame presented persuasive evidence establishing certain elements of its claim that were not quantified in its proof of claim--e.g., late charges and attorneys' fees--and corrected certain mistakes in the quantified portions of the proof of claim--e.g., pre-petition interest. Based on the evidence presented, the Court finds and concludes

_____

established at trial the right to payment by Qmect based on the claims asserted in the Guaranty Action and the Burlingame Cross-Complaint, these claims are deemed allowed.

25

that Burlingame is entitled to an allowed claim in the Qmect bankruptcy case in the following amounts: (a) $2,000,000 in principal, (b) $1,043,635.01 in pre-petition interest, (c) $27,779.23 in late fees, and (d) $357,998.59 in costs of collection.[8]

   **b.  Burlingame Funding's Proof of Claim**

   Burlingame Funding filed a proof of claim in the Qmect case, asserting a claim in the principal amount of $2,520,054.18, for pre-petition interest totaling $32,194.82, plus an unquantified amount of late fees and costs of collection, including attorneys' fees.  Qmect objected to Burlingame's proof of claim on the ground that the proof of claim was insufficiently detailed to establish a prima facie case in support of the claim.  Specifically, it contended that the proof of claim was insufficient because it failed to allocate the amounts owed among the four loan facilities.  The Court summarily adjudicated this issue in favor of Qmect prior to trial.

---

   [8]The Koellings are liable for Qmect's debts to Burlingame pursuant to the Burlingame Guaranty.  Burlingame filed a timely proof of claim in the Koellings' bankruptcy case.  The Koellings did not object to the proof of claim.  Nevertheless, at trial, Burlingame presented sufficient evidence at trial to establish certain unquantified portions of the claim that were different from the claim asserted against Qmect: i.e., for pre-petition interest, late fees, and collection costs accruing after Qmect filed its bankruptcy petition and before the Koellings filed their bankruptcy petition.  Based on the evidence presented, the Court finds and concludes that Burlingame's claim against the Koellings should be allowed in the following amounts: (a) $2,000,000 in principal, (b) $1,455,180.55 in pre-petition interest, (c) $40,057.01 in late fees, and (d) $1,413,132.80 in costs of collection.

26

At trial, Burlingame Funding presented persuasive evidence establishing the amounts of its claim. Based on the evidence presented, the Court finds and concludes that Burlingame Funding is entitled to a allowed claim in the Qmect bankruptcy case in the following amounts: (a) a claim for $187,500 in principal and $1,696.31 in pre-petition interest pursuant to the variable rate installment note, (b) a claim for $537,816.96 in principal and $5,052.51 in pre-petition interest pursuant to the note secured by a deed of trust, (c) a claim for $894,737.22 in principal and $8,948.32 in pre-petition interest pursuant to the amended and restated note secured by a deed of trust, and (d) a claim for $900,000 in principal and $7,850.60 in pre-petition interest pursuant to the master revolving note.[9]

**B. GUARANTY ACTION**

As tried to the Court, the Guaranty Action consisted of a complaint filed by Burlingame against the Koellings (the "Guaranty Complaint") and a cross-complaint filed by the Koellings against Burlingame (the "Koelling Cross-Complaint"). The Court's findings

---

[9]Burlingame Funding also filed a proof of claim in the Koellings' bankruptcy case based on the Koellings' liability under the Comerica Guaranties. Although the Koellings did not file an objection to this proof of claim, Burlingame Funding presented evidence in support of its claim against the Koellings at trial. The only difference from the evidence presented in support of Burlingame Funding's proof of claim in the Qmect case was the accrual of additional pre-petition interest. However, as discussed elsewhere, the Court has concluded that the Koellings are entitled to a release of their liability pursuant to the Comerica Guaranties. Therefore, this claim will be disallowed.

27

and conclusions with respect to the claims asserted in the Guaranty Complaint are set forth in section B-1 below. The Court's findings and conclusions with respect to the claims asserted in the Koelling Cross-Complaint are set forth in section B-2 below.

**1. Guaranty Complaint**

As tried to the Court, the Guaranty Complaint included two claims for relief: (a) breach of the Comerica Guaranties and (b) declaratory relief. Burlingame Funding has the burden of proof on both claims. The Court's findings of fact and conclusions of law with respect to these claims are set forth in section B-1-a and B-1-b, respectively.

**a. Breach of Comerica Guaranties**

In the first claim for relief, Burlingame Funding alleged as follows:

In 1998, when Qmect obtained loans from Comerica to build its new facility, the Koellings executed the Comerica Guaranties. On February 5, 2004, Burlingame purchased the Original Comerica Loans, including the Comerica Guaranties. On February 29, 2004, Burlingame assigned the Original Comerica Loans, including the Comerica Guaranties, to Burlingame Funding.

Commencing in 2003, Qmect defaulted on the Original Comerica Loans. On various dates in 2003, Comerica sent notices of default to the Koellings, demanding repayment of the amounts due under the Original Comerica Loans. The Koellings have failed to comply with their obligations pursuant to the Comerica Guaranties. Thus,

28

Burlingame Funding prays for judgment in the amount due under the Comerica Guaranties.

At trial, Burlingame Funding presented persuasive evidence of the allegations recited above and established the amounts due from the Koellings pursuant to the Comerica Guaranties. However, as discussed in connection with the next claim for relief, the Court finds and concludes that the Koellings are entitled to a release of their liability pursuant to the Comerica Guaranties by virtue of the June 14 Agreement. Thus, judgment will be granted in favor of the Koellings on this claim.

**b. Declaratory Relief**

In the second claim for relief, Burlingame alleged as follows:

On or about November 21, 2001, Burlingame and Qmect signed an agreement (the "Burlingame Loan Agreement") pursuant to which Burlingame loaned Qmect $2,000,000 (the "Burlingame Debt").[10] Thereafter, a dispute arose among the parties concerning the Burlingame Loan Agreement. It alleged that, on or about October 23, 2002, Qmect and the Koellings filed suit against Burlingame and others in San Mateo Superior Court, and that Burlingame filed a cross-complaint against the Koellings.

On or about June 14, 2003, Burlingame, Qmect, the Koellings, and SCG entered into the June 14 Agreement. The June 14 Agreement gave Burlingame the exclusive right to bid on the Original Comerica Loans from the date of the agreement to September 15,

---

[10]The claim actually alleged that Qmect loaned this amount to Burlingame. However, this is an obvious mistake.

29

2003. Thereafter, the June 14 Agreement provided, among other things, that, if Burlingame had not purchased the Original Comerica Loans by September 15, 2003, then Burlingame and SCG would each be entitled to submit independent bids.

The June 14 Agreement provided that, if Burlingame were successful in purchasing the Original Comerica Loans, the Koellings would be released from the Comerica Guaranties. However, the release was subject to a provision requiring all of the parties to the June 14 Agreement to "cooperate in good faith to achieve the purposes of" the agreement. If it were determined that the Koellings acted in bad faith in the joint bidding process, they would not be entitled to a release from the Comerica Guaranties. The second claim for relief alleged that, although Burlingame had acquired the Original Comerica Loans, the Koellings were not entitled to a release from the Comerica Guaranties because they acted in bad faith. Ten acts of bad faith were alleged.

The second claim for relief alleged further that the June 14 Agreement gave Burlingame the right, if it acquired the Original Comerica Loans, to appoint a new CEO to replace Fred Koelling. This CEO would be entitled to remain in charge of Qmect as long as any debt remained due from Qmect to Burlingame. Burlingame did acquire the Original Comerica Loans and advised Fred Koelling that it wished to appoint an individual named Robert Sick as CEO in place of Fred. Fred Koelling refused to step down as CEO so as to permit Robert Sick to take charge of Qmect.

30

In the second claim for relief, Burlingame sought a declaration that the Koellings had acted in bad faith within the meaning of the Good Faith Provision of the June 14 Agreement and thus were not entitled to a release of the their liability under the Comerica Guaranties. It also sought a declaration that, by refusing to let Robert Sick take over as CEO of Qmect, the Koellings "repudiated" the June 14 Agreement and thus were not entitled to assert a right to a release of liability on the Comerica Guaranties pursuant to that agreement.

There was no evidentiary dispute concerning the allegation that Burlingame, Qmect, the Koellings, and SCG entered into the June 14 Agreement. However, the parties disagreed about the meaning of certain provisions of the June 14 Agreement. In addition, conflicting evidence was presented concerning whether the Koellings committed some of the acts or omissions complained about by Burlingame Funding. There were also legal disputes concerning whether these acts or omissions qualified as bad faith within the terms of the June 14 Agreement. Finally, there were factual and legal disputes regarding whether the Koellings breached the June 14 Agreement by refusing to permit Robert Sick to take over as CEO of Qmect and, if so, whether this deprived them of the right to a release of liability pursuant to the Comerica Guaranties. The Court's findings and conclusions with respect to those disputes are as follows.

**(1) Construction of June 14 Agreement**

The parties read the June 14 Agreement differently in several ways. First, the Koellings contended that the good faith requirement only pertained to the initial 90 day period, during which Burlingame had the exclusive right to attempt to purchase the Original Comerica Loans. Burlingame contended that the requirement continued throughout the bidding process. The Court agrees with Burlingame's reading of the June 14 Agreement on this point. The relevant language cannot reasonably be read as limiting the effect of the Good Faith Provision to the initial 90 day period.

Second, the Koellings contended that, by agreeing that, after the initial 90 day period, Burlingame and SCG would each be entitled to submit independent bids, Burlingame waived any right to claim that SCG's purchase the Original Comerica Loans would violate Burlingame's contractual rights. Burlingame contended that paragraph 2 of the June 14 Agreement, which permitted SCG to bid, was essentially nullified by paragraph 5, which provided that Burlingame's contractual rights remained unaffected. At best this provision was ambiguous.

Jan Judson testified that this issue was negotiated at the time the June 14 Agreement was executed. She claimed that the parties understood that Burlingame was preserving its right to contend that SCG was not entitled to bid. The Court did not believe her testimony. Such an important provision would have been spelled out more clearly in the written agreement. Moreover,

32

the Court did not believe that Zakariya would have agreed to such a provision.

**(2) Alleged Acts of Bad Faith**

As noted above, Burlingame alleged ten acts of bad faith by the Koellings as follows: (1) failing to inform Burlingame that SCG had previously made an offer to purchase the Original Comerica Loans in May 2004 for $2.1 million, (2) failing to provide Burlingame with information and documents to assist it in formulating an offer to purchase the Original Comerica Loans, (3) supplying Burlingame with fraudulent and misleading documents, (4) refusing to provide Burlingame with information concerning prior efforts to purchase the Original Comerica Loans, (5) assisting SCG in its efforts to purchase the Original Comerica Loans, (6) agreeing to release Comerica from any claim by Qmect and the Koellings if the Original Comerica Loans were sold to Qmect Funding, (7) representing to creditors and others in the lending community that Qmect was arranging for new financing, (8) misrepresenting Qmect's finances, (9) misrepresenting Qmect's relationship with SCG, and (10) misrepresenting Qmect's relationship with Qmect Funding. The Court's findings and conclusions with respect to these allegations are set forth below.

**Items (1) and (4).**

Items (1) and (4) overlap or are duplicative. Item (1) asserts that the Koellings acted in bad faith within the meaning of the June 14 Agreement by failing to inform Burlingame that SCG had previously made an offer to purchase the Original Comerica

33

Loans in May 2004 for $2.1 million. Item (4) asserts that the Koellings acted in bad faith by refusing to provide Burlingame with information concerning prior efforts to purchase the Original Comerica Loans. Having considered the evidence and the argument of the parties, the Court finds and concludes that these acts or omissions do not serve as a basis for finding that the Koellings acted in bad faith within the meaning of the June 14 Agreement.

It is undisputed that, in May 2004, SCG offered to purchase the Original Comerica Loans for $2.1 million. The Judsons testified that, although they learned that an offer had been made in early June 2004, they did not learn the amount of the offer. Later, when the parties entered into the June 14 Agreement, and during the initial period during which Burlingame had the exclusive right to attempt to purchase the Original Comerica Loans, the Koellings did not tell Burlingame the amount that SCG had offered in May 2003. Burlingame contended that, if it had known that SCG had offered to purchase the Original Comerica Loans for $2.1 million in May 2003, it would not have offered to purchase them for $1.6 million in June 2003.

Fred Koelling and Zakariya admitted that they did not disclose to Burlingame the amount of the offer made by SCG in May 2003. However, it was undisputed that the Judsons never asked either individual what amount had been offered. Both individuals stated that, if the Judsons had asked, they would have told them the amount of the offer. The Court believed them.

34

Moreover, the Court is persuaded that, even if the Judsons had known the amount of SCG's May 2003 offer, Burlingame would not have offered any more for the Original Comerica Loans during the initial 90 day period. It is undisputed that, in the fall of 2002, Burlingame entered into negotiations with Comerica concerning the purchase of the Original Comerica Loans and was advised at that time that Comerica was unwilling to sell the loans for less than a $100,000 discount off the $2.7 million face amount of the loans. Given that prior history, Burlingame's offers during the initial initial 90 day period were clearly unreasonably low. Morever, Fred Koelling testified that he told Bob Judson that $1.6 million was too low and that he should offer something in the range of $1.8 to $2 million. The Court believed him.

**Items (5), (6), (9), and (10)**

These items also overlap or are duplicative. Item (5) asserts that that the Koellings acted in bad faith by assisting SCG in its efforts to purchase the Original Comerica Loans. Item (6) asserts the Koellings acted in bad faith by agreeing to release their and Qmect's claims against Comerica if Qmect Funding bought the Origianl Comerica Loans. Item (9) asserts that the Koellings acted in bad faith by misrepresenting their relationship with SCG. Item (10) asserts that the Koellings acted in bad faith by misrepresenting Qmect's relationship with Qmect Funding. Having considered the evidence and the argument of the parties, the Court finds and concludes that these acts or omissions do not

35

serve as a basis for finding that the Koellings acted in bad faith within the meaning of the June 14 Agreement.

It is undisputed that the Koellings assisted Zakariya in his attempts to purchase the Original Comerica Loans after Burlingame failed to do so during the initial 90 day period period. Among other things, they agreed to release any claims against Comerica and to indemnify it against claims and/or defense costs resulting from litigation by Burlingame, both on their own behalf and on behalf of Qmect. However, there is nothing in the June 14 Agreement that requires them to refrain from assisting one party in acquiring the Original Comerica Loans after the initial 90 day period had passed.

The Judsons testified that, during this period, Fred Koelling misrepresented to them that he was no longer working with Zakariya. The Court was not persuaded on this point. However, even if he had, the Court would not find that this constituted a violation of the Good Faith Provision. After the initial 90 day period, if Burlingame had wanted to bid on the Original Comerica Loans in good faith, it would have done so regardless of whether Fred Koelling was still attempting to arrange a sale to Qmect Funding. The Court surmises that, in fact, Burlingame did not wish to purchase the Original Comerica Loans. It simply did not want to have Qmect Funding or anyone else friendly to Qmect purchase them. However, the Good Faith Provision did not entitle Burlingame to compel the Koellings to cooperate with that strategy.

36

**Items (2), (3), and (8)**

Items (2), (3), and (8) are also either duplicative or overlapping. Item (2) asserts that the Koellings failed to provide information and documents to assist Burlingame in making an offer to purchase the Original Comerica Loans. Item (3) asserts that the Koellings supplied Burlingame with fraudulent and misleading documents. Item (8) asserts that the Koellings misrepresented Qmect's finances. Burlingame failed to present persuasive evidence supporting these allegations.

It was undisputed that the Koellings provided Burlingame with substantial information to assist it in making the second offer for $1.4 million. The initial offer for $1.6 million was made almost immediately after the June 14 Agreement was executed. Thus, there would have been no time to provide Burlingame with additional financial information.

Substantial evidence was presented that Fred Koelling failed to provide financial information requested by Burlingame on or about October 29, 2003 until January 14, 2004. SCG made an offer to purchase the Original Comerica Loans on October 29, 2003. Thus, there is some evidence that Fred Koelling delayed providing Burlingame with financial information so that SCG could have an advantage in bidding on the Original Comerica Loans.

However, the Court was not persuaded that this was what caused Fred Koelling to delay providing the requested information for so long. The request for information was extremely detailed. Qmect was short-staffed. Fred Koelling testified at trial that he

37

did not believe at that point that Burlingame had any intention of purchasing the Original Comerica Loans. The Court believed him.

Moreover, as discussed above, the Court was persuaded that Burlingame did not sincerely wish to purchase the Original Comerica Loans. It simply wished to block anyone else from doing so. The Court was persuaded that Burlingame purchased the Original Comerica Loans as a last resort. Thus, the Court finds and concludes that Fred Koelling's delay in providing the requested financial information to Burlingame did not violate the Good Faith Provision of the June 14 Agreement.

**Item (7)**

Item (7) asserts that Fred Koelling represented to creditors and others in the lending community that Qmect was arranging for new financing. The Koellings did not dispute this asserted fact. However, no persuasive argument was made that this act constituted a violation of the Good Faith Provision of the June 14 Agreement.

**(3) Appointment of Robert Sick as CEO**

Burlingame also asserted that the Koellings were not entitled to a release of liability pursuant to the Comerica Guaranties because Fred Koelling refused to let Burlingame appoint a new CEO for Qmect after Burlingame acquired the Original Comerica Loans. As set forth above, the June 14 Agreement provided that, if Burlingame purchased the Original Comerica Loans, it had the right to do so. It was required to consult with Fred Koelling but had the ultimate say in whom to appoint. The new CEO would be

38

entitled to run Qmect until such time as Burlingame's claims were paid in full.

It is undisputed that, after Burlingame acquired the Original Comerica Loans and after its attempt to foreclose on Qmect's assets were blocked by Qmect's chapter 11 filing, Burlingame attempted to appoint Robert Sick as Qmect's CEO. The Court finds and concludes that Burlingame did not consult with Fred Koelling before selecting Robert Sick. However, more important, Burlingame also did not request relief from the automatic stay to exercise this right. Clearly, under the terms of the June 14 Agreement, the right to appoint a new CEO constituted an attempt to exercise control over the assets of the debtor. 11 U.S.C. § 362(a)(3). Thus, the attempt to appoint Robert Sick as the CEO without first requesting relief violated the automatic Stay.

Moreover, the Court would not have granted relief to permit Burlingame to exercise this remedy unless it was prepared to grant relief from stay in toto. In a chapter 11 case, the debtor-in-possession is a fiduciary for all creditors. If the debtor-in-possession is not performing this function, the appropriate remedy is to move for appointment of a chapter 11 trustee. Burlingame would have the right to suggest that Robert Sick be appointed in this capacity. However, the Court has the right to decide whether a chapter 11 trustee should be appointed, and the Office of the United State Trustee has the right to select the individual to perform that role.

Case: 04-04190   Doc# 192   Filed: 02/08/06   Entered: 02/09/06 10:30:56   Page 39 of 67

In sum, the Court finds that the Koellings have not acted in bad faith within the meaning of the Good Faith Provision and that their refusal to let Robert Sick take over Qmect and the new CEO after the chapter 11 was filed does not deprive them of the right to a release from the Comerica Guaranties.

## 2. Koelling Cross-Complaint

As tried to the Court, the Koelling Cross-Complaint included three claims for relief, for (1) breach of contract, (2) intentional interference with prospective economic advantage, and (3) declaratory relief. The Koellings have the burden of proof on all three claims. The Court's findings of fact and conclusions of law with respect to these claims are set forth in Section B-2-a, B-2-b, and B-2-c, respectively.

### a. Breach of Contract

In this claim for relief, the Koellings alleged that, after Burlingame's exclusive bidding period expired, they worked with SCG over a period of months to assist SCG in purchasing the Original Comerica Loans, incurring substantial costs in the process. About the time that the Qmect Funding Sale Agreement was ready to be signed, Burlingame learned about it. Burlingame's counsel threatened Comerica with litigation if Comerica proceeded with the sale, thereby causing Comerica to withdraw from the agreement. The claim for relief alleged that the Koellings were damaged as a result of the breach.

As set forth above, in connection with Qmect's similar claim for breach of contract, the Court finds and concludes that the

40

Koellings performed their obligations under the June 14 Agreement, that Burlingame breached its obligations by sending the Second and Third Litigation Threat Letters, and that by its breach, Burlingame caused Comerica to renege on its agreement to sell the Original Comerica Loans to Qmect Funding. However, for the same reasons stated in connection with that claim, the Court finds and concludes that judgment must be granted in favor of Burlingame on this claim.

The Koellings failed to present persuasive evidence that they were damaged by Burlingame's breach: i.e., that they would have been better off if Qmect Funding had acquired the Original Comerica Loans. Notably, they had no agreement with Zakariya that Qmect Funding would release them from the Comerica Guaranties if it acquired the Original Comerica Loans. Although they did present evidence that they spent a substantial amount of money assisting Qmect Funding in its attempt to acquire the Original Comerica Loans, they would have been required to spend this money in any event if the Qmect Funding Sale Agreement had gone through. No evidence was presented that they would have been reimbursed for these expenditures.

**b. Intentional Interference With Prospective Economic Advantage**

In this claim for relief, the Koellings alleged that, in February 2004, Burlingame knew that SCG was about to acquire the Original Comerica Loans. It knew that this would have significantly eased Qmect's debt burden and that the Koellings

41

would have been released from the Comerica Guaranties. The Koellings alleged that Burlingame intentionally interfered with the SCG acquisition by causing Comerica to renege on its agreement to sell the Original Comerica Loans to SCG.

As a result, the Koellings alleged, they have a significantly higher debt on the Original Comerica Loan--i.e., pursuant to the Comerica Guaranties--that they would have had if SCG had acquired them. They have also been required to defend Burlingame's frivolous claim that the Comerica Guaranties have not been released. For the reasons discussed above, this claim must also fail.

The elements of a claim for intentional interference with prospective economic relations have been recited above in connection with Qmect's similar claim and will not be repeated here. It was undisputed that, at the time the Second and Third Litigation Threat Letters were sent, Burlingame knew about Qmect's and the Koellings' relationship with SCG and Qmect Funding. However, the evidence presented did not support the allegation that Burlingame knew that Qmect and the Koellings would be better off financially if Qmect Funding purchased the Original Comerica Loans. The evidence merely supported the finding that the Judsons felt that Burlingame would be worse off financially if this occurred. More important, the Court was not persuaded that, more probably than not, Qmect and the Koellings would have been better off if Qmect Funding had purchased the Original Comerica Loans.

The Koellings simply failed to meet their burden of proof on this issue.

The Koellings also claim as an element of damages that, if Qmect Funding had acquired the Original Comerica Loans, they would not have had to defend against a frivolous claim that they were not entitled to a release from the Comerica Guaranties. This claim has several problems. First, although the Court has found in favor of the Koellings on this claim, it does not find the contention frivolous. Second, and more important, the reason they would not have had to defend against a claim of this sort is that, if Qmect Funding purchased the Original Comerica Loans, the Koellings had no contractual right to a release from the Comerica Guaranties. This can hardly be seen as an improvement in the Koellings' position.

**c. Declaratory Relief**

In this claim for relief, the Koellings alleged that a controversy has arisen concerning the rights and duties of the parties under the terms of the June 14 Agreement, including (1) whether the June 14 Agreement constitutes a valid and binding obligation, (2) whether the Koellings performed under the June 14 Agreement, (3) whether Burlingame breached its obligations under the June 14 Agreement, (4) whether the Koellings acted in good faith throughout the bidding process, and (5) whether the Koellings are released from the Comerica Guaranties.

43

This claim for relief overlaps with or duplicates other claims asserted in these consolidated proceedings. However, the Court will repeat its findings and conclusions here:

(1) No factual or legal basis was presented at trial challenging the validity or enforceability of the June 14 Agreement. Therefore, the Court finds and concludes that it is a valid and enforceable agreement.

(2) The Court finds and concludes that the Koellings performed their obligations under the June 14 Agreement.

(3) The Court finds and concludes that Burlingame breached its obligation under the June 14 Agreement to act in good faith to achieve the purposes of the agreement.

(4) The Court finds and concludes that the Koellings acted in good faith to achieve the purposes of the June 14 Agreement.

(5) The Court finds and concludes that the Koellings are entitled to a release from their obligations under the Comerica Guaranties.

**C. BREACH OF FIDUCIARY DUTY ACTION**

As tried to the Court, the Breach of Fiduciary Duty Complaint no longer had any claims for relief. However, the Burlingame Cross-Complaint contained six claims for relief: (1) breach of unconditional guaranty, (2) tortious interference with contractual relations, (3) breach of fiduciary duty, (4) contractual/implied indemnity and contribution[11], (5) declaratory relief, and (6)

_____

[11]The Burlingame Cross-Complaint contains a general allegation that Qmect is the alter ego of the Koellings. Some

44

breach of subordination agreement. All six claims were asserted against the Koellings. The fourth, fifth, and sixth claims were also asserted against Qmect. Burlingame has the burden of proof on all six claims. The Court's findings of fact and conclusions of law with respect to all six claims are set forth in sections C-1, C-2, C-3, C-4, C-5, and C-6 below.

### 1. Breach of Unconditional Guaranty

In this claim for relief, Burlingame alleged that the Koellings executed the Burlingame Guaranty, guaranteeing the performance of Qmect's obligations under the Burlingame Loan Agreement. It alleged that the Koellings breached their obligations under the Burlingame Guaranty by failing to pay the obligations due under the Burlingame Guaranty upon demand. Burlingame presented sufficient evidence to support these allegations at trial, and the Koellings presented no contrary evidence. The only issue presented by this claim is whether Burlingame is entitled to satisfy its judgment on this claim from the Koellings' interest in Kids Connection: i.e., whether the Koellings' conduct has deprived them of the Carve Out and, if so, to what extent.

As recited above, the Carve Out--paragraph 9 of the Burlingame Guaranty--prevented Burlingame from seeking to satisfy its claim under the Burlingame Guaranty against the Koellings' interest in Kids Connection. However, the effectiveness of the

---

of the claims are asserted against the Koellings as well as Qmect in reliance on that theory.

45

Carve Out depended upon the Koellings' not investing "additional cash or other assets" in Kids Connection and not purchasing additional shares of stock or any other form of ownership in Kids Connection. At trial, Burlingame contended that the Koellings lost their right to the Carve Out by virtue of the September 2002 Salary Increase and the June 2003 $1.5 Million Note assignment. The Koellings contended that neither of the actions were sufficient to deprive them of the Carve Out. Alternatively, they contended that, if the June 2003 $1.5 Million Note assignment violated the Carve Out provision, the only asset that was thereby exposed to Burlingame's claim was the $1.5 Million Note.[12]     As recited above, the undisputed evidence presented at trial established that, in September 2002, Linda Koelling entered into an agreement with Kids Connection, increasing her annual salary from $80,000 to $225,000 and securing it with a deed of trust on the Kids Connection Real Property. Burlingame contended that this constituted the investment of additional cash of other assets in Kids Connection, thereby depriving the Koellings of the right to the Carve Out. This contention has no merit. To the contrary, Linda Koelling's increased salary and the lien on the Kids Connection Real Property securing her right to that salary

---

[12]The Koellings also argue that, even if either of these events constituted the transfer of an asset, the result of the event would not be a total loss of the Carve Out. The asset transferred would simply be made available to satisfy Burlingame's judgment on the Burlingame Guaranty. This argument is clearly at odds with the plain language of Carve Out.

46

increased the Koellings' personal assets available to Burlingame for execution of any money judgment.  While this additional or enhanced asset was related to Kids Connection, it did not constitute an interest in Kids Connection.  Therefore, it was not an Excluded Asset, within the meaning of the Carve Out.

On the other hand, the Court finds and concludes that assignment of the $1.5 Million Promissory Note to Kids Connection does deprive the Koellings of their right to the Carve Out.  Prior to its assignment, the $1.5 Million Promissory Note was an asset of the Koellings available for execution of a money judgment obtained by Burlingame.  After its assignment, if the Carve Out were enforced, it would be not be available for that purpose. Thus, in theory at least, the assignment of the $1.5 Million Note to Kids Connection decreased the assets available to Burlingame for execution and increased the value of Linda Koellings' interest in Kids Connection.  This is precisely the situation addressed by the Carve Out.

The Koellings contend that they should not lose the Carve Out as a result of this transaction for two reasons.  First, they contend that they were only the nominal owners of the $1.5 Million Note.  They presented persuasive evidence that the funds loaned to Qmect, as evidenced by the $1.5 Million Note, came from Kids Connection, not them.  They documented the transaction as a loan from Kids Connection to themselves and a second loan from themselves to Qmect on advice of their accountant, for tax purposes.

47

The Court is not persuaded by this contention. When the Koellings signed the Comerica Guaranty, they were entitled to repayment of the $1.5 Million Note, not Kids Connection. Burlingame knew about the loan and that the Koellings were the holders of the $1.5 Million Note. The Carve Out was negotiated based on the Koellings' assets at that time. If the parties had intended that the assignment of $1.5 Million Loan to Kids Connection would not deprive the Koellings of the Carve Out, that exclusion would surely have been spelled out in the Comerica Guaranty.

Second, the Koellings contend that the assignment of the $1.5 Million Note should not deprive them of the Carve Out because the $1.5 Million Note had no value. Persuasive evidence was presented that, at the time the $1.5 Million Note was assigned to Kids Connection, Qmect was insolvent, on both a going concern and liquidation basis. Thus, more likely than not, the $1.5 Million Note had no monetary value.

The question remains whether the term "asset" as used in the Carve Out should be read to mean "asset with a monetary value." The term "asset" in not defined in the Burlingame Guaranty. However, Black's Law Dictionary defines "assets" as "[p]roperty of all kinds...." It does not limit the definition to property with a monetary value. Moreover, even though Qmect could not have repaid the $1.5 Million Note, it does not follow that the $1.5 Million Note had no value to Burlingame.

48

Prior to June 9, 2003, pursuant to the Burlingame Guaranty, Burlingame had the right to foreclose on Fred Koellings' stock which, at that time represented a majority interest in Qmect. If Burlingame had exercised that right, it would become the majority owner of Qmect. If the Koellings had retained the $1.5 Million Note, Burlingame could have increased the value of its equity interest by foreclosing on the $1.5 Million Note and then releasing it.

Moreover, the value of Qmect's assets more likely than not exceeded the balance of the Original Comerica Loans. It seems inappropriate to include Burlingame's own secured loans in the calculation by which one determines that the $1.5 Million Note had no value. In sum, the Court concludes that the assignment of the $1.5 Million Note did constitute the investment of an additional asset in Kids Connection, thereby depriving the Koellings of the Carve Out.

**2. Tortious Interference With Contractual Relations**

In this claim for relief, Burlingame alleged that, in 2001, Qmect and Burlingame entered into the Burlingame Loan Agreement.[13] In paragraph 7 of the Burlingame Loan Agreement, Qmect agreed not

_____

[13]This claim for relief mistakenly includes Kids Connection as a cross-defendant. The claims against Kids Connection have been remanded to state court. In addition, Fred Koelling was added as a cross-defendant to this claim. Finally, the Court believes that Burlingame intended to allege that both the Koellings knew of the agreements, not just that Linda Koelling knew of them.

49

to do certain things without Burlingame's consent.[14] Burlingame alleged that the Koellings tortiously interfered with these contractual obligations by causing Qmect to breach them: i.e., by issuing additional stock and transferring it to Kids Connection, BDS, McNeil, and Qmect Funding. With respect to this claim, Burlingame sought both compensatory and punitive damages.[15]

As noted by Burlingame, to establish this claim, it was required to prove: (1) the existence of a contract between Qmect and Burlingame, (2) the Koellings' knowledge of that contract, (3) the Koellings' intent to disrupt Qmect's performance of that contract, (4) the actual disruption of performance, and (5) causation: i.e., that the Koellings' conduct was a substantial

---

[14]Burlingame also alleged in this claim that the Koellings tortiously interfered with Burlingame's contractual relations with Qmect by reassigning the $1.5 Million Note to Kids Connection, by issuing additional stock and transferring it to Kids Connection in satisfaction of $250,000 of the $1.5 Million Note obligation, and by failing to deliver the Kids Connection Stock to Burlingame as required by the Subordination Agreement. To the extent these allegations are based on a breach of the Subordination Agreement, they are not appropriately included in this claim for relief. The Subordination Agreement imposed obligations on Koellings, not Qmect. A claim for tortious interference cannot be based on a breach of one's own contract. These allegations are set forth more appropriately in the last claim for relief, for breach of the Subordination Agreement. See below.

[15]Burlingame sought a determination that Kids Connection was the Koellings' alter ego such that the assets of Kids Connection would be available to satisfy this claim. The Court was not persuaded by the evidence presented at trial that Kids Connection's separate corporate status should be disregarded in this fashion.

50

factor in causing the disruption. An officer or shareholder is not automatically immune from such a claim. However, an officer or shareholder may establish a privilege defense by proving that he or she acted for the benefit of the corporation. See Woods v. Fox Broadcasting Sub., Inc., 129 Cal. App. 4th 344, 350-56 (2005).

The undisputed evidence clearly established three of the five elements of the claim. Burlingame and Qmect were parties to the Burlingame Loan Agreement. The Koellings knew of the Burlingame Loan Agreement. Moreover, by causing Qmect to issue and transfer additional stock so that the Burlingame Stock Collateral no longer represented a majority interest in Qmect, Fred Koelling effectively induced Burlingame to cancel its foreclosure sale of the Burlingame Stock Collateral.

Fred Koelling disputed the contention that he caused Qmect to issue and transfer the additional stock in order to disrupt Qmect's performance. He testified that his motives in causing Qmect to issue and transfer the stock were unrelated to Burlingame's efforts to foreclose. The Court did not believe him. Thus, the third element of the claim is also established. The remaining issues are (1) whether the issuance and transfer of the additional stock violated the Burlingame Loan Agreement and (2) if so, whether Fred Koelling has established a privilege defense.[16]

---

[16]The evidence presented failed to establish that Linda Koelling had any active participation in this transaction. Therefore, this claim will not lie against her.

51

Burlingame alleged that Qmect's issuance of additional shares in June 2003 violated the seven negative covenants contained in paragraph 7 of the Burlingame Loan Agreement: (1) paragraph 7.1, disposing of any assets outside the ordinary course of business, (2) paragraph 7.2, permitting a Change in Control, (3) paragraph 7.5, incurring or permitting to be incurred a lien on its assets, (4) paragraph 7.6, paying any dividends, (5) paragraph 7.8, entering into any material transaction with an affiliate outside the ordinary course of business, (6) paragraph 7.9, making any payment on any subordinated debt, and (7) paragraph 7.12, entering into a contract with a provision restricting the creation of a security interest in Qmect's property.

The claim that Burlingame violated the negative covenants in paragraphs 7.5, 7.6, 7.9, and 7.12 lacks any merit and may be disposed of summarily. No evidence was presented that Burlingame incurred or permitted to be incurred any lien on its property (paragraph 7.5), paid any dividends to shareholders (paragraph 7.6), made any payment on subordinated debt--i.e., to the Koellings (paragraph 7.9), or entered into a contract with a provision restricting the creation of a security interest in Qmect's property (paragraph 7.12). The claim that Burlingame breached three of the negative covenants contained in paragraph 7--paragraphs 7.1, 7.2, and 7.8--requires some discussion.

**Paragraph 7.1**

In paragraph 7.1 of the Burlingame Loan Agreement, Qmect agreed not to transfer any of its property to a third party

52

outside the ordinary course of business without Burlingame's consent. It is undisputed that the issuance and transfer of the additional stock in June 2003 was outside the ordinary course of business and that Burlingame did not consent to the transaction. The only issue is whether the issuance and transfer of previously unissued stock in a corporation constitutes the transfer of property of the corporation. The Court concludes that it does not.

In <u>Decker v. Advantage Fund Ltd.</u>, 362 F.3d 593 (9th Cir. 2004), a chapter 7 trustee sued to avoid as fraudulent the transfer by an insolvent corporate debtor of previously unissued stock. At issue in the case was whether the stock constituted property of the debtor corporation. The <u>Decker</u> court held that it was not, that it was merely equity in the corporate debtor. The <u>Decker</u> court cited with approval <u>In re Curry & Sorenson, Inc.</u>, 57 B.R. 824, 829 (Bankr. 9th Cir. 1986), which reached the same conclusion. <u>Decker</u>, 362 F.3d at 596. Based on this authority, the Court concludes that Fred Koelling did not violate the negative covenant in paragraph 7.1 of the Burlingame Loan Agreement by causing Qmect to issue and transfer the additional stock in June 2003.

**Paragraph 7.2**

In paragraph 7.2, Qmect agreed not to suffer or permit a Change in Control without Burlingame's consent. It is undisputed that Burlingame never consented to a Change in Control. Burlingame contends that the issuance and transfer of the

53

additional stock to Kids Connection constituted a Change in Control. Change in Control is a defined term. However, essentially, it means that someone other than Fred Koelling would hold a majority of the stock "ordinarily entitled to vote."

Burlingame concedes that the issuance and transfer of the additional stock to Kids Connection Funding did not give Kids Connection a majority of the stock. However, it contended that the issuance and transfer gave Kids Connection Funding a majority of stock entitled to vote. It reached this conclusion based on the provision in Subordination Agreement giving Burlingame, rather than Fred Koelling, the right to vote Fred Koelling's stock if Qmect were in default. This method of counting cannot be squared with the  phrase recited above: i.e., "ordinarily entitled to vote"  Thus, the Court concludes that Qmect did not violate the negative covenant set forth in paragraph 7.2 by issuing and transferring the additional stock to Kids Connection in June 2003.

**Paragraph 7.8**

In paragraph 7.8, Qmect agreed not to enter into any material transaction with an affiliate outside the ordinary course of business. Burlingame contends that by Qmect violated this provision by issuing and transferring additional stock to Kids Connection in exchange for which Kids Connection forgave $250,000 of the obligation represented by the $1.5 Million Note. The Court agrees.

Kids Connection was owned by Linda Koelling who was also a shareholder of Qmect. Thus, Kids Connection was an affiliate of

54

Qmect. The issuance and transfer of the additional stock in June 2003 was clearly outside the ordinary course of business. Since it altered Fred Koelling's percentage of the stock from a majority to 12 percent, it was clearly a material transaction. Fred Koelling clearly participated in this transaction and is liable on the claim. The case against Linda Koelling is not as strong. However, as a director, the transaction could not have occurred without her consent. Therefore, the Court finds her liable on the claim as well.

However, Burlingame failed to establish any compensatory damages at trial for which the Koellings are not already liable pursuant to the Burlingame Guaranty. Burlingame also sought punitive damages. The Court finds and concludes that the Koellings' conduct under these circumstances does not warrant the imposition of punitive damages. Thus, Burlingame is entitled to judgment on this claim in the amount of the additional interest that accrued and costs of collection incurred on the Burlingame Proof of Claim from June 9, 2003 to the date the Koellings filed their bankruptcy petition.

**3. Breach of Fiduciary Duty**

In this claim for relief, Burlingame alleged that the Koellings are directors of Qmect. It alleged that, on June 11, 2003, the Koellings moved for a temporary restraining order so as to restrain Burlingame's public sale of Qmect's stock and that their motion was denied. It alleged that, on June 12, 2003, with the intent to hinder, delay, and defraud Burlingame's rights under

55

the Burlingame Loan agreements, the Koellings improperly caused Qmect to issue additional stock to Kids Connection, BDS, McNeil, and Qmect Funding. It alleged that the improper issuance of this stock diluted Fred Koelling's interest in Qmect from a controlling interest to 12 percent, which substantially decreased its value as Burlingame's collateral.

Burlingame alleged that, at the time the additional stock was issued, Qmect was "facing insolvency." As a result, Burlingame contended, the Koellings, as directors, owed a fiduciary duty to Qmect's creditors, including Burlingame. Burlingame alleged that Qmect breached that duty by issuing the additional stock in that the stock was issued and transferred with the intent to defraud Burlingame and was issued and transferred for less than reasonably equivalent value.

It is undisputed that the Koellings are directors of Qmect and that, in June 2003, Qmect issued additional shares of stock and transferred them to third parties. It is also undisputed that the result of this transaction was to dilute the Burlingame Stock Collateral to less than a controlling interest in Qmect. The Court finds and concludes that, more likely than not, Qmect was insolvent when this transaction occurred. As discussed above, notwithstanding Fred Koelling's testimony to the contrary, the Court was persuaded that the purpose of the issuance and transfer of this stock was to block the foreclosure sale. Thus, the transaction was intended to hinder and delay Burlingame: i.e., a creditor.

However, the claim asserted is not a fraudulent transfer claim against the third parties who received the stock, seeking to avoid the transfer. The claim is asserted against the Koellings for breach of fiduciary duty. As discussed above, the Court has already concluded that the issuance and transfer of the stock breached the Burlingame Loan Agreement and that the Koellings are liable for tortious interference with contractual relations for their role in this transaction. The question is whether they are also liable as a result of this transaction for breach of fiduciary duty. For this question to be answered in the affirmative, Burlingame must establish that the Koellings, as directors, owe Burlingame a fiduciary duty and that the issuance and transfer of the stock breached that duty.

Normally, the directors of a corporation have a fiduciary duty only to the corporation and its shareholders. A shareholder may assert two types of actions against a director: i.e., a "direct action," alleging an injury to that shareholder's particular interest, or a "derivative action," alleging an injury to the corporation for which the corporation has failed or refused to sue. Schuster v. Gardner, 127 Cal. App. 4th 305, 311-12 (2005).

When a corporation is insolvent, the fiduciary duty of the directors extends to the creditors as well as to the shareholders. Pepper v. Litton, 308 U.S. 295, 306 (1939). However, the duty only runs to the creditor body as a whole, not to any particular creditor. The trustee has the sole standing to assert a claim for

57

breach of this fiduciary duty.  Id.  Conceivably, in a bankruptcy case, a creditor or creditors' committee could be authorized by the court to assert a derivative claim for breach of fiduciary duty on behalf of the estate.  However, Burlingame has not sought authorization to assert such a claim.

Burlingame cites a series of cases, which its contends support its right to assert a breach of fiduciary duty claim on its own behalf.  None of these cases supports Burlingame's claim of standing to do so.  Therefore, the Koellings are entitled to judgment on this claim for relief.

### 4. Contractual/Implied Indemnity and Contribution

In this claim for relief, Burlingame alleged that it was entitled to be indemnified by Qmect and the Koellings pursuant to four separate agreements: (1) the November 18, 1999 letter agreement between Qmect and Sierra (the "Original Sierra Agreement"),[17] (2) the June 2001 Letter Agreement between Burlingame, on the one hand, and Fred Koelling and Qmect, on the other (the "2001 Letter Agreement"), (3) the Burlingame Loan Agreement, and (4) the Burlingame Guaranty.  Burlingame alleged that each of these agreements provided that Qmect and/or the Koellings are required to indemnify Burlingame for any claims or expenses incurred as a result of its agreements with Qmect.

---

[17]The Original Sierra Agreement was amended in March 2000 but the amendment did not alter the agreement in any way relevant to this claim.

58

Burlingame's claims clearly have no merit with respect to two of these agreements. The Original Sierra Agreement contains an indemnification provision. However, neither Burlingame nor Burlingame Funding is a party to that agreement. Burlingame is a party to the Burlingame Guaranty. However, the Burlingame Guaranty does not contain an indemnification provision.

Burlingame is a party to the 2001 Letter Agreement, and it does contain an indemnification provision. In this agreement, Burlingame expressed an interest in loaning $2,000,000 to Qmect on specified terms although it made no commitment to make any loan. The final paragraph of the 2001 Letter Agreement stated that, regardless of whether Burlingame actually loaned Qmect any money, Qmect agreed to indemnify Burlingame and hold it harmless from any claims and expenses arising out of the 2001 Letter Agreement, any financing, or any related investigation or proceeding.

Burlingame is also a party to the Burlingame Loan Agreement, and the Burlingame Loan Agreement also contains an indemnification provision. In paragraph 12.2 of the Burlingame Loan Agreement, Qmect agreed to "defend, indemnify and hold [Burlingame] harmless" from "(a) all...claims...asserted by any other party in connection with the transactions contemplated by this Agreement...and (b) all losses or...[Burlingame] Expenses...incurred...[or] paid by...[Burlingame] as a result of...[the] transactions between...[Burlingame and Qmect] whether under this Agreement, or otherwise...except for losses caused by...[Burlingame's] gross negligence or willful misconduct." Although the Koellings are not

59

parties to the Burlingame Loan Agreement, to the extent Qmect is liable to Burlingame pursuant to paragraph 12.2, the Koellings are also liable pursuant to the Burlingame Guaranty.

However, the Court concludes that this issue is moot. As discussed above, Qmect and the Koellings asserted various claims for relief against Burlingame. However, they failed to establish any of their claims. Although the indemnification provisions may still apply with respect to Burlingame's litigation expenses, to the extent they were incurred pre-petition, both Qmect and the Koellings are already liable for those expenses as costs of collection under the Burlingame Loan Agreement.

## 5. Declaratory Relief

In this claim for relief, Burlingame alleged that a controversy exists as to the parties' rights and obligations under the various agreements. It sought a determination of those rights and obligations. In particular, it sought a determination that the issuance of additional stock on June 12, 2003 constituted a fraudulent conveyance which should be set aside.

The Burlingame is not entitled to any judgment on this claim. Except with respect to the issuance of the additional stock, the claim was not alleged with sufficient specificity to permit the Court to identify the nature of the disputed rights and obligations with respect to which Burlingame seek declaratory judgment. Moreover, the claim appears duplicative of other claims asserted in these proceedings.

60

The claim for declaratory relief holding that the issuance of
the additional stock in June 2003 was a fraudulent transfer fails
for lack of standing.  When the transferor is a bankruptcy debtor,
unless a creditor or creditors' committee is authorized to bring
a derivative action to avoid the transfer, only the trustee or
debtor-in-possession to assert such a claim.  Even if the transfer
was made with the intention of hindering and delaying a specific
creditor, the transfer, if avoidable, will be avoided for the
benefit of all creditors.  In re Curry & Sorensen, Inc., 57 B.R.
824, 827-28 (Bankr. 9th Cir. 1986); Matter of Pointer, 952 F.2d 82,
88 (5th Cir. 1992).  A claim for declaratory relief may not be
prosecuted by a creditor without such authorization so as to
circumvent that limitation on standing.

**6. Breach of Subordination Agreement**

In this claim for relief, Burlingame alleged that the
Koellings and Burlingame entered into the Subordination Agreement.
It alleged that the Subordination Agreement provided in part as
follows:

> Creditor [the Koellings] shall promptly
> deliver to Lender [Burlingame] in the form
> received (except for endorsement or assignment
> by Creditor where required by Lender) for
> application to the Senior Debt [the Original
> Comerica Loans] any payment, distribution,
> security or proceeds received by Creditor with
> respect to the Subordinated Debt other than in
> accordance with this Agreement.

Burlingame alleged that the Koellings breached the Subordination
Agreement by failing to promptly deliver to Burlingame the stock
or equivalent cash value received by Kids Connection from Qmect.

61

The Subordinated Debt is defined by the Subordination Agreement as all of Qmect's debt to the Koellings, including all future debt.

The undisputed evidence presented at trial established that, on June 9, 2006, the Koellings caused Qmect to issue additional stock and to transfer some of that stock (the "Kids Connection Stock") to Kids Connection in partial satisfaction of the $1.5 Million Note. At the time the Subordination Agreement was executed, as discussed above, the $1.5 Million Note was owed by Qmect to the Koellings. Burlingame contended that the Koellings breached the Subordination Agreement by failing to promptly turn over the Kids Connection Stock to Burlingame. The Court disagrees.

As discussed above, the Koellings assigned the $1.5 Million Note to Kids Connection on June 9, 2003. Once they did this, Qmect no longer owed this debt to the Koellings. Rather, Qmect owed the debt to Kids Connection. Moreover, the Kids Connection Stock was not issued to the Koellings; it was issued to Kids Connection. Insufficient evidence was presented to establish that Kids Connection should be treated as the Koellings' alter ego so that its separate corporate status should be disregarded. Therefore, the Koellings are entitled to judgment on this claim.

CONCLUSION

The Court's rulings on the claims presented at trial in these consolidated adversary proceedings are summarized as follows:

**A. EQUITABLE SUBORDINATION ACTION**

62

**1.   Intentional Interference With Prospective Economic Advantage**

In this claim by Qmect against Burlingame, the Court grants judgment in favor of Burlingame.

**2.   Breach of Contract**

In this claim by Qmect against Burlingame, the Court grants judgment in favor of Burlingame.

**3.   Breach of Covenant of Good Faith and Fair Dealing**

In this claim by Qmect against Burlingame, the Court grants judgment in favor of Burlingame.

**4.   Objections to Proofs of Claim**

In this contested matter initiated by Qmect, the Court overrules the objections to Burlingame's proofs of claim and allows those claims as follows:

**a. Burlingame's Proof of Claim Against Qmect Estate**

The proof of claim filed by Burlingame in the Qmect bankruptcy case is allowed in the following amounts: (1) $2,000,000 in principal, (2) $1,043,635.01 in pre-petition interest, (3) $27,779.23 in late fees, and (4) $357,998.59 in costs of collection.

**b.   Burlingame's Proof of Claim Against Koelling Estate**

The proof of claim filed by Burlingame in the Koelling bankruptcy case is allowed in the following amounts:   (1) $2,000,000 in principal, (2) $1,455,180.55 in pre-petition interest, (3) $40,057.01 in late fees, and (4) $1,413.132.80 in costs of collection.

63

**c. Burlingame Funding's Proof of Claim Against Qmect Estate**

The proof of claim filed by Burlingame Funding in the Qmect bankruptcy case is allowed in the following amounts: (1) $187,500 in principal and $1,696.31 in pre-petition interest pursuant to the variable rate installment note, (2) $537,816.96 in principal and $5,052.51 in pre-petition interest pursuant to the note secured by a deed of trust, (3) $894,737.22 in principal and $8,948.32 in pre-petition interest pursuant to the amended and restated note secured by a deed of trust, and (4) $900,000 in principal and $7,850.60 in prepetition interest pursuant to the master revolving note.

**B. GUARANTY ACTION**

**1. Guaranty Complaint**

**a. Breach of Comerica Guaranties**

In this claim by Burlingame Funding against the Koellings, the Court grants judgment in favor of the Koellings.

**b. Declaratory Relief**

In this claim by Burlingame Funding against the Koellings, the Court declares that the Koellings are entitled to a release from the Comerica Guaranties pursuant to the June 14 Agreement.

**2. Koelling Cross-Complaint**

**a. Breach of Contract**

In this claim by the Koellings against Burlingame, the Court grants judgment in favor of Burlingame.

**b. Intentional Interference With Prospective Economic Advantage**

64

In this claim by the Koellings against Burlingame, the Court grants judgment in favor of Burlingame.

### c. Declaratory Relief

In this claim by the Koellings against Burlingame, the Court declares that: (1) the June 14 Agreement is a valid and binding contract, (2) the Koellings performed their obligations under the agreement, including their obligations under the Good Faith Provision, (3) Burlingame breached the Good Faith Provision of the agreement, and (4) the Koellings are entitled to a release from the Comerica Guaranties.

## C. BREACH OF FIDUCIARY DUTY ACTION--BURLINGAME CROSS-COMPLAINT

### 1. Breach of Unconditional Guaranty

In this claim by Burlingame against the Koellings, the Court finds and concludes that, by assigning the $1.5 Million Note to Kids Connection, the Koellings lost their right to the Carve Out set forth in paragraph 9 of the Burlingame Guaranty.

### 2. Tortious Interference With Contractual Relations

In this claim by Burlingame against the Koellings, the Court grants judgment in favor of Burlingame. However, it awards only compensatory damages in the amount of the additional interest accrued and costs of collection incurred from June 9, 2003 to November 16, 2004.

### 3. Breach of Fiduciary Duty

In this claim by Burlingame against the Koellings, the Court grants judgment in favor of the Koellings.

### 4. Contractual/Implied Indemnity and Contribution

65

In this claim by Burlingame against Qmect and the Koellings, the Court grants judgment in favor of Qmect and the Koellings on grounds of mootness.

**5.  Declaratory Relief**

In this claim by Burlingame against Qmect and the Koellings, the Court grants judgment in favor of Qmect and the Koellings.

**6.  Breach of Subordination Agreement**

In this claim by Burlingame against the Koellings, the Court grants judgment in favor of the Koellings.

Counsel for Burlingame and Burlingame Funding is directed to submit proposed forms of judgment in accordance with this decision.

END OF DOCUMENT

66

COURT SERVICE LIST

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery St., Ste. 1000
San Francisco, CA 94104

Tobias S. Keller
Pachulski, Stang, Ziehl, Young,
   Jones & Weintraub P.C.
Three Embarcadero Center, Ste. 1020
San Francisco, CA 94111-4023

Robert R. Moore
Allen Matkins Leck Gamble & Mallory LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111

Philip J. Nicholsen
Law Offices of Philip J. Nicholsen
221 Main St., #740
San Francisco, CA 94105

67